## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| AL'S PALS PET CARE, LLC, DeFABIO SPINE AND SPORTS REHAB, LLC, JULIE RUDIGER, INC., MENA STONE & LANDSCAPING SUPPLIES, LLC, and TULSA ART CENTER, LLC, individually and on behalf of all others similarly situated, | § § § § § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. |
| v. | § § | _____ |
| WOODFOREST NATIONAL BANK, N.A. and MERCHANTS' CHOICE PAYMENT SOLUTIONS, | § § § § | **Jury Trial Demanded** |
| Defendants. | § § | |

## CLASS ACTION COMPLAINT

COME NOW Plaintiffs Al's Pals Pet Care, LLC, DeFabio Spine and Sports Rehab, LLC, Julie Rudiger, Inc., Mena Stone & Landscaping Supplies, LLC, and Tulsa Art Center, LLC, individually and on behalf of the classes of persons and entities preliminarily defined below, and complain and allege as follows, based on personal knowledge, investigation of counsel, and information and belief.

## INTRODUCTION

1.     For years, Woodforest National Bank, through its credit card and debit card processing business called Merchants' Choice Payment Solutions ("MCPS"), has engaged in a scheme through which it defrauds and overbills its customers. Woodforest recently sold MCPS for $470 million to a British payments company, as described below. The problems detailed herein persist, however, and relief against MCPS, separate and apart from Woodforest, will be needed.

2.      In today's business world, most merchants must accept payment for goods and services via credit and debit cards to stay competitive in the marketplace.  In order to accept this method of payment, the merchant must utilize a payment processing service.  As used throughout this Class Action Complaint, the word "merchant" should be taken to mean any person or entity that accepts credit or debit cards for payments.  This includes non-profits, schools, churches, government agencies, and many persons or entities that are not traditional businesses.  All are subject to the same improper treatment by Defendants.

3.      Merchants like Plaintiffs rely on companies like Defendants to provide this critical payment processing service in accordance with fair and transparent terms.  Indeed, for many merchants, fees for card processing services are likely to be the third highest expense following labor and product costs.  Even for a very small business, these fees can easily exceed $100 per month.

4.      The card processing system can be extremely difficult to understand, with many involved parties.  For instance, in addition to the merchant who receives payment and the customer who provides such payment, the processing of a card transaction involves several other parties:

(a).      <u>The Card Issuer</u> – the company that issued the credit or debit card to the customer, which is typically a bank such as Chase or Bank of America, and which receives a fee whenever a customer uses one its cards for a transaction.  These companies receive fees that are usually calculated as a percentage of a transaction plus a per-transaction fee (e.g., 1.65% + $0.10/transaction).  There are hundreds of different card types and the fee varies based on the type of card used.  For example, rewards credit cards command a higher fee than a card with no rewards program.  The fees paid to the issuing banks are generally known as "interchange fees."

(b).   <u>The Card Network</u> – the card networks (i.e., Visa, MasterCard, and Discover) establish and publish interchange fees applicable to each type of card in their system. The card networks charge additional per transaction fees, such as access fees.  By way of example, Visa assesses an access fee known as the "APF" ("Acquirer Processing Fee"), which is currently $0.0195 per credit card transaction and $0.0155 per debit card transaction, and MasterCard charges an access fee known as the "NABU" ("Network Access Brand Usage") fee, which is $0.195 per any card transaction.  The card networks also charge various additional fees depending on the merchant and type of transaction.  These additional fees are generally known as "assessments." The fees established by the card networks (like the interchange fees) apply universally and are not subject to negotiation no matter who the customer, merchant, or processor is.  No entity aside from the card networks has the authority to modify these fees.

(c).   <u>The Payment Processor</u> – this is the entity that processes the payment and ensures that whenever a merchant receives payment for an item or service with a credit or debit card, (i) the customer's card account is debited and the merchant's bank account is credited, (ii) the merchant is assessed all applicable fees, and (iii) such fees are distributed to the proper parties.

(d).   <u>The Member Bank</u> – only banks such as Woodforest National Bank may be members of card networks.  These member banks "sponsor" payment processors so they may process transactions through the card networks.  Unsurprisingly, MCPS works primarily with Woodforest as its member bank thus, once again, allowing more of the revenue earned from customers to stay under the Woodforest corporate umbrella, and increasing group profits.

(e).   <u>The Merchant Acquirer</u> – this is the company that markets the payment processor's services to merchants.  Merchant acquirers essentially act as a "middle man" between merchants and payment processors.  They enroll merchants in payment processing services and

usually provide customer support to the merchant, such as sending monthly statements showing all credits and debits.  Merchant acquirers usually work with independent agents or companies, sometimes known as Independent Sales Organizations (ISOs) or Member Service Providers (MSPs), which sign up merchants.  The merchant acquirer then pays the ISO/MSP based on a percentage of the processing fees obtained from "their" merchants.  Defendant MCPS is a merchant acquirer but also signs up merchants directly, and so qualifies as an ISO/MSP as well. MCPS – or one of its affiliates – serves as a merchant acquirer for all of Woodforest's merchant services customers.  In this way, more of the revenues and profits from customer transactions stayed with Defendants than is often the case.

5.      Before the sale of MCPS, the number of shell companies held under the "Woodforest" umbrella made it particularly difficult for merchants to know which parties they were interacting with.  Merchants were left with no way of knowing how certain fees were distributed, thereby hindering their ability to question improper "junk" fees.

6.      The number of involved parties made it difficult for merchants to understand what payment processing fees were assessed and how they are calculated.  Discovery may reveal that additional parties, including companies affiliated with the current owners of MCPS, should be added as Defendants.

7.      Unfortunately, Defendants' business plan has long been to exploit their position of knowledge and power in an inherently confusing industry to defraud and overcharge merchants. Defendants are notorious for tricking merchants into signing up for their "services."  Their various corrupt methods are described below.  Even when Defendants actually gain a new customer through a legitimate process, they misrepresent the true terms by failing to disclose that the

merchant is going to be flooded with additional payment processing fees that either were never disclosed or were mischaracterized.

8.     Defendants have aggressively perpetrated their schemes.  Despite full knowledge of their troubling business practices at the highest levels of MCPS and Woodforest, their fraudulent and unethical practices have continued unabated.   Moreover, their standardized payment processing paperwork and contracts used by all agents and employees has continued to intentionally misrepresent, omit, and/or conceal key facts concerning the fees they know they will eventually charge merchants if merchants sign on the dotted line.

## **DEFENDANTS' IMPROPER PRACTICES**

9.     A major element of Defendants' scheme is to contact merchants who are already with competitor payment processors in an attempt to fool them into switching providers.  MCPS and its agents mislead unsuspecting merchants and suggest they are in fact the merchant's current payment processor calling to make sure the equipment previously provided by such processor is compliant with new standards or to save them money with a better rate plan.  This scheme results in merchants signing three-year agreements with Defendants for payment processing services the merchant does not want or need.  This practice is commonly known as "slamming" in the payment processing industry.  Defendants are the foremost purveyors of "slamming" and are universally reviled by honest participants in the payments business.

10.    Small business owners have posted innumerable independent reports of Defendants' practices.  For example, one business posted this in 2017:

> This company contacted my business in March, 2017.  They led us to
> believe they were our current CC company, and so they sent new contract,
> terminal, and so forth.  After terminal arrived, we called our CC company
> to get it set up.  Lo and behold, it wasn't their terminal.

Another merchant posted this in December 2016:

> Deceptive sales practices. Pretended to be my current processing company. Called and attempted to cancel application within minutes of my employee e-signing (without authorization mind you) and no one will help me. It has been 3 days and I have gotten no where. This is a horrible horrible company.

Yet another similar complaint was posted in March of 2016:

> Said they were my bank and I had to change terminals. Said they were their new processors. Scammed me. Received terminal that did not work, technical support was not understandable, did not speak English. They said I have a refund to someone for $300 and terminal didn't work! Still trying to figure out. Be careful!!!!!

And another from 2017:

> Shady outfit. Do NOT use!! My experience is they solicit business without disclosing who they are or what bank they are associated with and allow you to think it's your existing processor offering an upgrade in equipment and a discount in processing fees. Then they nickel and dime you like crazy from set up fee to cancelation fee. They are crooks in my opinion.

These are but a few examples. Such complaints span several years and are included on numerous small business websites and social media.

11.    A detailed video program exposing Defendants' scams can be viewed at the following link:

http://www.merchantservicesfraudalertassociation.com/perverting-interchange-plus-two.html

This 25-minute video details the elaborate nature of Defendants' fraud. It describes the initial calls to merchants, the well-practiced lies of Defendants' agents and employees, and confirms that Defendants' illegal acts are directed from and carried out at the "home office," not just by far-flung sales agents.

12.    Notably, the documentation and methods shown and described in the exposé by the Merchant Services Fraud Alert Association are the same as those used to trick Plaintiffs. Plainly,

Defendants' training is uniformly unethical and they have provided sales agents the tools to carry out their fraudulent scheme over a period of several years and from coast-to-coast.

13.     Former agents and employees of Defendants have also confirmed Defendants' knowledge of improper practices.  This is not a situation where rogue agents have carried out a scheme without corporate knowledge.  Defendants have embraced this scheme, including paying substantial amounts to sales agents that are known fraudsters.

14.     Conscientious members of the payments industry are disgusted by Defendants' practices.  Defendants are truly the worst of the many bad apples in a troubled industry.  They are notorious for giving the industry a bad name.

15.     Defendants' scheme results in merchants unknowingly granting Defendants the ability to take money out of their checking account.  Merchants are often stuck paying monthly fees for years after Defendants refuse to acknowledge that the contracts resulted from fraud.

16.     Even when merchants insist on terminating their unwanted relationship with Defendants, Defendants still guarantee themselves a profit via an early termination penalty fee buried within their form contracts.  Even if merchants never intend to sign up with Defendants and never use any of Defendants' "services" – as was the case, for example, with Plaintiff Julie Rudiger, Inc. – Defendants profit.

17.     Defendants know full well that if merchants knew they were not affiliated with their current payment processing company and/or the true nature and extent of the fees they would eventually be charged, they would never agree to do business with Defendants.

18.     After inducing merchants to bind themselves to the standardized contract, Defendants then systematically cram merchants with fees that were either not disclosed in the

contract or violate the express terms of the agreement.  Moreover, Defendants format their monthly statements to confuse and confound merchants and obscure overcharges.

19.     Out of Defendants' 70,000 customers, many were not signed up through Defendants' telephone fraud ring.  These customers are not free from Defendants' improper conduct, however, but are subject to cramming of improper fees and fee increases in violation of their contracts.

20.     Defendants' sales agents are provided training and told to use certain arguments when potential customers raise concerns.  For example, customers often ask what is the term or duration of the agreement.  Defendants' form contract establishes a three-year term, with no cancellations allowed without penalty.  Defendants instruct agents to state: "The reason it is to your advantage to sign a multi-year contract with us is because your rate will not go up during the length of the contract, the only rates that could ever go up are card network pass through fees, we will not raise our fees, so it is to your benefit to lock in these low rates."  This statement is false, yet Defendants intentionally instruct their agents to lie to customers.

21.     Those who complain about the improper overcharges are simply routed into an endless loop of automated messages and holding the line in Defendants' so-called customer service system.  The end result for most merchants is that the only way out of paying the improper fees is to pay the extortionate early termination fee ($495), which exceeds an amount that many small businesses can pay.

22.     When honest sales agents for Defendants have complained to the "home office" about fee increases against customers they have signed up (and, of course, promised that fees would not increase based on Defendants' training) they are told "everyone does that."  Specifically, Defendants' "home office" employees acknowledge that customers have been told there will not

be payment processing fee increases, but that Defendants knowingly breach this commitment. Some sales agents have quit because Defendants made liars out of them by raising fees on customers despite the promises all sales agents are told to make during their training.

23.     This case challenges all improper fees imposed by Defendants, whether the result of fraudulently induced contracts or overcharges that violate the contract.

24.     Shockingly, Defendants have been able to keep their schemes going for years. Payment processing is largely unregulated, so no governmental agency is directly charged with overseeing MCPS.  The industry has been called "the wild, wild west."  Still, Defendants have been sanctioned by at least one state's attorney general.

25.     After hearing complaints from numerous citizens, the Attorney General for New Hampshire opened an investigation of MCPS.  In September of 2015, MCPS and its Florida affiliate – Merchants' Choice of Florida – agreed to an "Assurance of Discontinuance" with the Attorney General.  The Attorney General's press release summarized the investigation as follows:

> These companies initiated thousands of solicitations calls, both in-person and through telephone contacts, to New Hampshire businesses who accept credit card payments from their own customers, attempting to solicit the businesses to enroll in payment processing services, merchant account monitoring and other ancillary services.  Both companies were unable to quantify the exact number of these calls made to New Hampshire businesses.

> These solicitations were conducted through a pre-approved script that failed to identify the legal name of the company and failed to inform consumers that the company making the calls is located in the state of Florida.  In addition, the script failed to provide a phone number for consumers to call back with any follow-up questions or concerns.  Further, the script characterized the offer being made as an "upgrade" of the existing payment processing equipment, when, in fact, the solicitations were an attempt to identify new customers to enroll in new services.  Finally, the script made several references to a "free" replacement of card payment processing equipment without clearly communicating to the consumers that the new equipment was conditioned on purchasing and remaining enrolled in their services.

> Neither company had registered to do business with the New Hampshire Secretary of State.

Under the terms of the Assurance, both companies agree that they will not renew solicitations in New Hampshire until they are duly registered with the Secretary of State and that, prior to renewing solicitations, they must submit a revised solicitation script for the Attorney General's approval. They must pay a combined sum of $5,000 to the State in lieu of a civil penalty and must reimburse the State for the cost of the investigation.

Rather than operate under such transparency, MCPS has chosen not to register with the New Hampshire Secretary of State.  Indeed, as of December 22, 2017, neither entity was registered with the state.  Unfortunately, there is nothing special about New Hampshire; MCPS uses the same methods in all other states as well.

26.     The Better Business Bureau ("BBB") has taken the extraordinary step of issuing an alert to warn people away from doing business with MCPS.  The BBB prominently states as to MCPS: "THIS BUSINESS IS NOT BBB ACCREDITED."  Over 80 victims of MCPS have gone through the formal BBB process of filing a complaint or review of MCPS.  After hearing of the same practices over and over again, the BBB issued this alert on the first page of its profile of MCPS:

PATTERN OF COMPLAINT
Since September 2013, the BBB Houston & South Texas have received several disputes that exhibit the following pattern.

According to disputes received at the BBB, it has been alleged, that Merchant's Choice Payment Solutions, Inc. is using deceptive sales practices to sell new credit card machines to companies.  Complainants are informed by Merchant's Choice that their current credit card machine carrier and the current machine need to be replaced to meet Payment Card Industry Data Security Standards.  Upon realizing that they are now dealing with a new company, attempts are made to contact Merchant's Choice which go unanswered and subsequently the complainant would be under contract with Merchant's Choice Payment Solutions, Inc. for 2 – 4 years.  Consumers also allege the annual fee, monthly fee and PCI charges were waived by the sales person but when their first bill arrives, these fees are included.  When complainant tires to cancels prior to end of this long contract, a large cancellation fee is charged.

The BBB has also rated other MCPS-related entities as "NOT ACCREDITED."

27.     Small business websites and more general social media postings include hundreds of complaints against MCPS.

28.     A complete description of Defendants' bad practices would run to hundreds of pages.  Far lesser misdeeds have led to the federal criminal prosecution of one of Defendants' competitors.  On May 2, 2017, two individual agents of Commerce Payment Group were indicted on mail and wire fraud.  *See* Indictment in Case No. 17-CRIM-248 (S.D.N.Y.).  The agents stand accused of committing mail and wire fraud and conspiracy to commit mail and wire fraud by, among other things, (a) advertising low payment processing fees despite knowledge that that actual fees would be much higher, (b) inducing merchants to sign applications identifying fees that were not the actual fees that would be assessed, (c) concealing the terms from merchants, and (d) imposing fees that were much higher than those that had been advertised and disclosed.

29.     The allegations against Defendants herein are far more scandalous than those deemed criminal violations in the Commerce Payment Group indictment.

## PARTIES

30.     Plaintiff Al's Pals Pet Care, LLC is an in-home dog walking and pet sitting service in Connecticut.  Its owner has turned her love of animals into a successful small business.

31.     Plaintiff DeFabio Spine and Sports Rehab, LLC is a family-run chiropractic office located in New Jersey.  Dr. DeFabio has been named Chiropractor of the Year by the Association of New Jersey Chiropractors.

32.     Plaintiff Julie Rudiger, Inc. provides psychotherapeutic services to individuals and couples in the Denver, Colorado area.  Owner Julie Rudiger uses a combination of therapy models to treat several conditions.  Ms. Rudiger accepts credit and debit card payments in order to provide convenient options to her patients.

33.     Plaintiff Mena Stone & Landscaping Supplies, LLC is a small business selling stone, plants, and other landscaping items in Mena, Arkansas.

34.     Plaintiff Tulsa Art Center, LLC describes itself as a "comprehensive art-centered educational community where some of Tulsa's finest artists inspire students of beginning levels of all ages to achieve their creative goals."

35.     Defendant Woodforest National Bank, N.A. ("Woodforest") is a privately-held business entity headquartered in The Woodlands, Texas.   Woodforest Bank participates in numerous financial service sectors, including "traditional" banking activities through its many branches, often located in Wal-Mart retail stores.  Additionally, Woodforest acts as a member bank for the major credit card brands and hosts MCPS as an ISO.

36.     Woodforest has a history of overreaching and "pushing the envelope" to maximize profits at the expense of customers.  For example, Woodforest's overdraft practices with its banking customers were the subject of scrutiny and penalties by the Office of Thrift Supervision ("OTS") and the Office of the Comptroller of the Currency ("OCC").  The OCC conducted an examination into Woodforest's overdraft practices and found a variety of improprieties.  These were summarized in a Consent Order that was ultimately accepted to resolve the issues.  *See* OCC Consent Order in Matter AA-EC-10-93.   Of particular interest to the allegations against Defendants, the OCC found that Woodforest marketed or promoted its deposit account products through a brochure that highlighted the free or low cost features of certain accounts while omitting information about costly features of the account, such as overdraft protection.  *Id.* at Art. 1, ¶ 4. The Consent Order agreed to between the OCC and Woodforest called for a correction of the aforementioned conduct and the imposition of a civil monetary penalty in the amount of $1,000,000.  *Id.* at Art. 2, ¶ 1.

37.     Also, the OTS issued an Order to Cease and Desist to Woodforest that, among other things, established that the bank's Board of Directors was required to create a new plan to govern overdraft programs offered by Woodforest that was acceptable to the OTS's Regional Director. *See* OTS Order No. WN-10-16.  The OTS ordered Woodforest to create a Remuneration Plan to compensate its customers for their financial losses as a result of Woodforest's conduct.  *Id.* at ¶¶ 15-19.

38.     Woodforest was also sued based on its improper overdraft practices.  After two years of litigation, the Unites States District Court for the Northern District of Georgia approved a class action settlement whereby a total amount of $7.75 million was returned to customers that had been damaged.  *See* Final Approval Order, Dkt. No. 84 in Civil Action No. 1:12-cv-103-CAP.  Unfortunately, Woodforest's avaricious behavior continued unabated even after its overdraft problems were resolved.

39.     Defendant Merchants' Choice Payment Solutions is a Member Services Provider (sometimes referred to as an "MSP") and Independent Sales Organization (sometimes referred to as an "ISO") of Woodforest and, on some occasions, for other banks.  MCPS is headquartered in The Woodlands, Texas and was founded in 1989.  Based on the aggressive sales methods described herein, the company grew rapidly in recent years.  Various governmental filings suggest that other entities controlled by Woodforest – such Merchants Choice of Florida, Merchants' Choice Partners, and Delta Card Services – may also be liable in this matter.  It is not currently possible for Plaintiffs to unravel Defendants' corporate shell game.  Discovery will be needed to ensure all necessary entities have been named as Defendants.  Regardless of which legal entities were involved, by 2016, the "Merchants' Choice" brand had 70,000 customers and handled $19 billion dollars in transactions annually according to industry publication the *Nilson Report*.

40. MCPS was acquired by British payment company Paysafe Group, PLC ("Paysafe") in August of 2017 for a total purchase price of $470 million. This amount equates to $6714 for each customer of MCPS. Thus, there was an enormous financial incentive for Defendants to take the improper actions described below. Paysafe retained MCPS CEO Todd Linden as Paysafe's CEO of Payment Processing North America and MCPS CFO Giovanni Diano as Paysafe's CFO of Payment Processing.

41. After closing on MCPS, Paysafe immediately agreed to be purchased by a group of private equity investors led by Blackstone, one of the world's largest private equity firms. Discovery may show that naming one or more acquiring entities, or their subsidiaries or affiliates, is necessary to provide relief for improper practices that are ongoing and that have occurred since August of 2017.

## JURISDICTION AND VENUE

42. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 potential class members and the aggregate amount in controversy exceeds $5 million exclusive of interest, fees, and costs, and at least one class member is a citizen of a state other than Texas.

43. Both Defendants are Texas businesses within this judicial district.

44. Venue lies within this judicial district because Defendants mandate that suits against them be filed in either Harris County or Montgomery County (depending on the version of the form contract), both of which fall entirely within this district.

## INDIVIDUAL FACTUAL ALLEGATIONS

45.     Plaintiffs are current and former payment processing customers of Defendants.

46.     On December 14, 2016, the owner of Plaintiff Julie Rudiger, Inc., Ms. Rudiger, received a call from an agent for MCPS claiming to be Plaintiff's then-current processor.  The agent claimed that Plaintiff's transaction fees "would go up" and that they "wanted to make sure that didn't happen."

47.     Ms. Rudiger agreed that she would like to avoid any fee increases and Defendants' agent asked her to send a current statement so he could confirm her savings.  Ms. Rudiger asked: "Why don't you just pull up my information?"  The agent said "I could run downstairs and get it but it will save time if you just send it."  The agent was well trained to deliver this lie and Ms. Rudiger had no reason to suspect he was a fraudster, so she complied and faxed Defendants her information.

48.     The MCPS agent called back and confirmed to her that "we can avoid the fee increase and I can even lower your rates but I will need you to sign some new documentation." He then faxed a fraudulent cost comparison showing that Plaintiff would save money.  The cost comparison was a form created by Defendants and used by their agents to facilitate the scheme. Defendants knew the cost comparison was inaccurate.

49.     He also sent a "Merchant Payment Card Application/Agreement."  Notably, unlike nearly all other companies in the payments industry, Defendants' application is often formatted so that it does not include the agent's name or signature.  This revision is needed to avoid criminal prosecutions against Defendants' agents and employees by their victims.  Rather than a name, which could subject the agent or employee to prosecution, only an "Agent #" is listed.  In this case, Agent #7224 was to be compensated by Defendants.  Defendants pay such agents hundreds of

dollars each time they successfully trick a merchant into signing up with MCPS.  Since Defendants sold their company for the equivalent of nearly $7000 per customer, such rich commissions could easily be justified.  Even though Defendants were informed on innumerable occasions that Agent #7224 committed fraud in their names, they continued to richly reward the agent.

50.     Since it was the only way Ms. Rudiger thought she could avoid the increased fees, she completed the paperwork.  Based on the representations of Defendants' agent, and Ms. Rudiger's belief she was working with her current processor, Plaintiff signed the application on December 14, 2016.  With the number of parties involved in the payment processing industry, as summarized above, and with Defendants' well-trained agent providing ready answers to each of her concerns, Ms. Rudiger was unable to discern the truth but rather believed Defendants' representations.

51.     When a new card reader was delivered the next day, Ms. Rudiger suspected she might not be dealing with her processor, which would have had no reason to send her additional equipment.  Ms. Rudiger called her representative at her processor – who she believed she had been re-signing with – and learned that she had been "poached" by MCPS.  Her agent at Omega Processing told her this happens all the time and he knew exactly which company had defrauded her, "Merchants' Choice."  He informed her of the steps she would have to take to try to minimize the damage.  He confirmed that Defendants' fraud was commonplace and he had dealt with other customers facing the same situation numerous times.

52.     Ms. Rudiger immediately called MCPS on December 15th and was eventually able to speak with a person and to inform them of the fraud.  Oddly, they were not concerned about such a fraud being committed in the name of their company and acted as if such calls were

16

commonplace.  At first, when Ms. Rudiger demanded an immediate cancellation, MCPS informed her of MCPS's $495 early termination fee.  Ms. Rudiger refused to pay the fee.

53.     After persistence by Ms. Rudiger, the employee did allow her to start the "resolution request" process, to be able to terminate without paying the fee.  This "pressure release valve" has been established by Defendants in an effort to avoid the attention of prosecutors and regulators.  But by establishing a gauntlet that merchants must navigate in order to extricate themselves from a contract that Defendants know full well was procured by fraud, Defendants are able to keep many merchants ensnared in their trap.  For those who are truly diligent, escape is possible but even then Defendants make it virtually impossible to avoid paying Defendants substantial amounts.  Indeed, despite Ms. Rudiger's prompt and tireless efforts, she was still forced to pay Defendants substantial funds.

54.     Ms. Rudiger filed a completed "resolution request form" as demanded by Defendants on December 20th.  She enclosed the formal cancellation request with the equipment and sent it where she was instructed.

55.     On December 28th, Peter Soord of MCPS identified MCPS as Plaintiff's "new processor," claimed it would save the business money, and might even help pay early termination fees for Plaintiff to leave its current processor.  Ms. Rudiger was forced to respond again, wasting more time and effort.  She stated that she had been defrauded and needed to undo the deal immediately.  She even alerted Defendants that she had saved the misleading voice message left by one of Defendants' agents.  Once again, Defendants had no interest in learning more about the fraud committed in their name.

56.     After realizing that MCPS – even after being informed of the fraud – had no intention to simply undo the transaction, Ms. Rudiger understandably had no interest in doing any

further business with MCPS.  Their lack of concern over her clear allegations of fraudulent practices by MCPS's agent was proof positive that such reports were not unusual.  Ms. Rudiger immediately and consistently sought to cancel any "agreement" she had signed with MCPS.

57.    Plaintiff never removed the new credit card terminal from the box and never processed a single transaction through MCPS.  Plaintiff did not use any services provided by MCPS. This is the same for many merchants defrauded by Defendants.  Even though the merchant never registers with Defendants, and never processes a single transaction with them, they will automatically deduct substantial amounts from their business checking account forever (Defendants auto-renew accounts after the three-year term expires), until the merchant successfully navigates their termination gauntlet.

58.    In the case of Plaintiff Julie Rudiger, Inc., Woodforest debited funds from Plaintiff's bank account for December of 2016 and January and February of 2017.   Plaintiff's bank account was not held with Woodforest Bank and Plaintiff was never "billed."  Woodforest simply took the money, only sending Plaintiff a notice of the debits after the funds had been seized.

59.    Woodforest failed to provide an accounting for the payment processing fees charged and left Plaintiff to do the math.  In any event, the fees do not match the rates shown in the paperwork she had been misled into signing.

60.    Defendants deducted $32.27 in payment processing fees from Plaintiff's bank account for the December statement period.  Defendants deducted $49.95 for both the January and February periods.  These monthly deductions cannot be justified, even if Defendants' paperwork is deemed to be a binding contract.

61.    All the fees were improperly charged, including the:

(a).    $8.00 "Merchant Foundry Fee" to supply "data" on Plaintiff's transactions and customers.  Plaintiff did not process a single transaction with Defendants and never registered with Defendants or connected any equipment to their systems;

(b).    $6.95 "PCI Protection Plan" to ensure Plaintiff is in compliance with payment card industry rules for data security.  Plaintiff did not transfer any data to or from Defendants.  Moreover, the terms of any purported agreement between Plaintiff and Defendants require Plaintiff to "enroll" in this "plan."  Plaintiff did not "enroll" in this "plan;"

(c).    $25 "Minimum Discount Fee," even though Plaintiff never took any steps to process a transaction with Defendants.  The "Minimum Discount Fee" is not defined in Defendants' terms but it could never apply in an instance where no transactions have been processed and no account even registered to transact business; and

(d).    $10 "Monthly Service Fee," even though a quote provided to Plaintiff by Defendants listed the fee as $8.  This "Monthly Service Fee" is not defined in Defendants' terms but would not be applicable until Defendants provided services or Plaintiff had at least established an account to run cards.

Every fee charged by Defendants was improper for multiple reasons, including that all fees violated the contract to the extent one existed.  In particular, the amount of Defendants' charges for the partial month of December could never be justified under the purported contract or otherwise.

62.    Eventually, after jumping through several hoops for MCPS, Defendants did stop seizing funds from Plaintiff's bank account.  The funds that had been seized over three months, however, were never refunded, despite Ms. Rudiger's numerous demands.  Thus, even where a

19

merchant does everything humanly possible to overcome Defendants' fraud, they are still left with losses that exceed $130.

63.     Plaintiff Mena Stone & Landscaping Supplies, LLC ("Mena Stone") suffered from the same fraud as did Ms. Rudiger.

64.     On February 14, 2017, Mena Stone received a phone call from Tammy Wittman acting as authorized agent for Defendants.  Ms. Wittman informed Mena Stone's owner Mike D'Albero that he needed a technological upgrade on his card reading equipment or he would not be in compliance with new payment industry standards.  The caller misrepresented herself by indicating that she was with Mr. D'Albero's then-current payment processor.

65.     Mr. D'Albero believed Ms. Wittman.  The caller stated that she would send some paperwork which Mr. D'Albero should sign and then she would send the replacement equipment.

66.     On February 14, 2017, at 11:01 AM, Ms. Wittman sent documents via email and the Adobe Sign system so that Mr. D'Albero could sign quickly and easily.  Oddly, Ms. Wittman's email address is with Mirand Response Systems, Inc.  Mirand is a Houston-based debt collection firm.  The relationship between Defendants and Mirand is not currently known.

67.     The documents sent by Ms. Wittman on February 14 included several misrepresentations.  First, they included a cost comparison that included multiple intentionally erroneous facts, including inaccurate rates that Mena Stone was then paying and inaccurate rates that Defendants' would charge.  Notably, the cost comparison form used by Ms. Wittman was essentially the same as that used by the agent for Julie Rudiger, Inc. and the agent exposed in the video by the Merchant Services Fraud Alert Association.

68.     The "Merchant Payment Card Application/Agreement" sent by Ms. Wittman included rates and fees other than those listed on Defendants' cost comparison.  Thus, Defendants

intentionally showed payment processing rates on the front page that differed from the rates they knew they would charge. This is always the case under Defendants' training and documents.

69.    On February 15, 2017, a terminal was delivered to Mena Stone. Mr. D'Albero unpacked the new terminal and took his old terminal and shipped it to Defendants, as he had been instructed to do by Ms. Wittman. Obviously this practice amounts to theft of property but is still part of Defendants' training. The same practice was suffered by other Plaintiffs and can be viewed coming from another agent in the video by the Merchant Services Fraud Alert Association. Defendants' have a corporate policy whereby they knowingly receive and utilize thousands of items of valuable stolen property each year. Such property is only shipped to Defendants under false pretenses, and Defendants know full well that each such piece of equipment lawfully belongs to someone else. There is no scenario when it would be proper for Defendants to keep or utilize such equipment.

70.    For a few weeks, Mr. D'Albero did not realize he had been scammed. Then he received his bank statement for February of 2017 and saw that both his old processor and Defendants had deducted funds.

71.    Mr. D'Albero called both processors and pieced together what had occurred. He confirms that everything done by Defendants was done under false pretenses. He was repeatedly given incorrect information by Ms. Wittman and Defendants and, based only on such misrepresentations, he signed Defendants' paperwork.

72.    Defendants refused to allow Mr. D'Albero to terminate his contract. They told him he could only terminate by paying $495.

21

73.     When Mr. D'Albero called his prior processor, they were not surprised that he had been slammed by Merchants' Choice.  Fortunately, they were willing to release Mena Stone from their contract as soon as their equipment was returned.

74.     Mr. D'Albero called and demanded that Defendants send back the equipment that they did not own and had scammed him into sending.  He was told that it was not Defendants' problem and was rudely instructed that there was nothing that could be done.

75.     Mr. D'Albero expanded his calling and emailing to include Woodforest Bank and various regulators of Woodforest.  Only then, after bankers felt that he would be able to involve regulators, did Defendants agree to return his equipment.

76.     The equipment was returned and Mr. D'Albero promptly sent it to his former processor, which stopped billing him.  He paid over $100 in fees to the former processor after he had sent the equipment to Defendants, and therefore could not even use his former processor's services.  He also spent money on packing and shipping the equipment.  Most importantly, he spent dozens of hours researching Defendants and calling and emailing them to get back the equipment.

77.     Defendants would not agree to terminate Mena Stone's contract.  Mr. D'Albero wants to terminate the contract but he has resigned himself to using Defendants for the three-year term of the contract because he cannot pay the termination fee.  Mr. D'Albero looks forward to switching providers as soon as possible.

78.     In the meantime, Mr. D'Albero is being overcharged each month by Defendants in violation of the contractual terms that were entered (based only on Defendants' fraud and misrepresentations).

79.     For example, Mena Stone is paying twice as much for many debit card transactions as Defendants promised.  Defendants' promotional materials show a "qualified" debit card rate of 1.29%.  The form contract shows this rate for all "signature debit cards."  Such a rate is massively profitable for Defendants, because pursuant to federal law and regulation the actual rate charged for most debit card transactions is .05%, leaving 1.24% of profit for Defendants.

80.     Defendants do not show any increased rate for debit card transactions that are not "qualified" or "signature."  Such a rate might be applicable, for instance, where the debit cards are charged over the phone, sometimes referred to as a "card not present" transaction.  Visa, for example, might charge a rate of 1.65% on such transactions.  In violation of their representations to Plaintiff and their contractual terms, Defendants have chosen to charge Mena Stone a rate of 2.58% for a substantial number of debit card transactions that Defendants characterize as "mid-qualified."  This rate has appeared on nearly all of Plaintiff's monthly statements and has consistently been applied by Defendants.  This is not the quoted "mid-qualified" rate and Defendants' form contract does not allow Defendants' to charge the 2.58% rate for most of the debit card transactions to which it has been applied.

81.     This is but one example of the many overcharges paid by Mena Stone.

82.     Plaintiff Tulsa Art Center also suffered from Defendants' telephone fraud scam. Plaintiff's owner had the misfortune to pick up a call from Defendants' agent and was told that "you are not compliant with your current credit card machine and you will have to change it to a new one."  Defendants' agent acted as if she worked for Plaintiff's long-time payments company (without saying the name).  At no time did she mention Defendants.

83.     After speaking with Plaintiff's owner about the bogus compliance issue, the caller said "and it also looks like we can save you some money, but we'll need you to sign new paperwork."

84.     Plaintiff's owner was very busy and does not remember signing any paperwork with Defendants.  A piece of equipment was promptly delivered, however, and she did go through the instructions to set it up.  Based on Defendants' misrepresentations, Plaintiff's owner still believed she was dealing with the same processor she had been dealing with for years.

85.     The credit card machine from Defendants would not work for Plaintiff's business because Plaintiff needed a written record of charges.  Plaintiff's owner called Defendants' agent and was promised the proper type of equipment.  It never arrived.

86.     During a call to Defendants' agent, Plaintiff's owner realized she was not dealing with the same company she had worked with for approximately six years, a company known as EPS.  She was very upset to realize that she had been duped by Defendants.  She asked Defendants if her EPS account had been closed.  She was assured in no uncertain terms that Defendants had taken care of it, her EPS account had been closed, and Plaintiff would not be charged any additional amounts by EPS.

87.     Plaintiff's EPS account was not closed.  In fact, Defendants had done nothing to close the account.  Plaintiff continued to have its account automatically debited by EPS in addition to all of Defendants' payment processing charges.

88.     Of course, Defendants also took funds from Plaintiff's business bank account.  Plaintiff could not terminate the bogus account because Defendants' employees instructed that there was a $495 early termination fee.

89.     Months went by and both companies continued to deduct funds from Plaintiff's account each month.  Defendants refused to honor their promise to "buy out" the prior payment provider.  She emailed back and forth with Defendants' employees dozens of times and spent many hours on the phone with Defendants.  Most of the time was spent on hold and being passed from one "customer service" employee to the next.  In order to stop the double billing, Plaintiff had to handle the EPS termination process and paid EPS's termination fee of $245.  By this time, Plaintiff had paid over $819 that it would not have paid if Defendants had not defrauded Plaintiff.  Eventually, based only on the tireless efforts of Plaintiff's owner, Defendants did issue a credit to partially cover the losses on the old account.  The credit was far too small to cover Plaintiff's total losses though.  Plaintiff has paid hundreds of dollars more than it would have if Defendants had not defrauded her.

90.     Tulsa Art Center is still processing with Defendants and paying for their unwanted services each month.  Even if Defendants are deemed to have a binding contract with Plaintiff – which Plaintiff vehemently disputes – Tulsa Art Center is being overcharged for a variety of the rates and fees shown on Defendants' form contract.

91.     Plaintiff's owner looks forward to ending the relationship with Defendants – which she knows to be unethical, if not criminal, organizations – at the earliest opportunity.  Tulsa Art Center plans to insist on termination after the three-year term of Defendants' form contract.

92.     Plaintiff DeFabio Spine and Sports Rehab, LLC ("Dr. DeFabio") was not a victim of Defendants' telephone fraud scheme.  Rather Dr. DeFabio signed up with a seemingly reputable sales agent, Michael Judd, in September of 2013.  Unfortunately, Defendants immediately began a nearly-continuous course of dealing to change or undermine the terms of Dr. DeFabio's contract.

93.     Like other Plaintiffs, Dr. Fabio has been overcharged for debit card transactions. Because such cards are backed by actual cash in bank accounts, the federal government has imposed a cap on fees that banks can charge for the acceptance of such transactions. Thus, Defendants pay only .05% and 21 cents per transaction to Visa, MasterCard, and their member banks for processing most debit card transactions. Dr. Fabio agreed to pay 1.39% for processing such transactions, affording Defendants a healthy profit of 1.34% on each transaction.

94.     Rather than accepting such healthy profits, however, Defendants have consistently charged 2.39% and even 2.69% for some debit card transactions. These rates have been misleadingly described by Defendants on monthly statements as "Card Fees" even though they are merely extra charges to pad Defendants' bottom lines.

95.     There is no market justification and no contractual justification for these excessive debit card charges. Defendants have merely taken a high profit portion of their relationship with Dr. DeFabio and turned it into one that provides astronomical returns for Defendants with no attendant risk. This one segment of overcharges has cost Dr. DeFabio thousands of dollars.

96.     Defendants made additional across-the-board increases to the rates charged to Dr. DeFabio for processing credit and debit card transactions. Despite lower rates and greater competition across the industry, Defendants imposed substantial increases to Dr. Fabio's rates. Such increases were not imposed to cover higher costs for Defendants but merely to increase profits and, ultimately, the sale price for MCPS.

97.     Defendants have assessed numerous other improper fees as well. For example, the contract signed by Dr. DeFabio included a Monthly PCI Protection Plan in the amount of $6.95. "PCI" stands for "Payment Card Industry" and refers to the security standards that have been adopted by this industry group. Pursuant to his contract, this fee was to be charged and Plaintiff

would not have to pay for any non-compliance with PCI standards.  This fee provides no value to merchants, but rather is pure profit for MCPS.  Rather than honor this profitable fee amount, however, Defendants quickly reneged on their promise and began to charge Dr. DeFabio a "PCI NON-VALIDATION" fee.  The name and amount of this fee were changed over time by Defendants.  For example, it was $16.95 and called "PCI NON-VALIDATION" in December of 2014, was $16.95 but called "DATA PROTECTION" by June of 2016, and was raised to $27.95 and called "DATA PROTECTION" by April of 2017.

98.     Defendants have rolled out monthly "Foundry Fees" for all customers.  "Foundry" or "Merchant Foundry" is Defendants' name for a variety of data and technology services which are not used by the vast majority of customers.  Nevertheless, Foundry fees have been added to all accounts, even those who have never registered for or benefited from any Foundry service.  Press releases in 2015 trumpeted various "Foundry" features, such as "Foundry POS . . . a powerful, cloud-based software application designed to meet the specific business needs of the retail and restaurant industries" and "Foundry Business Insights . . . a market leading platform enabling merchants to grow and protect their businesses."

99.     Dr. DeFabio never signed up for the Foundry program.  It is not listed on his initial contract.  Nevertheless the fee has been applied to his account on numerous occasions and in varying amounts.  Dr. DeFabio has expressly opted-out of the service at least twice, yet Defendants continue to impose the fee, which has ranged from $4.00 to $20.95.

100.     Defendants have been especially interested in assessing the Foundry fees because such fees are generally not shared with sales agents who receive a portion of Defendants monthly billings for many customers.  For example, a sales agent may be entitled to receive residuals of 33% of the fees received by Defendants (as opposed to the amounts passed through to the card

networks and member banks) from a merchant for the entire the merchant processes with Defendants. Defendants have taken the position that Foundry fees are not subject to such commission agreements, thereby drastically increasing profits.

101. Plaintiff Al's Pals Pet Care, LLC ("Al's Pals") also was not a victim of Defendants' fraudulent slamming scheme. Al's Pals knowingly signed up for a processing account with Defendants in 2013. Defendants did not honor the agreed-upon terms, however, but rather repeatedly overcharged Plaintiff.

102. In Al's Pals contract with Defendants, Plaintiff's owner had agreed to pay a variety of fees. These fees were acceptable to Plaintiff and afforded Defendants a healthy profit margin. Nevertheless, Defendants repeatedly increased Plaintiff's monthly fees, annual fees, and per transaction fees in violation of the contract.

103. Despite promising not to increase customer rates for three years, and despite providing customers contracts which do not allow for such increases, Defendants charged Al's Pals new annual and monthly fees.

104. For example, an $8 per month Foundry fee was added to Al's Pals account and charged every month until they terminated their account in August of 2017. Al's Pals did not benefit from any Foundry services. Despite promises that the various Foundry services would include point of sale access and security, Defendants also charged Al's Pals monthly fees for "GATEWAY MTHLY ACCESS" (e.g., $17.95) and "DATA PROTECTION" (e.g., $16.95). All of these fees represented pure profit for Defendants.

105. Even more nefarious, Defendants have increased fees and informed customers that the fees were actually pass through fees from the card networks, even though such fees were increased by Defendants and all proceeds went directly to their bottom lines.

106.    When Al's Pals terminated its account in August of 2017, Defendants added a variety of improper fees for which there was no basis in the contract.

107.    These are but a few examples of Defendants' improper payment processing overcharges.  All customers suffered from Defendants' systematic practice of adding fees in violation of Defendants' contracts with customers.  When Defendants desired to increase profits – which was often – they simply tinkered with a payment processing fee, applied it across thousands of customers in an automated fashion, and reaped the increased profits.

108.    This lawsuit does not challenge, in any form, Defendants' representations or obligations with respect to equipment (e.g., terminals, card readers, chip readers) they marketed or provided to customers, including but not limited to the capabilities of such equipment, lease or sale agreements for such equipment, the cost of such equipment, or any charged for such equipment. Any and all references to equipment are only intended to provide further detail and context to Defendants' fraudulent scheme to induce merchants to enroll in their payment processing services. Plaintiffs do not allege they have been overcharged for equipment provided by Defendants or their partners or seek the return of any amounts they have paid for such equipment.

## CLASS ALLEGATIONS

109.    Plaintiffs bring this action on behalf of themselves and all others similarly situated.

110.    Two Classes are preliminarily defined as follows:

> All United States persons or entities that paid Defendants a fee for payment processing services after receiving a communication from an agent of Defendants indicating that Defendants were the merchant's current payment processing provider;

which is referred to hereinafter as the "Fraud Class;" and

> All United States customers of Defendants who contracted for payment processing services and paid a fee not authorized by their contract;

which is referred to hereinafter as the "Overcharge Class."

111.    Plaintiffs reserve the right to modify or amend the definitions of the proposed Classes before the Court determines whether certification is appropriate and as the Court may otherwise allow.  It is very likely that additional classes or subclasses will be appropriate.

112.    Excluded from the Classes are Defendants, their parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendants have a controlling interest, all customers who make a timely election to be excluded, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

113.    The time period for the Classes is the number of years immediately preceding the date on which this Complaint is filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendants remedy the conduct complained of herein. All of Defendants' contracts mandate that Texas law be applied.  By way of example only, Texas imposes a four-year statute of limitations on breach of contract actions.  Thus, if Texas law is deemed to apply, the relevant class period for breach of contract is likely to begin in December of 2013 and extend through Defendant's change in conduct or the conclusion of the case.  It is also

possible that the applicable statute of limitations will be tolled based on Defendants' improper conduct as alleged below.

114.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can meet all the applicable requirements of Federal Rule of Civil Procedure 23 and can prove the elements of its claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

115.     **Numerosity.**  The members of the Classes are so numerous that individual joinder of all the members is impracticable.  There are thousands of merchants that have been damaged by Defendants' wrongful conduct as alleged herein.  The precise number of Class members and their addresses is presently unknown to Plaintiffs, but can readily be ascertained from Defendants' books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, and/or published notice.

116.     **Commonality and Predominance.**  Numerous common questions of law and fact exist as to the claims of Plaintiffs and the other Class members.  Such questions include, but are not limited to:

(a).     Whether Defendants have established a scheme to sign up new customers by intentionally misleading merchants into believing Defendants are their current provider;

(b).     Whether Defendants violated their contracts with merchants by assessing improper fees;

(c).     Whether Defendants are liable to Plaintiffs and the other Class members for imposing improper fees;

31

(d).     Whether certain contractual provisions in Defendants' merchant agreement are invalid exculpatory clauses, violate public policy, lack mutuality, are illusory, are procedurally and substantively unconscionable, and are otherwise void and unenforceable;

(e).     The proper method or methods by which to measure damages and/or restitution; and

(f).     Whether Defendants should be enjoined from engaging in any or all of the improper practices complained of herein.

117.     Defendants have engaged in a common course of conduct toward Plaintiffs and the other Class members.  The common issues arising from this conduct that affect Plaintiffs and the other Class members predominate over any individual issues.  Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

118.     **Typicality.**  Plaintiffs' claims are typical of the other Class members' claims because, among other things, all of the claims arise out of a common course of conduct and assert the same legal theories.  Further, Plaintiffs and members of the Classes were comparably injured through the uniform misconduct described above.

119.     **Adequacy of Representation.**   Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously.  Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

120.     **Declaratory and Injunctive Relief.**  Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive and declaratory relief, as described below.  Specifically, Defendants

continue to knowingly enroll customers through fraud and misrepresentation, overbill customers, and utilize unenforceable contractual provisions in order to block the Class members from seeking legal relief.  Class-wide declaratory and/or injunctive relief is appropriate to put an end to these illicit practices.

121.    **Superiority.**   A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and each of the other Class members are small compared to the burden and expense that would be required to individually litigate their claims against Defendants, thus rendering it impracticable for Class members to individually seek redress for Defendants' wrongful conduct.  Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**CLAIM FOR RELIEF**

**COUNT ONE**
**Fraudulent Inducement**
**(Plaintiffs Julie Rudiger, Inc., Mena Stone, and Tulsa Art Center)**

122.    Plaintiffs repeat paragraphs 1 through 121 above.

123.    As alleged herein, Defendants make a regular practice of calling customers of other payment processing companies and misrepresenting their identity by acting like the customer's current payment processor.  Through a well-practiced variety of stratagems, Defendants' sales agents intentionally and fraudulently induced three Plaintiffs and the members of the Fraud Class to sign contractual paperwork with Defendants.

33

124.     Among other things, Defendants intentionally (a) misrepresented their identity, (b) incorrectly stated that equipment needed to be updated or that fees were going up, even though Defendants did not even know what processor serviced the account, (c) promised to lower rates and fees, once again without even knowing what was being paid, (d) stated that in order to gain new and better terms with the existing processor, new documentation would need to be signed, and/or (e) presented misleading and incomplete documentation for signature.

125.     Defendants knew that their representations and promises were false but made them anyway intending to induce three Plaintiffs and the other members of the Fraud Class to rely on them and sign agreements with Defendants.

126.     Defendants' misrepresentations and omissions alleged herein were material for several reasons, including that they would be considered very important to merchants in deciding whether or not to do business with Defendants and were in fact important to the three Plaintiffs and members of the Fraud Class.  Plaintiffs were happy with their then-current processors when Defendants represented that they were their then-current processors.  Plaintiffs would not have agreed to anything with Defendants had Plaintiffs known Defendants' true identity.  Defendants knew that Plaintiffs and the other members of the Fraud Class would rely on their misrepresentations and omissions.

127.     Defendants' statements, if true, would have been: (a) they had no affiliation with the customer's current processor, (b) they had no knowledge of the customer's current equipment or rates and fees, nor any increases in such rates and fees, (c) they did not know that they could lower the victim's rates, (d) the customer did not need to sign any documentation or take any action to avoid fictional higher rates, and (e) full documentation of Defendants' contracts was not provided in an effort to avoid discovery of the scheme.

34

128.     Prior to executing a contract with Defendants, three Plaintiffs and the other Fraud Class members were wholly deceived by Defendants.

129.     Plaintiffs and the members of the Fraud Class justifiably relied on Defendants' misrepresentations.  Defendants were in a superior bargaining position, because they were the only parties with knowledge of the actual facts.  Plaintiffs and the members of the Fraud Class had no reason to suspect that Defendants' agents would commit illegal acts and had no means of verifying the truth or falsity of Defendants' misrepresentations.

130.     Had Defendants accurately represented themselves to Plaintiffs and the other Fraud Class members, and not misrepresented, obscured, and concealed the truth from them, Plaintiffs and the Fraud Class members would not have contracted with Defendants to receive payment processing services.

131.     Accordingly, Plaintiffs and the other Fraud Class members were fraudulently induced to enter into contracts with Defendants.

132.     Plaintiffs and the Fraud Class are entitled to seek damages and/or rescission of their contracts with Defendants, or other equitable relief, including restitution of funds Defendants took from them without permission.

133.     Plaintiffs will make any necessary election of remedies at the appropriate juncture.

### COUNT TWO
### Misrepresentation
### (All Plaintiffs)

134.     Plaintiffs repeat paragraphs 1 through 133 above.

135.     Defendants' misrepresentations were made in the regular course of their business. Defendants are in the business of recruiting merchants to sign merchant processing agreements with Defendants.  Defendants had direct pecuniary interests in the merchant agreements they

entered into with merchants they contacted and to which they made these representations. Defendants made, and stand to make, substantial sums of money through termination fees and/or service fees from the merchants who sign agreements with Defendants.

136.    Defendants provided "false information;" for example that merchants' current transaction rates would increase and other falsities described herein.  This false information was provided to merchants to alter merchants' business decision of whether to enter into a payment processing agreement.

137.    Defendants did not exercise reasonable care or competence in their representations to Plaintiffs and members of the Fraud Class.  For example, Defendants did not know the equipment in use by Plaintiff or the terms of existing processing agreements, yet continually represented that equipment was faulty and/or processing rates would rise and that Defendants could save them money.

138.    Plaintiffs and the members of the Fraud Class justifiably relied on Defendants' representations.  Defendants were the only parties aware that their statements were false.  Further, they had significantly more knowledge of the payment processing industry than do Plaintiffs and the members of the Fraud Class.  This allowed Defendants to frame their representations in exceedingly persuasive and misleading terms.

139.    Defendants' representations resulted in pecuniary damage to Plaintiffs and the members of the Fraud Class, including payment of termination fees and charges for unnecessary and unwanted services.  Valuable equipment was also stolen by Defendants under false pretenses. For many victims, as in the case of Plaintiff Julie Rudiger, Inc., often no service whatsoever is provided because the merchant already has a payment processor and is unwilling to work with fraudsters.

140.     Defendants also train their agents to uniformly utilize misrepresentations as to rates and fees that will not be the actual rates and fees charged.  Defendants' documents, such as the cost comparison form used by all agents, also misrepresent facts to mislead customers, including all Plaintiff and the members of both Classes.

## COUNT THREE
## Breach of Contract
## (All Plaintiffs)

141.     Plaintiffs repeat paragraphs 1 through 121 above.

142.     Defendants may argue they have binding contractual agreements even with those they have defrauded, merchants which only came into contact with Defendants via fraud and misrepresentations.   Many such customers never even processed a single transaction with Defendants.  Even if this Court determines that a binding contract exists between such Plaintiffs and the members of the Fraud Class, on the one hand, and Defendants, on the other hand, however, Defendants have materially violated the specific terms of such contracts.  As described above, Defendants' business plan also includes systematic overcharges.

143.     For contracts that did not result from fraudulent inducement, such as those of Dr. DeFabio and Al's Pals, Defendants have materially violated the specific terms of the contract.

144.     Defendants' merchant agreement sets forth various fees to be charged.  Yet, from the earliest stages of the relationship, Defendants assess additional fees not allowed by the contract.

145.     Numerous examples of Defendants' overcharges are described above.

146.     The improper fees described above are not a complete list of improper fees charged by Defendants, but merely examples.

147.     Defendants' assessment and deduction of fees from the accounts of Plaintiffs and the members of the Classes are improper and not calculated using rates disclosed in any contract.

37

148.    As described in this Count Three and throughout this Class Action Complaint, Defendants have repeatedly violated the express terms of their contracts with Plaintiffs and the members of the Overcharge Class and the Fraud Class (to the extent they are deemed to have binding contracts).

149.    Defendants violated the contracts by assessing charges not provided for and by unilaterally marking up agreed-upon fees and charges.  Furthermore, Defendants have assessed other fees in the guise of pass-through fees from the card networks which are actually retained by Defendants.  Thus, Defendants have materially breached the express terms of their own form contracts.

150.    Plaintiffs and the Classes have performed all, or substantially all, of the conditions precedent and obligations imposed on them under the contract.  There is no legitimate excuse or defense for Defendants' conduct.

151.    Defendants' anticipated attempts to defend their overbilling through reliance on self-serving contractual provisions will be without merit.  Such provisions are either inapplicable or are unenforceable because they are void, illusory, lacking in mutuality, are invalid exculpatory clauses, violate public policy, and are procedurally and substantively unconscionable, among other reasons.  These provisions do not excuse Defendants' breaches or otherwise preclude Plaintiffs and the Classes from recovering for such breaches.

152.    Plaintiffs and the members of the Fraud Class and Overcharge Class sustained damages as a result of Defendants' breaches of contract.

### COUNT FOUR
### Unjust Enrichment
### (All Plaintiffs)

153.    Plaintiffs repeat paragraphs 1 through 121 above.

154.     Plaintiffs, on behalf of themselves and the other Class members, assert a common law claim for unjust enrichment.  This claim is brought only in the alternative and is contingent on Defendants' contracts with Plaintiffs and the Class members being deemed ineffective, inapplicable, void, or unenforceable.  In such a scenario, unjust enrichment will dictate that Defendants disgorge all monies and items unjustly received.

155.     As alleged herein, Defendants were unjustly enriched at the expense of Plaintiffs and the other Class members, who were improperly charged and overcharged by Defendants.

156.     Three Plaintiffs and the other Fraud Class members were unjustly deprived of money obtained by Defendants as a direct and proximate result of their fraudulent inducement to enter contracts which they never would have entered but for Defendants' misrepresentations.

157.     Plaintiffs and the other Overcharge Class members were unjustly deprived of money obtained by Defendants as a direct and proximate result of their contract, which may be deemed void or unenforceable in whole or in part by this Court.

158.     It would be inequitable and unconscionable for Defendants to retain the profit, benefit, and other compensation obtained from Plaintiffs and the other Class members as a result of the wrongful conduct alleged herein.

159.     Plaintiffs and the other Class members are entitled to seek restitution from Defendants as well as an order from this Court requiring disgorgement of all profits, benefits, and other compensation obtained by Defendants by virtue of their wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the proposed Classes demand a jury trial on all claims so triable and judgment as follows:

1.     Certifying this case as a class action pursuant to Federal Rule 23;

2.      Temporarily and permanently enjoining Defendants from continuing the improper practices alleged herein;

3.      Granting rescission of the contracts;

4.      Declaring certain contractual provisions to be unenforceable and enjoining their enforcement;

5.      Awarding damages in an amount to be determined by a jury;

6.      Requiring restitution or disgorgement of all amounts improperly obtained by Defendants;

7.      Awarding pre-judgment interest at the maximum rate permitted; and

8.      Awarding such other relief as this Court deems just and proper.

DATED this 22nd day of December, 2017.

Respectfully submitted,

BY:    MEADE & NEESE LLP

*/s/Andrew K. Meade*
Andrew K. Meade
Texas Bar No. 24032854
ameade@meadeneese.com
D. John Neese, Jr.
Texas Bar No. 24002678
jneese@meadeneese.com
Leann Pinkerton
Texas Bar No. 24038826
lpinkerton@meadeneese.com
2118 Smith Street
Houston, Texas 77002
713-355-1200 - Phone

*Local Counsel for Plaintiffs*

BY:    WEBB, KLASE & LEMOND, LLC

*/s/ E. Adam Webb*
E. Adam Webb*
  Georgia Bar No. 743910

1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
(770) 271-9950 (facsimile)
Adam@WebbLLC.com

*Attorney-in-Charge for Plaintiffs*

\* Motion for *Pro Hac Vice* Admission to be filed
after case number assigned