# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| AL'S PALS PET CARE, LLC, DeFABIO SPINE AND SPORTS REHAB, LLC, JULIE RUDIGER, INC., MENA STONE & LANDSCAPING SUPPLIES, LLC, TULSA ART CENTER, LLC, BAN-A-PEST EXTERMINATION CO., INC., FLEETWOOD CHIROPRACTIC & REHABILITATION, PC, and BAYLEY PRODUCTS, INC., individually and on behalf of all others similarly situated, | § § § § § § § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. |
| v. | § § | 4:17-CV-3852 |
| WOODFOREST NATIONAL BANK, N.A., MERCHANTS' CHOICE PAYMENT SOLUTIONS, and PAYSAFE PAYMENT PROCESSING SOLUTIONS LLC, | § § § § § | **<u>Jury Trial Demanded</u>** |
| Defendants. | § § | |

## <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>

COME NOW Plaintiffs Al's Pals Pet Care, LLC, DeFabio Spine and Sports Rehab, LLC, Julie Rudiger, Inc., Mena Stone & Landscaping Supplies, LLC, Tulsa Art Center, LLC, Ban-A-Pest Extermination Co., Inc., Fleetwood Chiropractic & Rehabilitation, PC, and Bayley Products, Inc., individually and on behalf of the classes of persons and entities preliminarily defined below, and complain and allege as follows, based on personal knowledge, investigation of counsel, and information and belief. This First Amended Class Action Complaint is filed pursuant to agreement of the parties and with permission of the Court (Dkt. No. 23).

## <u>INTRODUCTION</u>

1.      For years, Woodforest National Bank, through its credit card and debit card processing business, engaged in a scheme through which it defrauded and overbilled its

customers. Woodforest's card processing business was predominantly known as "Merchants' Choice Payment Solutions," although Woodforest has also allowed others to market its services, as explained below. Merchants' Choice will sometimes be referred to herein as MCPS. Woodforest recently sold MCPS for $470 million to Paysafe Payment Processing Solutions LLC ("Paysafe"), a British payments company. The problems detailed herein persist, however, and relief against Paysafe and MCPS, separate and apart from Woodforest, will be needed.

2.      In today's business world, most merchants must accept payment for goods and services via credit and debit cards to stay competitive in the marketplace. In order to accept this method of payment, the merchant must utilize a payment processing service. As used throughout this First Amended Class Action Complaint, the word "merchant" should be taken to mean any person or entity that accepts credit or debit cards for payments. This includes non-profits, schools, churches, government agencies, and many persons or entities that are not traditional businesses. All are subject to the same improper treatment by Defendants.

3.      Merchants like Plaintiffs rely on companies like Defendants to provide this critical payment processing service in accordance with fair and transparent terms. Indeed, for many merchants, fees for card processing services are likely to be the third highest expense following labor and product costs. Even for a very small business, these fees can easily exceed $100 per month.

4.      The card processing system can be extremely difficult to understand, with many involved parties. For instance, in addition to the merchant who receives payment and the customer who provides such payment, the processing of a card transaction involves several other parties:

(a). <u>The Card Issuer</u> – the company that issued the credit or debit card to the customer, which is typically a bank such as Chase or Bank of America, and which receives a fee whenever a customer uses one its cards for a transaction. These companies receive fees that are usually calculated as a percentage of a transaction plus a per-transaction fee (e.g., 1.65% + $0.10/transaction). There are hundreds of different card types and the fee varies based on the type of card used. For example, rewards credit cards command a higher fee than a card with no rewards program. The fees paid to the issuing banks are generally known as "interchange fees."

(b). <u>The Card Network</u> – the card networks (i.e., Visa, MasterCard, and Discover) establish and publish interchange fees applicable to each type of card in their system. The card networks charge additional per transaction fees, such as access fees. By way of example, Visa assesses an access fee known as the "APF" ("Acquirer Processing Fee"), which is currently $0.0195 per credit card transaction and $0.0155 per debit card transaction, and MasterCard charges an access fee known as the "NABU" ("Network Access Brand Usage") fee, which is $0.195 per any card transaction. The card networks also charge various additional fees depending on the merchant and type of transaction. These additional fees are generally known as "assessments." The fees established by the card networks (like the interchange fees) apply universally and are not subject to negotiation no matter who the customer, merchant, or processor is. No entity aside from the card networks has the authority to modify these fees.

(c). <u>The Payment Processor</u> – this is the entity that processes the payment and ensures that whenever a merchant receives payment for an item or service with a credit or debit card, (i) the customer's card account is debited and the merchant's bank account is credited, (ii) the merchant is assessed all applicable fees, and (iii) such fees are distributed to the proper parties. Upon information and belief, MCPS has used First Data and TSYS as its payment

processors during the time periods at issue.

(d). <u>The Member Bank</u> – only banks such as Woodforest National Bank may be members of card networks. These member banks "sponsor" payment processors so they may process transactions through the card networks. Unsurprisingly, MCPS works primarily with Woodforest as its member bank, which allowed more of the revenue earned from customers to stay under the Woodforest corporate umbrella, and increased group profits.

(e). <u>The Merchant Acquirer</u> – this is the company that markets the payment processor's services to merchants. Merchant acquirers essentially act as a "middle man" between merchants and payment processors. They enroll merchants in payment processing services and usually provide customer support to the merchant, such as sending monthly statements showing all credits and debits. Merchant acquirers usually work with independent agents or companies, sometimes known as Independent Sales Organizations (ISOs) or Member Service Providers (MSPs), which sign up merchants. The merchant acquirer then pays the ISO/MSP based on a percentage of the processing fees obtained from "their" merchants. Defendant MCPS is a merchant acquirer but also signs up merchants directly, and so qualifies as an ISO/MSP as well. MCPS – or one of its affiliates – serves as a merchant acquirer for many of Woodforest's merchant services customers. In this way, more of the revenues and profits from customer transactions stayed with Defendants than is often the case.

5. Before the sale of MCPS to Paysafe, the number of shell companies held under the "Woodforest" umbrella made it particularly difficult for merchants to know which parties they were interacting with. Merchants were left with no way of knowing how certain fees were distributed, thereby hindering their ability to question improper "junk" fees.

6.      The number of involved parties made it difficult for merchants to understand what payment processing fees were assessed and how they are calculated. Discovery may reveal that additional parties, including additional companies affiliated with Paysafe, should be added as Defendants.

7.      Unfortunately, Defendants' business plan has long been to exploit their position of knowledge and power in an inherently confusing industry to defraud and overcharge merchants. Defendants are notorious for tricking merchants into signing up for their "services." Their various corrupt methods are described below. Even when Defendants actually gain a new customer through a legitimate process, they misrepresent the true terms by failing to disclose that the merchant is going to be flooded with additional payment processing fees that either were intentionally never disclosed or mischaracterized during the contracting process.

8.      Defendants have aggressively perpetrated their schemes. Despite full knowledge of the troubling business practices at the highest levels of MCPS and Woodforest, their fraudulent and unethical practices have continued unabated even after the sale to Paysafe. Moreover, their standardized payment processing paperwork and contracts used by all agents and employees has continued to intentionally misrepresent, omit, and/or conceal key facts concerning the fees they know they will eventually charge merchants if merchants sign on the dotted line.

## DEFENDANTS' IMPROPER PRACTICES

### A.      Defendants' "Slamming" Scheme.

9.      A major element of Defendants' scheme is to contact merchants who are already with competitor payment processors in an attempt to fool them into switching their business to MCPS. MCPS agents "cold call" unsuspecting merchants, identifying that they are with "Merchant Services" or "your Merchant Services Partners." MCPS agents use this generic name

to trick merchants into believing that they are in fact with the merchant's current payment processing partner.

10.     This ruse is successful because many of the country's major processing outfits have the moniker "merchant services" in the title of their company, including but not limited to Chase Merchant Services, Wells Fargo Merchant Services, PNC Merchant Services, Citi Merchant Services, SunTrust Merchant Services, Total Merchant Services, Key Merchant Services, Redwood Merchant Services, United Merchant Services, and MainStream Merchant Services.   Moreover, these companies too identify themselves to customers as "Merchant Services."

11.     MCPS agents indicate that they are calling to make sure the equipment previously provided is compliant with new standards or to save them money by avoiding increased costs due to a new rate plan going into effect.

12.     The goal of this scheme is to induce merchants into signing three-year agreements with Defendants for payment processing services the merchant does not want or need.   This practice is commonly known as "slamming" in the payment processing industry.   Defendants are the foremost purveyors of "slamming" and are universally reviled by honest participants in the payments business.

13.     Small business owners have posted innumerable independent reports of Defendants' practices.   For example, one business posted this in 2017:

> This company contacted my business in March, 2017.   They led us to believe they were our current CC company, and so they sent new contract, terminal, and so forth.   After terminal arrived, we called our CC company to get it set up.   Lo and behold, it wasn't their terminal.

Another merchant posted this in December 2016:

> Deceptive sales practices. Pretended to be my current processing company. Called and attempted to cancel application within minutes of my employee e-signing (without authorization mind you) and no one will help me. It has been 3 days and I have gotten no where. This is a horrible horrible company.

Yet another similar complaint was posted in March of 2016:

> Said they were my bank and I had to change terminals. Said they were their new processors. Scammed me. Received terminal that did not work, technical support was not understandable, did not speak English. They said I have a refund to someone for $300 and terminal didn't work! Still trying to figure out. Be careful!!!!!

And another from 2017:

> Shady outfit. Do NOT use!! My experience is they solicit business without disclosing who they are or what bank they are associated with and allow you to think it's your existing processor offering an upgrade in equipment and a discount in processing fees. Then they nickel and dime you like crazy from set up fee to cancelation fee. They are crooks in my opinion.

These are but a few examples. Such complaints span several years and are included on numerous small business websites and social media.

14. A detailed video program exposing Defendants' slamming scam can be viewed at the following link:

http://www.merchantservicesfraudalertassociation.com/perverting-interchange-plus-two.html

This 25-minute video details the elaborate nature of Defendants' fraud. It (a) illustrates Defendants' cold calls to merchants and the well-practiced lies of Defendants' agents, (b) explains how Defendants use the generic "Merchant Services" name so as not to arouse suspicion, and (c) confirms that Defendants' illegal acts are directed from and carried out at the "home office," not just by far-flung sales agents.

15. Transcripts of misleading messages that MCPS leaves for merchants are widely available on the internet. For example:

> This is an automated call about your merchant account from Merchant Services Partners to remind you that the deadline for EMV updates has now passed. Because you have already been notified, please be advised that the fraud liability has now shifted to you, the merchant. If you haven't obtained the proper equipment or made the necessary updates, please call us at 800 816 4793 to avoid high out-of-pocket equipment costs and/or a possible increase in processing rates charged per card.

And another example:

> This is Merchant Services Partners with a notification regarding possible pending or outstanding actions needed on your merchant account. Please call for final chip card validation on your processing equipment, and possible rate and fee increases from your sales office. Please call 800-755-8108 to speak with an agent for a rate adjustment and to validate your processing equipment's EMV status.

*See* www.merchantmaverick.com/reviews/merchants-choice-payment-solutions-review/.

16.     These messages contain several misrepresentations. First, while the callers technically never say, "we are your current processor," it is plainly obvious that this is the impression they intend to create. Indeed, by referring to "your merchant account," "your sales office," "your processing equipment," and using a super-generic company name, there is plenty of room for misunderstanding. Second, the EMV liability shift has nothing to do with processing rate increases. This is a lie intended to scare the merchant into returning the call. Third, because MCPS does not own or service the merchant's "processing equipment," it has no basis to validate that equipment's status. Another lie preying on merchant fears.

17.     Notably, the documentation and methods shown above are the same as those used to trick Plaintiffs. The similarity of Plaintiffs' experience, the experiences of the merchants that have lodged complaints online and with various governmental agencies, and the experiences of the merchant highlighted in the exposé and who received the foregoing messages provide clear evidence that Defendants' training is uniformly unethical and they have provided sales agents the tools to carry out their fraudulent scheme over a period of several years and from coast-to-coast.

18.     Specific former agents of Defendants have also confirmed Defendants' knowledge of improper practices.  This is not a situation in which rogue agents have carried out a scheme without corporate knowledge.  Defendants have embraced this scheme, including paying substantial amounts to sales agents that are known fraudsters.

19.     Conscientious members of the payments industry are disgusted by Defendants' practices.  Defendants are truly the worst of the many bad apples in a troubled industry.  They are notorious for giving the industry a bad name.

20.     Other payment processing companies even warn their customers to be wary of MCPS' scheme.  Here is a message from one competitor:

> WE HAVE RECEIVED MANY REPORTS OF A SCAM IN WHICH UNSCRUPULOUS PARTIES ARE POSTING AS "YOUR" MERCHANT SERVICE PROVIDER.  IF YOU RECEIVE A CALL FROM SOMEONE STATING THAT YOUR TERMINAL IS OUT OF COMPLIANCE AND IS IN NEED OF REPROGRAMMING, YOU COULD BE UNKNOWINGLY SWITCHING MERCHANT SERVICE PROVIDERS.  SWITCHING TO ANOTHER COMPANY IN THIS FASHION WILL MOST LIKELY LEAD TO AN INCREASED RATE WHICH YOU HAVE NOT AGREED TO.  SHOULD YOU RECEIVE A SIMILAR CALL WE URGE YOU TO CONTACT OUR CUSTOMER SERVICE DEPARTMENT AT THE PHONE NUMBER LISTED ABOVE FOR VERIFICATION.

21.     Those merchants that speak with "Merchant Services" are sent documentation to sign, including a document labeled Merchant Processing Application/Agreement ("Application").  Because the MCPS agent has continually insinuated that it is "your" payment "partner" and developed a rapport with the merchant (albeit one built on fraud), merchants do not notice that the Application is for a new company or realize that new company is not affiliated with their current processor.  Merchants simply think they are signing a better deal with their current company.

22.    That merchants would rely on the representations of MCPS' agents and fail to grasp that the Application is for a new and completely unaffiliated company is understandable because Defendants' name "Merchants Choice Payment Solutions" is not materially different from the names of virtually every merchant services provider in the country, nearly all of which have "merchant," "payment," and/or "solutions" (or similar sounding names) in their title, e.g., "Merchant e-Solutions," "Total Merchant Services," "Priority Payment Systems," "First American Payment Systems," "Sage Payment Solutions," etc. *Also, e.g.*, ¶ 10, *supra*.

23.    Nor are the MCPS logos on the Application and other documentation provided meaningful to merchants. Indeed, it is not as if the MCPS brand is so prominent in the marketplace that it carries the type of logo recognition as McDonalds' "golden arches" or the Nike "swoosh." The MCPS logos are thus not so indicative of a new company that is completely unaffiliated with the merchant's existing processing partner so as to lead merchants to know they have been lied to.

24.    The paperwork's references to "Woodforest" are also meaningless to merchants. As previously noted, the payment processing system is very confusing and involves many parties, including but not limited to multiple banks. *See* ¶¶ 4(a)-(e), *supra*. Indeed, each card payment transaction involves a minimum of two banks – the bank that issued the card and the processing partners' member bank. To make matters even more complicated, processing companies switch member banks. That the paperwork would reference the name of an unfamiliar bank is not surprising or unusual and is certainly not enough to put merchants on notice they have been slammed.

25.    That merchants justifiably rely on Defendants' slamming scheme to sign the form paperwork with MCPS is completely understandable and supported by the allegations of

Plaintiffs, the innumerable online allegations of other merchants who have also been duped, and the additional evidence cited herein.

26.     Defendants know full well that, if merchants knew they were not affiliated with their current payment processing company, merchants would be unlikely to take their cold calls or hear their sales pitches.  Their misrepresentations are thus intended to, and do, trick merchants into agreeing to contract with Defendants so Defendants can automatically withdraw money out of their checking account for duplicative services they do not need or want.

27.      Merchants are often stuck paying two sets of monthly fees for years after Defendants refuse to acknowledge that the contracts resulted from fraud.  Such fees are paid to both the merchant's former processor, with whom the merchant still has an (often non-cancelable) contract, and Defendants.

28.     Even when merchants realize they have been duped and insist on terminating their unwanted relationship with Defendants, Defendants still guarantee themselves a profit via an early termination penalty fee buried within their form contract paperwork, which is a *minimum* of $495.  Even if merchants never intend to sign up with Defendants and never use any of Defendants' "services" – as was the case, for example, with Plaintiff Julie Rudiger, Inc. – Defendants profit.

**B.      Defendants' Pre-Contractual Fee Misrepresentations.**

29.     Out of Defendants' 70,000 customers, many were not signed up through Defendants' telephone fraud ring.  These customers, however, were fraudulently induced to do business with Defendants by promises of fees and rates that Defendants had no intention to keep.

30.     Defendants' sales agents are provided training and told to use certain arguments when potential customers raise concerns.  For example, customers often ask what is the term or

duration of the agreement. Defendants' Application establishes a three-year term, with no cancellations allowed without penalty. Defendants instruct agents to state: "The reason it is to your advantage to sign a multi-year contract with us is because your rate will not go up during the length of the contract, the only rates that could ever go up are card network pass through fees, we will not raise our fees, so it is to your benefit to lock in these low rates."

31.     Nothing in the uniform Application contradicts this statement. The "Rates & Fees" are prominently disclosed and there is no indication that they can or will change throughout the term. For instance, there is no disclosure they are only "introductory" or "initial" rates and fees. Merchants are led to believe, and justifiably believe, the disclosed rates and fees are what they will pay throughout the term. Such rates and fees induce merchants to do business with Defendants.

32.     Defendants, however, have never had any intention of charging the merchant only those fees and rates set forth in the Application. Defendants at all times knew full well that these rates and fees **would** absolutely be increased and new junk fees added once merchants sign on the dotted line and bind themselves to the three-year term. Those fees and rates disclosed in the Application – i.e., the pricing that induces the merchant to do business with Defendants – in actuality comprise only a fraction of the charges that are actually imposed once a merchant starts to do business with Defendants.

33.     For example, Defendants' form contract paperwork contains pre-filled amounts for certain fees, such as the "Monthly PCI Protection Plan." The identified rate induces merchants to do business with Defendants. But Defendants never intended to charge the identified rate per month for this service.

34.     After merchants enroll, Defendants' uniform practice is to increase this fee substantially (such as from $6.95 to $16.95 per month) and rename it "Data Protection" fee. Thus, merchants enroll with Defendants based on the false representation that they will pay one rate and Defendants end up automatically debiting their accounts for a much higher rate. These unexpected charges are sufficient to make a sizeable dent in merchants' bottom lines.

35.     By way of another example, Defendants' form Applications also disclose low "Monthly Minimum Discount Fee[s]," which guarantee Defendants a certain amount of fees per month even during the months when the merchant does not use (or minimally uses) Defendants' services. Again, this is an important part of the deal for merchants because no merchant ever wants to pay high fees during months when they do not use processing services. But Defendants never had any intent to charge only the "Minimum Discount Fee" set forth in the Application.

36.     After merchants enroll, Defendants' increase this fee, for example from $10.00 per month to $25 per month, so as to ensure the merchant pays more (and Defendants profit more) each month. These unexpected charges are important to merchants and materially affect their decision to do business with Defendants.

37.     By way of a third example, for merchants that enroll in Defendants' tiered pricing program, the form contracts disclose a "Signature Debit Rate" for all debit card transactions, for example a rate of .99%. The rate disclosed is massively profitable for Defendants, because pursuant to federal law and regulation the actual rate charged for most debit card transactions is .05%, which for an example rate of .99% would leave .94% of profit for Defendants. This is an important part of the deal for merchants because customers often pay for goods and services with debit cards. But Defendants never had any intent to charge only to charge the "Signature Debit Rate" for all debit card transactions.

38.     After merchants enroll, Defendants often charge much higher rates for debit card transactions that they deem to be "mid-qualified" and "non-qualified."  For example, a "mid-qualified" debit card transaction might pay a rate of 1.85% and a "non-qualified" debit card transaction might pay a rate of 2.25%.  Defendants knew that they would employ this upcharge scheme but intentionally failed to disclose it to merchants on the Application.  These unexpected charges for common debit card transactions are important to merchants and would have materially impacted their decision to do business with Defendants.

39.     Defendants' whole business model is built on such misrepresentations.  Indeed, throughout the relevant period while they were promising prospective merchants that they would be charged the rates and fees set forth in their Applications, Defendants were charging much more to existing customers.  Defendants knew they would eventually charge all prospective merchants more if they signed up.

40.     Defendants know full well that if merchants were apprised of the true rates and fees they would be charged if they agreed to do business with Defendants, they would never do so.  Indeed, no reasonable merchant would bind itself to a three-year contract term containing huge early termination penalties if it knew the disclosed fees and rates were merely "introductory" or "initial" rates and would be massively increased.  That is a lose-lose situation for merchants as they would either be bound to pay the early termination fee or the undisclosed increases.

41.     To get business, Defendants bait merchants with promises of low rates and fees, knowing full well that the amounts disclosed will be increased substantially over the term of the contract.  Defendants' entire business model is built on a bait-and-switch.

## C.     <u>Defendants' Form Contract.</u>

42.     If the merchant is agreeable to the rates and fees set forth in the Application, it signs the Application.

43.     In tiny, barely legible print on the last page of the Application is the following language (which is reproduced herein in a similar font size):

> Each person signing below certifies that all information provided is true, correct, and complete, and each person agrees to be bound by all provisions set forth in this document, including, but not limited to the Terms and Conditions, which is hereby incorporated by reference for all purposes (Terms and Conditions can be obtained by visiting http://woodforest.com/Business-Banking/Services/MerchantServices).

44.     With this boilerplate language, Defendants purport to bind the merchant to their adhesive, take-it-or-leave-it Terms and Conditions ("Terms"), a separate document that is not attached to the Application. *See* Dkt No. 21-3.[1]

45.     It is Defendants' policy and practice not to provide a copy of the Terms to merchants before they sign the Application. As a result, any merchants that catch Defendants' incorporation of the Terms into the Application must take steps to seek them out before they sign, such as requesting a copy from Defendants' agents or typing the web address into their internet browser.

46.     That Defendants include a passing reference to the Terms rather than physically provide them to merchants before they sign is no accident. The Terms are an intimidating, legalistic document spanning 15 pages of dense, fine-print text that could potentially scare off potential business.

---

[1] For instance, Terms version "3/17" can be found at Docket 21-3. This is ***not*** the version that governs any of the Plaintiffs' accounts. For instance, Plaintiffs Rudiger and Mena Stone's Applications indicate that their accounts are governed by version "2/15." Dr. DeFabio, on the other hand, is governed by version "MCPS 11/2011(a)." Plaintiffs do not all have copies of such documents in their files. While it is believed that the applicable versions of the Terms are largely similar, discovery is needed.

47.     Buried within the Terms is a provision which is intended to undermine the most critical part of the deal from the merchant's perspective – the price.  This provision purports to provide Defendants with the ability to disregard the agreed-upon "Rates & Fees" and charge *whatever they want, whenever they want, for whatever reason they want,* **without advance notice***:*

> 10.6  Amendment.  MERCHANT acknowledges that the terms set forth herein including but not limited to fees, rates, and charges may be changed by BANK. MERCHANT agrees that any such changes shall be considered accurate and final unless MERCHANT disputes them in writing within 30 days of receipt of documentation showing said changes.

Terms, § 10.6.

48.     This term is Defendants' effort to disavow all of the misrepresentations and promises that were made to induce the merchant to do business in the first place.  Defendants know full that if merchants knew that the rates and fees they negotiated and agreed to were meaningless and could be raised at the whims of Defendants they would never agree to the deal to begin with.

49.     As a result, Defendants have intentionally configured the contracting process so merchants must (a) request or find a copy of the Terms, (b) read the legalistic Terms, (c) find the "Amendment" provision buried in the morass of fine print, and (d) understand that it purports to allow Defendants to ignore the entire basis for the deal.  Defendants know full well that 99.99% of merchants cannot and will not jump through these hoops to cross-check the representations of the seemingly trustworthy sales agents.

**D.     Defendants Cram Merchants with Excessive and Undisclosed Fees.**

50.     Once the contract is executed by customers, Defendants repeatedly cram them with rates and fees that are higher than those set forth in the Application and additional fees that

were not even mentioned in the Application, including but not limited to (a) increased fees for monthly PCI protection, (b) new and increased fees for PCI non-compliance, (c) marked-up pass through fees, (d) excessive rates for debit card transactions for customers on tiered pricing plans, (e) increased monthly minimum discount fees, (f) increased discount fees, (g) new annual fees, (h) increased Foundry fees, and (i) improper non-qualified fees.

51.     Notably, Defendants do not provide notice of many new or increased fees until *after* such fees have already been debited by Defendants from merchant accounts.   The statements provided by Defendants are not bills and need not be voluntarily paid by merchants. Rather, statements are created and made available for merchant review *after* the fees have already been seized by Defendants.   Thus, merchants lack a mechanism to dispute a new or increased fee *before* Defendants have already deducted it from the account.

52.     Those merchants that subsequently notice and complain about the overcharges are simply routed into an endless loop of automated messages and holding the line in Defendants' so-called customer service system.   The end result for most merchants is that the only way out of paying the improper fees is to pay the extortionate early termination fee, which is a minimum of $495 and an amount that many small businesses cannot pay.   Terms, § 8.1 (setting early termination fee at the greater of (i) $495.00 per location; or (ii) "an amount equal to the average monthly charges, excluding any interchange fees assessed by the Card Associations, but including and not limited to all card and miscellaneous fees, on MERCHANT statements (for months during which MERCHANT processed any transactions) multiplied by the number of months remaining on the Term thereof").

53.     When honest sales agents for Defendants have complained to the "home office" about fee increases against customers they have signed up (and, of course, promised that fees

would not increase based on Defendants' training) they are told "everyone does that." Specifically, Defendants' "home office" employees acknowledge that customers have been told there will not be payment processing fee increases, but that Defendants knowingly breach this commitment. Some sales agents have quit because Defendants made liars out of them by raising fees on customers despite the promises all sales agents are told to make during their training.

54. This case challenges all improper fees imposed by Defendants, whether the result of fraudulently induced contracts or overcharges that violate the contract.

55. Shockingly, Defendants have been able to keep their schemes going for years. Payment processing is largely unregulated, so no governmental agency is directly charged with overseeing MCPS. The industry has been called "the wild, wild west." Still, Defendants have been sanctioned by at least one state's attorney general.

56. After hearing complaints from numerous citizens, the Attorney General for New Hampshire opened an investigation of MCPS. In September of 2015, MCPS and its Florida affiliate – Merchants' Choice of Florida – agreed to an "Assurance of Discontinuance" with the Attorney General. The Attorney General's press release summarized the investigation as follows:

> These companies initiated thousands of solicitations calls, both in-person and through telephone contacts, to New Hampshire businesses who accept credit card payments from their own customers, attempting to solicit the businesses to enroll in payment processing services, merchant account monitoring and other ancillary services. Both companies were unable to quantify the exact number of these calls made to New Hampshire businesses.

> These solicitations were conducted through a pre-approved script that failed to identify the legal name of the company and failed to inform consumers that the company making the calls is located in the state of Florida. In addition, the script failed to provide a phone number for consumers to call back with any follow-up questions or concerns. Further, the script characterized the offer being made as an "upgrade" of the existing payment processing equipment, when, in fact, the solicitations were an attempt to identify new customers to enroll in new services. Finally, the script made several references to a "free" replacement of card

payment processing equipment without clearly communicating to the consumers that the new equipment was conditioned on purchasing and remaining enrolled in their services.

Neither company had registered to do business with the New Hampshire Secretary of State.

Under the terms of the Assurance, both companies agree that they will not renew solicitations in New Hampshire until they are duly registered with the Secretary of State and that, prior to renewing solicitations, they must submit a revised solicitation script for the Attorney General's approval. They must pay a combined sum of $5,000 to the State in lieu of a civil penalty and must reimburse the State for the cost of the investigation.

Rather than operate under such transparency, MCPS has chosen not to register with the New Hampshire Secretary of State. Indeed, as of March 28, 2018, neither entity was registered with the state. Unfortunately, there is nothing special about New Hampshire; MCPS uses the same methods in all other states as well.

57.     The Better Business Bureau ("BBB") has taken the extraordinary step of issuing an alert to warn people away from doing business with MCPS. The BBB prominently states as to MCPS: "THIS BUSINESS IS NOT BBB ACCREDITED." Over 80 victims of MCPS have gone through the formal BBB process of filing a complaint or review of MCPS. After hearing of the same practices over and over again, the BBB issued this alert on the first page of its profile of MCPS:

**PATTERN OF COMPLAINT**
**Since September 2013, the BBB Houston & South Texas have received several disputes that exhibit the following pattern.**

**According to disputes received at the BBB, it has been alleged, that Merchant's Choice Payment Solutions, Inc. is using deceptive sales practices to sell new credit card machines to companies. Complainants are informed by Merchant's Choice that their current credit card machine carrier and the current machine need to be replaced to meet Payment Card Industry Data Security Standards. Upon realizing that they are now dealing with a new company, attempts are made to contact Merchant's Choice which go unanswered and subsequently the complainant would be under contract with Merchant's Choice Payment Solutions, Inc. for 2 – 4 years. Consumers also**

**allege the annual fee, monthly fee and PCI charges were waived by the sales person but when their first bill arrives, these fees are included. When complainant tries to cancel prior to end of this long contract, a large cancellation fee is charged.**

The BBB has also rated other MCPS-related entities as "NOT ACCREDITED."

58.     Small business websites and more general social media postings include hundreds of complaints against MCPS.

59.     A complete description of Defendants' bad practices would run to hundreds of pages.  Far lesser misdeeds have led to the federal criminal prosecution of one of Defendants' competitors.  On May 2, 2017, two individual agents of Commerce Payment Group were indicted on mail and wire fraud.  *See* Indictment in Case No. 17-CRIM-248 (S.D.N.Y.).  The agents stand accused of committing mail and wire fraud and conspiracy to commit mail and wire fraud by, among other things, (a) advertising low payment processing fees despite knowledge that that actual fees would be much higher, (b) inducing merchants to sign applications identifying fees that were not the actual fees that would be assessed, (c) concealing the terms from merchants, and (d) imposing fees that were much higher than those that had been advertised and disclosed.

60.     The allegations against Defendants herein are far more scandalous than those deemed criminal violations in the Commerce Payment Group indictment.

## PARTIES

61.     Plaintiff Al's Pals Pet Care, LLC operated a dog walking and pet sitting service.  Its owner turned her love of animals into a business.

62.     Plaintiff DeFabio Spine and Sports Rehab, LLC is a family-run chiropractic office located in New Jersey.  Dr. DeFabio has been named Chiropractor of the Year by the Association of New Jersey Chiropractors.

63.     Plaintiff Julie Rudiger, Inc. provides psychotherapeutic services to individuals and couples in the Denver, Colorado area. Owner Julie Rudiger uses a combination of therapy models to treat several conditions. Ms. Rudiger accepts credit and debit card payments in order to provide convenient options to her patients.

64.     Plaintiff Mena Stone & Landscaping Supplies, LLC is a small business selling stone, plants, and other landscaping items in Mena, Arkansas.

65.     Plaintiff Tulsa Art Center, LLC describes itself as a "comprehensive art-centered educational community where some of Tulsa's finest artists inspire students of beginning levels of all ages to achieve their creative goals."

66.     Plaintiff Ban-A-Pest Extermination Co., Inc. is a small business based in Muscogee, Oklahoma, that provides exterminating services.

67.     Plaintiff Fleetwood Chiropractic & Rehabilitation, PC offers chiropractic and physical therapy services in Blandon, Pennsylvania.

68.     Plaintiff Bayley Products, Inc. is a family-owned business that operates the Sailfish Marina of Stuart, Florida.

69.     Defendant Woodforest National Bank, N.A. is a privately-held business entity headquartered in The Woodlands, Texas. Woodforest Bank participates in numerous financial service sectors, including "traditional" banking activities through its many branches, often located in Wal-Mart retail stores. Additionally, Woodforest acts as a member bank for the major credit card brands and hosts MCPS as an ISO.

70.     Woodforest has a history of overreaching and "pushing the envelope" to maximize profits at the expense of customers. For example, Woodforest's overdraft practices with its banking customers were the subject of scrutiny and penalties by the Office of Thrift

Supervision ("OTS") and the Office of the Comptroller of the Currency ("OCC").  The OCC conducted an examination into Woodforest's overdraft practices and found a variety of improprieties.  These were summarized in a Consent Order that was ultimately accepted to resolve the issues.  *See* OCC Consent Order in Matter AA-EC-10-93.  Of particular interest to the allegations against Defendants, the OCC found that Woodforest marketed or promoted its deposit account products through a brochure that highlighted the free or low-cost features of certain accounts while omitting information about costly features of the account, such as overdraft protection.  *Id.* at Art. 1, ¶ 4.  The Consent Order agreed to between the OCC and Woodforest called for a correction of the aforementioned conduct and the imposition of a civil monetary penalty in the amount of $1,000,000.  *Id.* at Art. 2, ¶ 1.

71.     Also, the OTS issued an Order to Cease and Desist to Woodforest that, among other things, established that the bank's Board of Directors was required to create a new plan to govern overdraft programs offered by Woodforest that was acceptable to the OTS's Regional Director.  *See* OTS Order No. WN-10-16.  The OTS ordered Woodforest to create a Remuneration Plan to compensate its customers for their financial losses as a result of Woodforest's conduct.  *Id.* at ¶¶ 15-19.

72.     Woodforest was also sued based on its improper overdraft practices.  After two years of litigation, the Unites States District Court for the Northern District of Georgia approved a class action settlement whereby a total amount of $7.75 million was returned to customers that had been damaged.  *See* Final Approval Order, Dkt. No. 84 in Civil Action No. 1:12-cv-103-CAP.  Unfortunately, Woodforest's avaricious behavior continued unabated even after its overdraft problems were resolved.

73.     Defendant Merchants' Choice Payment Solutions is a Member Services Provider (sometimes referred to as an "MSP") and Independent Sales Organization (sometimes referred to as an "ISO") of Woodforest and, on some occasions, for other banks.  MCPS is headquartered in The Woodlands, Texas and was founded in 1989.  Based on the aggressive sales methods described herein, the company grew rapidly in recent years.  Various governmental filings suggest that other entities controlled by Woodforest – such as Merchants Choice of Florida, Merchants' Choice Partners, and Delta Card Services – may also be liable in this matter.  It is not currently possible for Plaintiffs to unravel Defendants' corporate shell game.  Discovery will be needed to ensure all necessary entities have been named as Defendants.  Regardless of which legal entities were involved, by 2016, Woodforest's "Merchants' Choice" brand had 70,000 customers and handled $19 billion dollars in transactions annually according to industry publication the *Nilson Report*.

74.     MCPS (and potentially other MSP/ISOs controlled by Woodforest) was acquired by Defendant Paysafe in August of 2017 for a total purchase price of $470 million.  This amount equates to $6714 for each customer of MCPS.  Thus, there was an enormous financial incentive for Defendants to take the improper actions described below.  Paysafe retained MCPS CEO Todd Linden as Paysafe's CEO of Payment Processing North America and MCPS CFO Giovanni Diano as Paysafe's CFO of Payment Processing.

75.     After closing on MCPS, Paysafe immediately agreed to be purchased by a group of private equity investors led by Blackstone, one of the world's largest private equity firms. Discovery may show that naming one or more acquiring entities, or their subsidiaries or affiliates, is necessary to provide relief for improper practices that are ongoing and that have occurred since August of 2017.

## JURISDICTION AND VENUE

76.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 potential class members and the aggregate amount in controversy exceeds $5 million exclusive of interest, fees, and costs, and at least one class member is a citizen of a state other than Texas.

77.     Defendants are Texas businesses within this judicial district.

78.     Venue lies within this judicial district because Defendants mandate that suits against them be filed in either Harris County or Montgomery County (depending on the version of the form contract), both of which fall entirely within this district.

## INDIVIDUAL FACTUAL ALLEGATIONS

### A.     Plaintiff Julie Rudiger, Inc.

79.     Plaintiff Julie Rudiger, Inc. was a victim of Defendants' slamming scheme.

80.     On December 14, 2016, the owner of Plaintiff Julie Rudiger, Inc., Ms. Rudiger, received a call from an agent for MCPS claiming to be Plaintiff's then-current processor, Omega Processing Solutions.  The agent claimed that Plaintiff's transaction fees "would go up" and that they "wanted to make sure that didn't happen."

81.     Ms. Rudiger agreed that she would like to avoid any fee increases and Defendants' agent asked her to send a current statement so he could confirm her savings.  Ms. Rudiger asked: "Why don't you just pull up my information?"  The agent said "I could run downstairs and get it but it will save time if you just send it."  The agent was well trained to deliver this lie and Ms. Rudiger had no reason to suspect he was a fraudster, so she complied and faxed Defendants her information.

82. The MCPS agent called back and confirmed to her that "we can avoid the fee increase and I can even lower your rates but I will need you to sign some new documentation." He then faxed a fraudulent cost comparison showing that Plaintiff would save money. The cost comparison was a form created by Defendants and used by their agents to facilitate the scheme. Defendants knew the cost comparison was inaccurate.

83. He also sent a "Merchant Payment Card Application/Agreement" to her via email. Notably, unlike nearly all other companies in the payments industry, Defendants' application is often formatted so that it does not include the agent's name or signature. This revision is needed to avoid criminal prosecutions against Defendants' agents and employees by their victims. Rather than a name, which could subject the agent or employee to prosecution, only an "Agent #" is listed. In this case, Agent #7224 was to be compensated by Defendants. Defendants pay such agents hundreds of dollars each time they successfully trick a merchant into signing up with MCPS. Since Defendants sold their company for the equivalent of nearly $7000 per customer, such rich commissions could easily be justified. Even though Defendants were informed on innumerable occasions that Agent #7224 committed fraud in their names, they continued to richly reward the agent.

84. Since it was the only way Ms. Rudiger thought she could avoid the increased fees, she completed the paperwork. Based on the representations of Defendants' agent, and Ms. Rudiger's belief she was working with her current processor, Plaintiff docu-signed the Application on December 14, 2016.

85. The references on the paperwork to MCPS and Woodforest did not give Ms. Rudiger pause. Merchants Choice Payment Solutions is a very similar name to Ms. Rudiger's processor Omega Payment Solutions, which also happens to be an ISO of Woodforest Bank.

With the number of parties involved in the payment processing industry, as summarized above, and with Defendants' well-trained agent providing ready answers to each of her concerns, Ms. Rudiger was unable to discern the truth but rather believed Defendants' misrepresentations.

86.     Ms. Rudiger would not have signed the contract paperwork but for the well-rehearsed misrepresentations of Defendants' agent.

87.     When a new card reader was delivered the next day, Ms. Rudiger suspected she might not be dealing with her processor, which would have had no reason to send her additional equipment.  Ms. Rudiger called her representative at her processor – who she believed she had been re-signing with – and learned that she had been "poached" by MCPS.  Her agent at Omega Processing Solutions told her this happens all the time and he knew exactly which company had defrauded her, "Merchants' Choice."  He informed her of the steps she would have to take to try to minimize the damage.  He confirmed that Defendants' fraud was commonplace and he had dealt with other customers facing the same situation numerous times.

88.     Ms. Rudiger immediately called MCPS on December 15th and was eventually able to speak with a person and to inform them of the fraud.  Oddly, they were not concerned about such a fraud being committed in the name of their company and acted as if such calls were commonplace.  At first, when Ms. Rudiger demanded an immediate cancellation, MCPS informed her of MCPS's $495 early termination fee.  Ms. Rudiger refused to pay the fee.

89.     After persistence by Ms. Rudiger, the employee did allow her to start the "resolution request" process, to be able to terminate without paying the fee.  This "pressure release valve" has been established by Defendants in an effort to avoid the attention of prosecutors and regulators.  But by establishing a gauntlet that merchants must navigate in order to extricate themselves from a contract that Defendants know full well was procured by fraud,

Defendants are able to keep many merchants ensnared in their trap. For those who are truly diligent, escape is possible but, even then, Defendants make it virtually impossible to avoid paying Defendants substantial amounts. Indeed, despite Ms. Rudiger's prompt and tireless efforts, she was still forced to pay Defendants substantial funds.

90.     On December 20th, Defendants emailed Ms. Rudiger a copy of the "resolution request form." Ms. Rudiger immediately completed it and emailed it back.

91.     On December 28th, Peter Soord of MCPS identified MCPS as Plaintiff's "new processor," claimed it would save the business money, and might even help pay early termination fees for Plaintiff to leave its current processor. Ms. Rudiger was forced to respond again, wasting more time and effort. She stated that she had been defrauded and needed to undo the deal immediately and wanted all fees waived. She even alerted Defendants that she had saved the misleading voice message left by one of Defendants' agents. Once again, Defendants had no interest in learning more about the fraud committed in their name.

92.     After realizing that MCPS – even after being informed of the fraud – had no intention to simply undo the transaction, Ms. Rudiger understandably had no interest in doing any further business with MCPS. Their lack of concern over her clear allegations of fraudulent practices by MCPS's agent was proof positive that such reports were not unusual. Ms. Rudiger immediately and consistently sought to cancel any "agreement" she had signed with MCPS.

93.     Plaintiff never removed the new credit card terminal from the box and never processed a single transaction through MCPS. Plaintiff did not use any services provided by MCPS. This is the same for many merchants defrauded by Defendants. Even though the merchant never registers with Defendants, and never processes a single transaction with them, they will automatically deduct substantial amounts from their business checking account forever

(Defendants auto-renew accounts after the three-year term expires), until the merchant successfully navigates their termination gauntlet.

94.     On December 29th, Ms. Soord responded via email and indicated the account had been canceled without penalty, and provided instructions to Ms. Rudiger as to how she could return the equipment, which she promptly did.

95.     Nonetheless, Defendants did not stop debiting Plaintiff's account.  Indeed, Woodforest debited funds from Plaintiff's bank account not only in December of 2016, but also January and February of 2017.   Plaintiff's bank account was not held with Woodforest Bank and Plaintiff was never "billed."  Woodforest simply took the money, only sending Plaintiff a notice of the debits after the funds had been seized.

96.     Woodforest failed to provide an accounting for the payment processing fees charged and left Plaintiff to do the math.  In any event, the fees do not match the rates shown in the paperwork she had been misled into signing.

97.     Defendants deducted $32.27 in payment processing fees from Plaintiff's bank account for the December statement period.  Defendants deducted $49.95 for both the January and February periods.  Because of their fraud, every fee charged by Defendants was improper.

98.     Eventually, after jumping through several hoops for MCPS, Defendants did stop seizing funds from Plaintiff's bank account.  The funds that had been seized over three months, however, were never refunded, despite Ms. Rudiger's numerous demands.  Thus, even where a merchant does everything humanly possible to overcome Defendants' fraud, they are still left with losses that exceed $130.

**B.** **Plaintiff Mena Stone & Landscaping Supplies, LLC.**

99.     Plaintiff Mena Stone & Landscaping Supplies, LLC ("Mena Stone") suffered from the same fraud as did Ms. Rudiger.

100.     On February 14, 2017, Mena Stone received a phone call from Tammy Wittman acting as authorized agent for Defendants.  Ms. Wittman informed Mena Stone's owner Mike D'Albero that he needed a technological upgrade on his card reading equipment or he would not be in compliance with new payment industry standards.  The caller misrepresented herself by indicating that she was with Mr. D'Albero's then-current payment processor.

101.     Mr. D'Albero believed Ms. Wittman.  The caller stated that she would send some paperwork which Mr. D'Albero should sign and then she would send the replacement equipment.

102.     On February 14, 2017, at 11:01 AM, Ms. Wittman sent documents via email and the Adobe Sign system so that Mr. D'Albero could sign quickly and easily.  Oddly, Ms. Wittman's email address is with Mirand Response Systems, Inc.  Mirand is a Houston-based debt collection firm.  The relationship between Defendants and Mirand is not currently known.

103.     The documents sent by Ms. Wittman on February 14th included several misrepresentations.  First, they included a cost comparison that included multiple intentionally erroneous facts, including inaccurate rates that Mena Stone was then paying and inaccurate rates that Defendants' would charge.  Notably, the cost comparison form used by Ms. Wittman was essentially the same as that used by the agent for Julie Rudiger, Inc. and the agent exposed in the video exposé by the Merchant Services Fraud Alert Association.

104.     The "Merchant Payment Card Application/Agreement" sent by Ms. Wittman included rates and fees other than those listed on Defendants' cost comparison.  Thus,

Defendants intentionally showed payment processing rates on the front page that differed from the rates set forth on the Application. This is always the case under Defendants' training and documents.

105.    Mr. D'Albero docu-signed the Application on February 14, 2017. Prior to signing, Mr. D'Albero did not notice the references on the documents to MCPS or Woodforest, nor would such references have meant anything to him even if he had noticed them. It was very clear from speaking to Ms. Wittman that he was dealing with his current provider.

106.    On February 15, 2017, a terminal was delivered to Mena Stone. Mr. D'Albero unpacked the new terminal and took his old terminal and shipped it to Defendants, as he had been instructed to do by Ms. Wittman. Obviously, this practice amounts to theft of his current processor's property but is still part of Defendants' training. The same practice was suffered by other Plaintiffs and can be viewed coming from another agent in the video exposé by the Merchant Services Fraud Alert Association. Defendants' have a corporate policy whereby they knowingly receive and utilize thousands of items of valuable stolen property each year. Such property is only shipped to Defendants under false pretenses, and Defendants know full well that each such piece of equipment lawfully belongs to someone else. There is no scenario when it would be proper for Defendants to keep or utilize such equipment.

107.    For a few weeks, Mr. D'Albero did not realize he had been scammed. In March of 2017, he received (a) his bank statement for February of 2017 and saw that both his old processor and Defendants had deducted funds and (b) a statement from Defendants that was in a different format than he was used to seeing.

108.    Mr. D'Albero called both processors and pieced together what had occurred. He confirms that everything done by Defendants was done under false pretenses. He was repeatedly

given incorrect information by Ms. Wittman and Defendants and, based on such misrepresentations, he signed Defendants' paperwork.

109.     On March 13, 2017, Mr. D'Albero emailed Woodforest and informed them that he had been slammed by its merchant services provider.  He indicated he had already incurred over $500 in fees as a direct result of this fraud and asked Woodforest to get in touch with him immediately to rectify the situation.

110.     On March 28, 2017, Woodforest responded by letter and acknowledged receipt of Mr. D'Albero's written complaint.  Woodforest indicated it was investigating the allegations but then self-servingly stated "you are not claiming any fees as fraudulent and are remaining with our processing service."  This was not true.  In fact, Mr. D'Albero had advised Woodforest that Mena Stone wanted to terminate but was told that it would first have to pay the $495 early termination fee, which is not something Mr. D'Albero was interested in.

111.     When Mr. D'Albero called his prior processor, they were not surprised that he had been slammed by Merchants' Choice.  Fortunately, they were willing to release Mena Stone from its contract as soon as its equipment was returned.

112.     Mr. D'Albero called and demanded that Defendants send back the equipment that they did not own and had scammed him into sending.  He was told that it was not Defendants' problem and was rudely instructed that there was nothing that could be done.

113.     Mr. D'Albero expanded his calling and emailing to include Woodforest Bank and various regulators of Woodforest.  Only then, after bankers felt that he would be able to involve regulators, did Defendants agree to return his equipment.

114.     The equipment was returned and Mr. D'Albero promptly sent it to his former processor, which stopped billing him.  He paid over $100 in fees to the former processor after he

had sent the equipment to Defendants, and therefore could not even use his former processor's services. He also spent money on packing and shipping the equipment. Most importantly, he spent dozens of hours researching Defendants and calling and emailing them to get back the equipment.

115.    Defendants would not agree to terminate Mena Stone's contract without payment of the $495 fee, so he was stuck using their services for almost a year. It was only after this litigation was filed that Defendants finally agreed to allow Mena Stone to terminate without paying the early termination fee. According to counsel for Defendants, Mena Stone's termination became effective on March 1, 2018.

116.    Aside from being victimized by Defendants' slamming scheme, Mena Stone was also induced to contract based on Defendants' fraudulent misrepresentations. Mena Stone was provided the "Rates & Fees" disclosed in the Application, including (a) the "Signature Debit Rate" of 1.29% for all debit card transactions, (b) a "Monthly PCI Protection Plan" fee of $0.00 per month, and (c) a "Monthly Minimum Discount Fee" of $25.00.

117.    At no time before he signed the Application was Mr. D'Albero advised that these identified rates and fees would be increased. Had Mena Stone known that Defendants intended to charge substantially higher rates and fees, Mr. D'Albero would not have signed the Application.

118.    Mr. D'Albero was overcharged each month by Defendants in violation of the contractual terms that were entered (based only on Defendants' fraud and misrepresentations).

119.    For example, Mena Stone is paying twice as much for many debit card transactions as Defendants promised. Defendants' promotional materials show a "qualified" debit card rate of 1.29%. The form contract shows this rate for all "signature debit cards." Such

a rate is massively profitable for Defendants, because pursuant to federal law and regulation the actual rate charged for most debit card transactions is .05%, leaving 1.24% of profit for Defendants.

120.    Defendants' form documents do not show any increased rate for debit card transactions that are not "qualified" or "signature."  Such a rate might be applicable, for instance, where the debit cards are charged over the phone, sometimes referred to as a "card not present" transaction.  Visa, for example, might charge a rate of 1.65% on such transactions.  In violation of their representations to Plaintiff and their contractual terms, Defendants have chosen to charge Mena Stone a rate of 2.58% for a substantial number of debit card transactions that Defendants characterize as "mid-qualified."  This rate has appeared on nearly all of Plaintiff's monthly statements, including but not limited to the February 2018 statement, and has consistently been applied by Defendants.  This is not the quoted "mid-qualified" rate and Defendants' form contract does not allow Defendants' to charge the 2.58% rate for the debit card transactions to which it has been applied.

121.    Additionally, on its December 2017 and January 2018 statements, Defendants charged Mena Stone a $16.95 monthly "Data Protection" fee.  Mena Stone never agreed to pay this fee and, indeed, its Application specifically indicates that $0.00 will be charged for Defendants' "Monthly PCI Protection Plan" which is what the "Data Protection" fee represents.

122.    On its January 2018 statement, Defendant charged Mena Stone a Monthly Minimum Fee of $27.99 even though it only agreed to pay a $25.00 Monthly Minimum Fee in its Application.

123.    These and numerous other improper fees were assessed against Mena Stone most months from February 2017 through February 2018.  Mena Stone does not have every monthly

statement that Defendants issued to it but believes there are other instances where it was charged fees that did not comport with its Application.

124.     Mena Stone has lodged multiple written complaints with Defendants, including but not limited to (a) its March 13, 2017 email to Woodforest, which complained about all charges received to date (sent to Woodforest within 30 days of Mena Stone's receipt of its February 2017 statement), (b) the original complaint, which complained about all fees to date that conflicted with the Application (served on Woodforest on January 2, 2018), and (c) this amended complaint.[2]

**C.     Plaintiff Tulsa Art Center.**

125.     Plaintiff Tulsa Art Center also suffered from Defendants' telephone slamming scam.  Plaintiff's owner had the misfortune to pick up a call from Defendants' agent and was told that "you are not compliant with your current credit card machine and you will have to change it to a new one."  Defendants' agent acted as if she worked for Plaintiff's long-time payments company (without saying the name).  At no time did she mention Defendants.

126.     After speaking with Plaintiff's owner about the bogus compliance issue, the caller said "and it also looks like we can save you some money, but we'll need you to sign new paperwork."

127.     Plaintiff's owner Marie Sullivan was very busy and does not actually remember signing any paperwork with Defendants.  Ms. Sullivan did not notice the references on the documents to MCPS or Woodforest, nor would such references have meant anything to her even

---

[2] All fees that conflict with the Applications that have been charged to Plaintiffs since the original complaint was filed (such as those imposed on Plaintiffs' December 2017, January 2018, February 2018, and all future statements) have been preemptively disputed.

if she had noticed them. It was very clear from speaking to Defendants' agent that she was dealing with her current provider.

128. A piece of equipment was promptly delivered and she did go through the instructions to set it up. Based on Defendants' misrepresentations, Plaintiff's owner still believed she was dealing with the same processor she had been dealing with for years.

129. The credit card machine from Defendants would not work for Plaintiff's business because Plaintiff needed a written record of charges. Plaintiff's owner called Defendants' agent and was promised the proper type of equipment. It never arrived.

130. During a call to Defendants' agent, Plaintiff's owner realized she was not dealing with the same company she had worked with for approximately six years, a company known as EPS. She was very upset to realize that she had been duped by Defendants. She asked Defendants if her EPS account had been closed. She was assured in no uncertain terms that Defendants had taken care of it, her EPS account had been closed, and Plaintiff would not be charged any additional amounts by EPS.

131. Plaintiff's EPS account was not closed. In fact, Defendants had done nothing to close the account. Plaintiff continued to have its account automatically debited by EPS in addition to all of Defendants' payment processing charges.

132. Of course, Defendants also took funds from Plaintiff's business bank account. Plaintiff could not terminate the bogus account because Defendants' employees instructed that there was a $495 early termination fee.

133. Months went by and both companies continued to deduct funds from Plaintiff's account each month. Defendants refused to honor their promise to "buy out" the prior payment provider. She emailed back and forth with Defendants' employees 50 to 60 times and spent

many hours on the phone with Defendants.  Most of the time was spent on hold and being passed from one "customer service" employee to the next.  In order to stop the double billing, Plaintiff had to handle the EPS termination process and paid EPS's termination fee of $245.  By this time, Plaintiff had paid over $819 that it would not have paid if Defendants had not defrauded Plaintiff.  Eventually, based only on the tireless efforts of Plaintiff's owner, Defendants did issue a credit to partially cover the losses on the old account.  The credit was far too small to cover Plaintiff's total losses though.  Plaintiff has paid hundreds of dollars more than it would have if Defendants had not defrauded her.

134.    Even if Plaintiff had not been slammed, it was also induced to contract based on Defendants' fraudulent misrepresentations concerning fees.  At no time before Plaintiff signed the Application was it advised that the rates and fees identified in the Application would be increased.  Had Tulsa Art Center known that Defendants intended to charge substantially higher rates and fees, it would not have signed the Application.

135.    Nevertheless, Tulsa Art Center, like the other Plaintiffs, was often charged fees that either are not disclosed on its Application or are appreciably larger than the disclosed fees. Tulsa Art Center does not have all of its monthly statements from Defendants and will promptly identify these precise overcharges after such statements are provided in discovery.

136.    Tulsa Art Center has lodged multiple written complaints with Defendants, including but not limited to (a) many emails and at least one letter complaining about Defendants' slamming and improper fees which were sent to Defendants within 30 days of the disputed charges, (b) the original complaint, and (c) this amended complaint.

137.    As of the filing of the original complaint, Tulsa Art Center was still processing with Defendants and paying for their unwanted services each month.  It was only after the

original complaint was filed that Defendants finally agreed to allow Tulsa Art Center to terminate without paying an early termination penalty. According to counsel for Defendants, Plaintiff's termination became effective on March 1, 2018.

### D.    **Plaintiff DeFabio Spine and Sports Rehab, LLC.**

138.    Plaintiff DeFabio Spine and Sports Rehab, LLC ("Dr. DeFabio") was **not** a victim of Defendants' telephone slamming scheme. Rather Dr. DeFabio signed up with a seemingly reputable sales agent, Michael Judd, in September of 2013.

139.    Dr. DeFabio was, however, induced to contract based on Defendants' fraudulent misrepresentations concerning fees. Dr. DeFabio agreed to the "Rates & Fees" disclosed in the Application, including (a) the "Signature Debit Rate" of 1.39% for all debit card transactions, (b) a "Monthly PCI Protection Plan" fee of $6.95 per month, and (c) an "eMerchant Support" fee of $4.00 per month. Additionally, there was no PCI Compliance Non-Validation Fee specified in the Application, thus Dr. DeFabio did not expect to pay one.

140.    At no time before he signed the Application was Dr. DeFabio advised that these identified rates and fees would be increased or previously unspecified fees would be added. Had Dr. DeFabio known that Defendants intended to charge much higher rates and fees, he would not have signed the Application.

141.    During many months while he was a customer, Dr. DeFabio was overcharged by Defendants in violation of the contractual terms that were entered (based only on Defendants' fraud and misrepresentations).

142.    For instance, Dr. Fabio has been overcharged for debit card transactions. Because such cards are backed by actual cash in bank accounts, the federal government has imposed a cap on fees that banks can charge for the acceptance of such transactions. Thus, Defendants pay only

.05% and 21 cents per transaction to Visa, MasterCard, and their member banks for processing most debit card transactions. Dr. Fabio agreed to pay 1.39% for processing such transactions, affording Defendants a healthy profit of 1.34% on each transaction.

143.     Rather than accepting such healthy profits, however, Defendants have consistently charged 2.39% and even 2.69% for many debit card transactions. These rates have been misleadingly described by Defendants on monthly statements as "Card Fees" even though they are merely extra charges to pad Defendants' bottom lines.

144.     There is no market justification and no contractual justification for these excessive debit card charges. Defendants have merely taken an agreed-upon high profit portion of their relationship with Dr. DeFabio and turned it into one that provides astronomical returns for Defendants with no attendant risk. This one segment of overcharges has cost Dr. DeFabio thousands of dollars.

145.     Defendants made additional across-the-board increases to the rates charged to Dr. DeFabio for processing credit and debit card transactions. Despite lower rates and greater competition across the industry, Defendants imposed substantial increases to Dr. Fabio's rates. Such increases were not imposed to cover higher costs for Defendants but merely to increase profits and, ultimately, the sale price for MCPS.

146.     Defendants have assessed numerous other improper fees as well. For example, on numerous statements, including June 2016, Defendants noted that Dr. DeFabio had been charged a $16.95 monthly "Data Protection" fee. Dr. DeFabio never agreed to pay this amount and indeed, his Application specifically indicates that only $6.95 will be charged for Defendants' "Monthly PCI Protection Plan" (which is what the "Data Protection" fee represents). Terms, §

2.58 ("MERCHANT agrees that it shall be liable for the PCI Protection Plan monthly fee in the amount set forth in Rates and Fees section of the Application").

147.    Additionally, on numerous statements, including November 2013 and September 2016, Defendants noted that Dr. DeFabio has been charged fees for PCI Compliance Non-Validation for amounts ranging from $16.95 to $27.95 per month.  This is despite the fact that Dr. DeFabio's Application identifies no PCI Compliance Non-Validation Fee.  Defendants' Terms make clear that the Application controls when it comes to such fees.  Terms, § 2.57 ("MERCHANT agrees the during the Initial Term and any Renewal Term it . . . shall be liable for PCI Compliance Non-Validation Fee per month **in the amount stated in the section titled "Rates and Fees" of the Application** . . .") (emphasis added).  Because Dr. DeFabio's Application does not state such fee, the parties agreed Defendants would not charge it.

148.    By way of additional example, on numerous statements Dr. DeFabio had been charged a "Merchant Foundry Fee."  Defendants charge monthly "Foundry Fees" for nearly all customers.  "Foundry" or "Merchant Foundry" is Defendants' name for a variety of data and technology services which are not used by the vast majority of customers.  Nevertheless, Foundry fees have been added to all accounts, even those that have never registered for or benefited from any Foundry service.  Press releases in 2015 trumpeted various "Foundry" features, such as "Foundry POS . . . a powerful, cloud-based software application designed to meet the specific business needs of the retail and restaurant industries" and "Foundry Business Insights . . . a market leading platform enabling merchants to grow and protect their businesses."

149.    Defendants have been especially interested in assessing the Foundry fees because such fees are generally not shared with sales agents who receive a portion of Defendants monthly billings for many customers.  For example, a sales agent may be entitled to receive residuals of

33% of the fees received by Defendants (as opposed to the amounts passed through to the card networks and member banks) from a merchant for the entire time the merchant processes with Defendants. Defendants have taken the position that Foundry fees are not subject to such commission agreements, thereby drastically increasing profits.

150. Dr. DeFabio never signed up for the Foundry program. It is not listed on his initial contract and thus no fees should have been charged. Terms, § 2.60 ("MERCHANT agrees that it shall be liable for the monthly Merchant Foundry fee as disclosed in the Rates and Fees section of the Agreement").

151. Even presuming that the Foundry Fee is equivalent to the "eMerchant Support" fee described in Dr. DeFabio's Application, rather than charge such fee at the agreed rate of $4.00 per month, Defendants more than quintupled it and charged Dr. DeFabio $20.95 per month many months, including September 2016 through April 2017.

152. Dr. DeFabio has expressly opted-out of the Foundry service at least twice, yet Defendants continued to impose the fee.

153. These and numerous other improper fees were assessed against Dr. DeFabio most months while he was a customer of Defendants. Dr. DeFabio does not have every monthly statement of Defendants but believes there are numerous other instances where his office was charged fees that did not comport with the Application.

154. Dr. DeFabio has lodged multiple written complaints with Defendants, including but not limited to the original complaint and this amended complaint.

## E.     Al's Pals Pet Care, LLC.

155.     Plaintiff Al's Pals Pet Care, LLC ("Al's Pals") was **not** a victim of Defendants' telephone slamming scheme.  Al's Pals knowingly signed up for a processing account with Defendants in August of 2013 and was a customer of Defendants until July of 2017.

156.     Al's Pals was, however, induced to contract based on Defendants' fraudulent misrepresentations concerning fees.  Al's Pals agreed to the "Rates & Fees" disclosed in the Application, including (a) an "interchange plus" relationship with a "plus" of .50%, (b) a "Monthly PCI Protection Plan" fee of $6.95 per month, (c) a "Monthly Minimum Discount Fee" of $10.00, (d) an "Annual Customer Service Fee" of $0, and (e) a "Gateway" fee of $17.95 monthly.

157.     At no time before its owner signed the Application was Al's Pals advised that these identified rates and fees would be increased or that previously unspecified fees would be added.  Had Al's Pals known that Defendants intended to charge substantially higher rates and fees, she would not have signed the Application.

158.     During many months while Al's Pals was a customer, it was overcharged by Defendants in violation of the contractual terms that were entered (based only on Defendants' fraud and misrepresentations).

159.     For instance, Defendants unilaterally increased the agreed upon "plus" in the "interchange plus" relationship from .50% to .59%.  This occurred in February of 2015 and for all months thereafter.   Al's Pals has also been overcharged for debit card transactions.

160.     Defendants also often charged Al's Pal's a "Gateway Mthly Access" fee of $30.00, rather than the agreed-upon rate of $17.95.  *E.g,.* October 2014 statement.

161.    Starting with its February 2015 statement and continuing each month thereafter, Defendant unilaterally increased Al's Pals "Minimum Monthly Discount Fee" from $10.00 to $25.00 per month and, if the discount fees incurred by Al's Pals fell below $25.00, Defendants charged it the difference between such fees and $25.00 each month.

162.    Additionally, in and after August 2015, Defendants charged Al's Pals a $16.95 monthly "Data Protection" fee.  Al's Pals never agreed to pay this fee and, indeed, its Application specifically indicates that only $6.95 will be charged for Defendants' "Monthly PCI Protection Plan" which is what the "Data Protection" fee represents.

163.    Additionally, Al's Pals was charged Annual Fees of $79.00 in November of 2015 and 2016.  This was despite the fact that Al's Pals' Application indicated it would pay a $0 Annual Fee.

164.    These and numerous other improper fees were assessed against Al's Pals in most months since it started as a customer.  Al's Pals does not have every monthly statement of Defendants but believes there are other instances where it was charged fees that did not comport with its Application.

165.    On July 17, 2017, Al's Pals contacted Defendants to inform them that its business was closing and thus Al's Pals needed to terminate the account.  Defendants sent a cancellation form via email which Al's Pals owner completed and returned on July 18, 2017.

166.    Defendants did not immediately close the account.  In early August 2017, Defendants attempted to automatically debit Al's Pals bank account as if the account had not been closed, including several of the fee types challenged herein.  Al's Pals did not anticipate it would be billed for fees incurred after the account was closed and did not have sufficient funds in the account.  This caused Al's Pals to incur overdraft fees with its bank.  Twice more

Defendants attempted to direct debit Al's Pals account and twice more Al's Pals incurred overdraft fees with its bank.

167.   That same month, after being alerted to Defendants' actions, Al's Pals owner emailed at least two written complaints to Defendants.

## F.   Ban-A-Pest Extermination Co., Inc.

168.   Plaintiff Ban-A-Pest Extermination Co., Inc. ("Ban-A-Pest") also was not a victim of Defendants' fraudulent slamming scheme.   Ban-A-Pest knowingly signed up for a processing account with Defendants in April of 2011.

169.   Ban-A-Pest was, however, induced to contract based on Defendants' fraudulent misrepresentations concerning fees.   Ban-A-Pest agreed to the "Rates & Fees" disclosed in the Application, including (a) a "Monthly PCI Protection Plan" fee of $6.95 per month, (b) a "Signature Debit Rate" of 1.50%, and (c) a "Mid-Qualified Rate" of 2.25% for credit card transactions.   Additionally, there was no PCI Non-Compliance Fee, eMerchant Support Fee, or Paper Statement Fee specified in the Application, thus Ban-A-Pest did not expect to pay these fees.

170.   At no time before it signed the Application was Ban-A-Pest advised that these identified rates and fees would be increased or previously unspecified fees would be added.   Had Ban-A-Pest known that Defendants intended to jack up the agreed-upon rates and fees, it would not have signed the Application.

171.   Ban-A-Pest was overcharged throughout its time as a customer of Defendants in violation of the contractual terms that were entered (based only on Defendants' fraud and misrepresentations).

172. For example, on numerous statements, including October 2017 through January 2018, Defendants noted that Ban-A-Pest has been charged fees for PCI Non-Compliance for amounts ranging from $16.95 to $27.95 per month. This is despite the fact that Ban-A-Pest's Application identifies no PCI Non-Compliance Fee. Because Ban-A-Pest's Application does not state such a fee, the parties agreed Defendants would not charge it.

173. Additionally, Defendants often charged Ban-A-Pest a $16.95 monthly "PCI Protection Fee." *See, e.g.*, February 2018 statement. Ban-A-Pest never agreed to pay this amount for PCI or data protection. Indeed, its Application specifically indicates that only $6.95 will be charged for Defendants' "Monthly PCI Protection Plan."

174. Furthermore, Defendants charged Ban-A-Pest $4.95 per month for the privilege of receiving a paper statement (e.g., January 2018 statement), yet another fee it never agreed to pay.

175. Defendants often charged Ban-A-Pest an eMerchant Support Fee of $8.00 monthly even though the Application does not indicate such a fee will be charged. *E.g.*, December 2012 statement.

176. Moreover, Defendants repeatedly charged Ban-A-Pest higher rates for debit and mid-qualified credit card transactions than the rates set forth in the Applications. Indeed, rather than charge the 1.50% and 2.25% rates for such transactions specified in the Application, Defendants often charged 1.59% and 2.34%, thus inflating the rates by 0.09%. *E.g.*, November 2017 statement; February 2018 statement.

177. These and numerous other improper fees were assessed against Ban-A-Pest in most months since it started as a customer. Ban-A-Pest does not have every monthly statement of Defendants but believes there are other instances where it was charged fees that did not comport with its Application.

178.    Ban-A-Pest has lodged multiple timely written complaints with Defendants.  In addition to this First Amended Class Action Complaint, on February 9, 2018 (shortly after receiving the January 2018 statement), Ban-A-Pest owner Curt Postlethwait emailed Defendants admonishing them for charging his account another PCI Non-Compliance Fee.  Mr. Postlethwait sought "a full refund of all monies stolen from my account by your company."  Defendants responded that they were agreeable to handling complaints by email and offered a partial refund, which did not begin to cover all of the improper fees Ban-A-Pest's account had been wrongfully charged.  This was not the first time that Plaintiff had caught Defendants adding this improper fee to statements.  Indeed, Defendants' representatives had acknowledged previously that the fee was improper and removed and refunded it, only to sneak it in again a few months later.

179.    On February 28, 2018, Mr. Postlethwait emailed Defendants and notified them that Ban-A-Pest was terminating the account immediately due to their fraudulent fee practices.  Defendants did not respond.

180.    After Mr. Postlethwait received Ban-A-Pest's February 2018 statement, on March 19, 2018, he called to check on the status of termination but never received a return call.  Based on such non-responsiveness, Ban-A-Pest assumes that Defendants will not allow termination unless an early termination penalty is paid.

G.    **Fleetwood Chiropractic & Rehabilitation, PC.**

181.    Plaintiff Fleetwood Chiropractic & Rehabilitation, PC ("Fleetwood") signed up for a processing account with Defendants in August of 2016.

182.    Fleetwood was induced to contract based on Defendants' fraudulent misrepresentations concerning fees.  Fleetwood agreed to the "Rates & Fees" disclosed in the

Application, including (a) a "Signature Debit Rate" of 1.29% and (b) a PCI Compliance Non-Validation Fee of $19.95.

183.    At no time before it signed the Application was Fleetwood advised that these identified rates and fees would be increased or previously unspecified fees would be added.  Had Fleetwood known that Defendants intended to jack up the agreed-upon rates and fees, it would not have signed the Application.

184.    Fleetwood was repeatedly overcharged during its time as a customer of Defendants in violation of the contractual terms that were entered (based only on Defendants' fraud and misrepresentations).

185.    For example, on numerous statements (including but not limited to the February 2018 statement) Defendants charged Fleetwood higher rates for debit card transactions than the rate set forth in the Application.  Indeed, rather than charge the agreed rate of 1.29%, Defendants often charged 2.09% and 2.59%.

186.    Beginning in August of 2017, Defendants jacked up the agreed $19.95 monthly fee for PCI Compliance Non-Validation from $19.95 to $27.95.  The increased rate has been uniformly charged on each monthly statement Fleetwood has received from Defendants, including its February 2018 statement.

187.    In February 2018, after receiving its January 2018 statement, Fleetwood contacted Defendants to inquire about the increased PCI Compliance Non-Validation Fee.  Fleetwood was told that the fee would be reduced to $8.95 going forward – Defendants' supposed "standard" Monthly PCI Compliance Fee – if Fleetwood fulfilled certain steps.  No refund for prior fees was offered.

188. This was not acceptable to Fleetwood because it never agreed to pay a $27.95 monthly PCI Compliance Non-Validation Fee, nor did it agree to pay anything for enrollment in Defendants' "Monthly PCI Protection Plan." Indeed, the Application notes that Fleetwood will pay "$0.00" per month for such fee, not $8.95.

189. Fleetwood has lodged written complaints with Defendants concerning their fee practices, including this amended complaint.

190. Fleetwood desperately wants to cease its relationship with Defendants but was told it would only be allowed to do so if it first pays a $495 early termination penalty.

## H.     Bayley Products, Inc.

191. Plaintiff Bayley Products, Inc. ("Bayley") signed up for a processing account with Defendants in December of 2015.

192. Bayley was presented with a form Application to sign that is identical in all material respects to the form Applications signed by the other Plaintiffs, with one exception. Instead of noting MCPS on the header of the document, Bayley's Application notes "US Merchant Services."

193. Bayley thought it was agreeing to do business with "US Merchant Services," a local Florida company. However, after it signed the Application, Bayley received Terms that indicated its contract was actually with Woodforest Bank. These Terms are indistinguishable from the standard MCPS Terms. Moreover, all statements subsequently received on the account also bear the "Woodforest" name. The statements too are indistinguishable from the standard MCPS statements. Thus, even when Woodforest/MCPS signs up merchants under local independent sales organizations ("ISOs"), Defendants use the same documentation and apply identical practices to such customers.

194.    Bayley was induced to contract based on Defendants' fraudulent misrepresentations concerning fees.  Bayley agreed to the "Rates & Fees" disclosed in the Application, including (a) a "Signature Debit Rate" of 1.29% and (b) a "Monthly PCI Protection Plan" fee of $6.95 per month.

195.    Additionally, Bayley's Application was clear that Plaintiff would not be billed for several fees, including "Batch Header Fee[s]" and "Annual Customer Service Fee[s]."  Both of these fee types (and many others) are left blank on the Application, thus Bayley did not expect to pay these fees.

196.    At no time before it signed the Application was Bayley advised that these identified rates and fees would be increased or that previously unspecified fees would be added. Had Bayley known that Defendants intended to jack up the agreed-upon rates and fees, it would not have signed the Application.

197.    Bayley was repeatedly overcharged during its time as a customer of Defendants in violation of the contractual terms that were entered (based only on Defendants' fraud and misrepresentations).

198.    On most of its monthly statements, including its February 2018 statement, Bayley was charged Batch Header Fees of $0.10 per transaction.  This was despite the fact that Bayley did not agree to pay any Batch Header Fees on the Application.

199.    Additionally, Bayley was charged Annual Fees of $89.00 (*e.g.*, March 2017 statement).  This was despite the fact that Bayley did not agree to pay any Annual Fee on the Application.

200.    Beginning with its August 2017 statement, Defendants charged Bayley a $16.95 monthly "PCI Protection Fee."  *E.g.*, February 2018 statement.  Bayley never agreed to pay this

amount for PCI or data protection. Indeed, its Application specifically indicates that only $6.95 will be charged for Defendants' "Monthly PCI Protection Plan."

201.     Beginning with its May 2017 statement, Defendants added a new "Non-Qualified Fee" to their monthly billing. Bayley never agreed to pay such a fee, nor would such a fee even make sense given Bayley was on an "interchange plus" pricing program that does not distinguish between qualified vs. non-qualified transactions, as opposed to a tiered program in which certain credit card transactions are deemed by Defendants to be "non-qualified."

202.     This "Non-Qualified Fee" was charged each month from May 2017 through November 2017, except October 2017. It ranged from a high of $530.55 in July 2017 to a low of $302.39 in November 2017.

203.     In October of 2017, Bayley noticed the deductions for improper fees. After reviewing its contract and noting that it never agreed to pay such fees, Bayley contacted Defendants via email, complained about the fees, demanded a refund, and sought to terminate the contract.

204.     The agent that Bayley spoke to acknowledged the fees were improper and blamed them on a pricing decision of the new owner of the company (presumably Paysafe). He apologetically said, "I had no[] control over what transpired once they were sold. As usual when a company buys another one they look to get their money back quickly and do it by raising prices. That is why we have moved elsewhere."

205.     The agent forwarded an MCPS cancellation form for Bayley to complete and return. The agent also told Bayley that they may be subject to the early termination penalty of $495 and/or liquidated damages, which the agent acknowledged in Bayley's case "could amount to quite a bit of money and most likely not be an amount anyone would be willing to pay."

206.     The agent subsequently offered Bayley half of the wrongful charges back, an offer which Bayley rejected.  The agent responded that he had done all he could do and advised Bayley to retain legal counsel.

207.     Bayley did retain local legal counsel who sent a letter to Defendants demanding a refund for multiple improper overcharges.  On December 18, 2017, Defendants relented and issued a partial refund.  This refund did not cover all of Defendants' improper fees.  Moreover, Defendants have continued to assess improper, unauthorized charges on Bayley, including but not limited to on its January and February 2018 statements.

208.     Bayley has lodged multiple written complaints with Defendants concerning their fee practices, including its October and November 2017 emails, the letter from its local legal counsel, and this amended complaint.

209.     These are but a few examples of Defendants' improper payment processing overcharges.   All customers suffered from Defendants' systematic practices of inducing merchants to do business through fee promises that they never intended to keep and adding fees in violation of Defendants' contracts with customers.  When Defendants desired to increase profits – which was often – they simply tinkered with a payment processing fee, applied it across thousands of customers in an automated fashion, and reaped the increased profits.

210.     This lawsuit does not challenge, in any form, Defendants' representations or obligations with respect to equipment (e.g., terminals, card readers, chip readers) they marketed or provided to customers, including but not limited to the capabilities of such equipment, lease or sale agreements for such equipment, the cost of such equipment, or any charged for such equipment.  Any and all references to equipment are only intended to provide further detail and context to Defendants' fraudulent scheme to induce merchants to enroll in their payment

processing services. Plaintiffs do not allege they have been overcharged for equipment provided by Defendants or their partners or seek the return of any amounts they have paid for such equipment.

**ANTICIPATED CONTRACTUAL DEFENSES**

211.    In their motion to dismiss the original complaint, Defendants raised two contractual defenses, neither of which have merit.

**A.    Written Notice Provision.**

212.    First, Defendants referred to Section 2.11(b) of the Terms, which states:

(b) MERCHANT shall promptly upon receipt, examine, balance, and reconcile all statements relating to the Account. Additionally, MERCHANT shall daily balance and reconcile all DAILY deposit and debit totals to confirm accuracy. MERCHANT is required to notify BANK IN WRITING of any and all errors on MERCHANT'S statements and/or DAILY totals. Each such written notice shall contain the following information: (i) MERCHANT name and account number, (ii) the specific dollar amount of the asserted error, (iii) a detailed description of the asserted error, and (iv) a detailed explanation of why MERCHANT believes an error exists and the cause of the error, if known. The written notice MUST be RECEIVED by BANK within thirty (30) days after MERCHANT receives the statement (regarding an asserted error on a statement) or within thirty (30) days from the date the alleged error on a DAILY total was made. **FAILURE TO TIMELY SEND THE NOTICE REFERRED TO HEREIN CONSTITUTES A WAIVER OF ANY AND ALL RIGHTS MERCHANT MAY HAVE AGAINST BANK RELATED TO THE ASSERTED ERROR.**

213.    According to Defendants, this provision applies to each of the fees alleged by Plaintiffs to be improper and Plaintiffs' failure to comply with this "written notice provision" constitutes a waiver of all its claims. Defendants are mistaken.

214.    As a preliminary matter, there is no indication that these provisions are applicable to each Plaintiff. As previously noted, the Terms attached hereto are but one of several versions. *See* ¶ 44 n.1, *supra.* These provisions may not appear in the Terms that are actually applicable to certain accounts of Plaintiffs.

215.    However, even if Section 2.11(b) (or its substantive equivalent) does appear in each Plaintiff's Terms, since Plaintiffs were fraudulently induced to enter a contractual relationship with Defendants, the contract is subject to rescission and such provisions are not enforceable.

216.    Regardless, by its own terms, Section 2.11(b) *only* requires merchants to provide timely written notice of all "errors" on merchant statements.

217.    An error is "[a]n act, assertion, or belief that unintentionally deviates from what is correct, right, or true;" it is a "mistake."[3]  *The American Heritage Dictionary* 606 (4th ed. 2000) (first and fourth definitions).  In other words, an error is an unintentionally incorrect act, assertion, or belief, or a mistake.  It does not include intentionally wrongful conduct.

218.    Here, Plaintiffs do not complain of "errors" in their statements.  They do not contend that Defendants have mistakenly charged them too much; rather, they assert that Defendants have intentionally and systematically overcharged them.  Because Plaintiffs contend that Defendants' overcharges are willful, as opposed to accidental, they do not complain of "errors" and Section 2.11(b) is inapplicable.

219.    Because it is inapplicable, Section 2.11(b) is irrelevant to this suit.  However, if this provision is given the interpretation suggested by Defendants, it violates Texas law and public policy, including but not limited to V.T.C.A. § 16.071(a), is unduly exculpatory and unconscionable, and is otherwise void and unenforceable.

---

[3] Other dictionaries offer substantially similar definitions of "error."  *See New Oxford American Dictionary* 573 (2d ed. 2005) ("a mistake") (first definition); *Black's Law Dictionary* 582 (8th ed.2004) ( "An assertion or belief that does not conform to objective reality; a belief that what is false is true or that what is true is false; mistake."); *Webster's Third New International Dictionary Unabridged* 772 (1993) ("an act involving an unintentional deviation from truth or accuracy" or "a mistake in perception, reasoning, recollection, or expression") (second definition).

220.    Moreover, regardless of Section 2.11(b)'s applicability and enforceability, Plaintiffs provided Defendants with timely, written notice of allegedly improper fees in substantial compliance with Section 2.11(b), which is all that the law requires.  *See* ¶¶ 79-210, *supra*.

**B.    Amendment Provision.**

221.    Unsurprisingly, Defendants also rely on the "Amendment Provision" of the Terms, claiming that it gives them unfettered discretion to change all terms of the deal, "including but not limited to fees, rates, and charges." Terms, § 10.6.  However, this provision is not enforceable and Defendants may not use it to justify their decisions to charge more than merchants agreed to pay.

222.    The Amendment Provision is invalid because it lacks mutual consideration. Indeed, the provision purports to give Defendants the unfettered discretion to change the pricing of its services for any reason or no reason, without prior notice.  This renders Defendants' promise to provide services in exchange for the rates and fees set forth within the Application illusory and unenforceable for lack of consideration.  *E.g.*, *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 205-09 (5th Cir. 2012) (Texas law).

223.    Indeed, pursuant to the Amendment Provision, Defendants have the power to double or even triple the agreed-upon rates and automatically debit such increased amounts from merchant accounts *before* giving notice.  Under Texas law, one party is not allowed to negate a promise by retaining the right to alter that promise: "Thus, the fundamental concern driving this line of case law is the unfairness of a situation where two parties enter into an agreement that ostensibly binds them both, but where one party can escape its obligations under the agreement by modifying it."  *Id.* at 209.

224.    Even if the Amendment Provision were not illusory, it is unconscionable.  The provision is procedurally unconscionable because the bargaining process was fundamentally unfair.  Defendants (the stronger parties) intentionally did not note on the Application – the document that all merchants (the weaker parties) review and sign – that they retained the unfettered right to change rates and fees set forth in the Application.  Instead, Defendants buried the Amendment Provision deep in the Terms, a separate document from the Application that is only noted on the Application in small, inconspicuous print.

225.    Defendants intentionally arranged the contracting process so the adhesive, "take-it-or-leave-it" Terms were kept separate from the Application and not made available to merchants to review *before* they signed the Application unless they took steps to locate it.

226.    Defendants knew such a provision would be important to merchants and would affect their decision to do business with Defendants.  By burying the provision in the separate Terms, Defendants knew that merchants would never become aware of it until after the Application was signed and a contract was formed.  Moreover, Defendants engaged in the foregoing deceptive acts despite knowing full well that the Amendment Provision would have a profoundly detrimental effect on merchants' ability to receive the fruits of the contract (i.e., services over the life of the term for the contracted-for rates and fees, as opposed to the rates and fees that Defendants subsequently determined they wanted to charge).

227.    The Amendment Provision is also substantively unconscionable because it is wholly one-sided and unreasonably favorable to Defendants.  Indeed, it provides Defendants complete control to disregard the agreed-upon rates and fees and charge merchants whatever they want over the term of the contract *without first providing notice to merchants or any ability to opt-out of the new rates and fees.*

228.     This unfettered discretion is especially dangerous here because Defendants automatically debit monies from merchant accounts before they provide statements itemizing such debits.   Thus, the Amendment Provision allows Defendants to double or even triple the agreed-upon rates and to seize such additional amounts from merchants *before* merchants have any opportunity to object, let alone to refuse payment.   The facts as pled herein show that Defendants have used the Amendment Provision to do just that.

229.     Merchants must either live with paying much higher fees than they were informed they would pay at the beginning of the deal or subject themselves to the costly early termination penalties, which are a minimum of $495.   No merchant in their right mind would ever voluntarily agree to such a "Catch 22" situation.

230.     The Amendment Provision violates public policy, lacks mutuality, is illusory, unconscionable, and is otherwise void and unenforceable pursuant to applicable Texas law.

## CLASS ALLEGATIONS

231.     Plaintiffs bring this action on behalf of themselves and all others similarly situated.

232.     Two Classes are preliminarily defined as follows:

> All United States persons or entities that paid Defendants a fee for payment processing services after receiving a communication from an agent of Defendants indicating that Defendants were the merchant's current payment processing provider;

which is referred to hereinafter as the "Slamming Class;" and

> All United States customers of Defendants who contracted for payment processing services and paid a fee not authorized by their contract;

which is referred to hereinafter as the "Overcharge Class."

233. Plaintiffs reserve the right to modify or amend the definitions of the proposed Classes before the Court determines whether certification is appropriate and as the Court may otherwise allow. It is very likely that additional classes or subclasses will be appropriate.

234. Excluded from the Classes are Defendants, their parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendants have a controlling interest, all customers who make a timely election to be excluded, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

235. The time period for the Classes is the number of years immediately preceding the date on which this First Amended Class Action Complaint is filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendants remedy the conduct complained of herein. All of Defendants' contracts mandate that Texas law be applied. By way of example only, Texas imposes a four-year statute of limitations on breach of contract actions. Thus, if Texas law is deemed to apply, the relevant class period for breach of contract is likely to begin in December of 2013 and extend through Defendants' change in conduct or the conclusion of the case. It is also possible that the applicable statute of limitations will be tolled based on Defendants' improper conduct as alleged below.

236. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can meet all the applicable requirements of Federal Rule of Civil Procedure 23 and can prove the elements of its claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

237. **Numerosity.** The members of the Classes are so numerous that individual joinder of all the members is impracticable. There are thousands of merchants that have been damaged by Defendants' wrongful conduct as alleged herein. The precise number of Class members and

their addresses is presently unknown to Plaintiffs, but can readily be ascertained from Defendants' books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, and/or published notice.

238. **Commonality and Predominance.** Numerous common questions of law and fact exist as to the claims of Plaintiffs and the other Class members. Such questions include, but are not limited to:

(a). Whether Defendants have established a scheme to sign up new customers by (i) intentionally misleading merchants into believing Defendants are their current provider or (ii) promising rates and fees they know are less than the actual rates and fees that will be charged;

(b). Whether Defendants violated their contracts with merchants by assessing improper fees;

(c). Whether Defendants are liable to Plaintiffs and the other Class members for imposing improper fees;

(d). Whether certain contractual provisions in Defendants' merchant agreement are invalid exculpatory clauses, violate public policy, lack mutuality, are illusory, are procedurally and substantively unconscionable, and are otherwise void and unenforceable;

(e). The proper method or methods by which to measure damages and/or restitution; and

(f). Whether Defendants should be enjoined from engaging in any or all of the improper practices complained of herein.

239. Defendants have engaged in a common course of conduct toward Plaintiffs and the other Class members. The common issues arising from this conduct that affect Plaintiffs and the other Class members predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

240. **Typicality.** Plaintiffs' claims are typical of the other Class members' claims because, among other things, all of the claims arise out of a common course of conduct and assert the same legal theories. Further, Plaintiffs and the members of the Classes were comparably injured through the uniform misconduct described above.

241. **Adequacy of Representation.** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

242. **Declaratory and Injunctive Relief.** Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive and declaratory relief, as described below. Specifically, Defendants continue to knowingly enroll customers through fraud and misrepresentation, overbill customers, and utilize unenforceable contractual provisions in order to block the Class members from seeking legal relief. Class-wide declaratory and/or injunctive relief is appropriate to put an end to these illicit practices.

243. **Superiority.** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment

suffered by Plaintiffs and each of the other Class members are small compared to the burden and expense that would be required to individually litigate their claims against Defendants, thus rendering it impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIM FOR RELIEF

### COUNT ONE
### Fraudulent Inducement – Slamming
**(Plaintiffs Julie Rudiger, Inc., Mena Stone, and Tulsa Art Center)**

244.    Plaintiffs repeat paragraphs 1 through 243 above.

245.    As alleged herein, Defendants make a regular practice of calling customers of other payment processing companies and misrepresenting their identity by acting like the customer's current payment processor. Through a well-practiced variety of stratagems, Defendants' sales agents intentionally and fraudulently induced three Plaintiffs and the members of the Slamming Class to sign contractual paperwork with Defendants.

246.    Among other things, Defendants intentionally (a) misrepresented their identity, (b) incorrectly stated that equipment needed to be updated or that fees were going up, even though Defendants did not even know what processor serviced the account, (c) promised to lower rates and fees, once again without even knowing what was being paid, (d) stated that in order to gain new and better terms with the existing processor, new documentation would need to be signed, and/or (e) presented misleading and incomplete documentation for signature.

247.    Defendants knew that their representations and promises were false but made them anyway intending to induce three Plaintiffs and the other members of the Slamming Class to rely on them and sign agreements with Defendants.

248.    Defendants' misrepresentations and omissions alleged herein were material for several reasons, including that they would be considered very important to merchants in deciding whether or not to do business with Defendants and were in fact important to the three Plaintiffs and members of the Slamming Class.  Plaintiffs were happy with their then-current processors when Defendants represented that they were their then-current processors.  Plaintiffs would not have agreed to anything with Defendants had Plaintiffs known Defendants' true identity. Defendants knew that Plaintiffs and the other members of the Slamming Class would rely on their misrepresentations and omissions.

249.    Defendants' statements, if true, would have been: (a) they had no affiliation with the customer's current processor, (b) they had no knowledge of the customer's current equipment or rates and fees, nor any increases in such rates and fees, (c) they did not know that they could lower the victim's rates, (d) the customer did not need to sign any documentation or take any action to avoid fictional higher rates, and (e) full documentation of Defendants' contracts was not provided in an effort to avoid discovery of the scheme.

250.    Prior to executing a contract with Defendants, three Plaintiffs and the other Slamming Class members were wholly deceived by Defendants.

251.    Plaintiffs and the members of the Slamming Class justifiably relied on Defendants' misrepresentations.  Defendants were in a superior bargaining position, because they were the only parties with knowledge of the actual facts.  Plaintiffs and the members of the

Slamming Class had no reason to suspect that Defendants' agents would commit illegal acts and had no means of verifying the truth or falsity of Defendants' misrepresentations.

252.     Had Defendants accurately represented themselves to Plaintiffs and the other Slamming Class members, and not misrepresented, obscured, and concealed the truth from them, Plaintiffs and the Slamming Class members would not have contracted with Defendants to receive payment processing services.

253.     Accordingly, Plaintiffs and the other Slamming Class members were fraudulently induced to enter into contracts with Defendants.

254.     Plaintiffs and the Slamming Class are entitled to seek damages and/or rescission of their contracts with Defendants, or other equitable relief, including restitution of funds Defendants took from them without permission.

255.     Plaintiffs will make any necessary election of remedies at the appropriate juncture.

### COUNT TWO
### Fraudulent Inducement – Misrepresented Rates and Fees
### (Plaintiffs Mena Stone, Tulsa Art Center, Dr. DeFabio, Al's Pals, Ban-A-Pest, Fleetwood, and Bayley)

256.     Plaintiffs repeat paragraphs 1 through 255 above.

257.     As alleged herein, Defendants intentionally and fraudulently induced the identified Plaintiffs and the Overcharge Class members to enter into contracts with Defendants through their material omissions and material affirmative promises of pricing terms that Defendants never had any intention to honor.

258.     Among other things, Defendants intentionally (a) prominently promised Plaintiffs and the Overcharge Class members, as an inducement to enter into business with Defendants, rates and fees that were lower and different than what Defendants knew would be charged, (b)

failed to properly disclose the true applicable rates and fees on the Application or elsewhere, and (c) disclosed rates and fees that do not reflect, omit, conceal, and affirmatively misrepresent the true pricing model that Defendants knew they would apply.

259. Defendants knew that their disclosed pricing terms did not accurately reflect the rates and fees they would ultimately charge merchants, including Plaintiffs and the other Overcharge Class members, at the time the pricing terms were provided to such merchants. Defendants made the foregoing misrepresentations and omissions alleged herein to induce Plaintiffs and the other members of the Overcharge Class to rely on them.

260. Defendants' misrepresentations and omissions alleged herein were material, including in that they would be considered very important to merchants in deciding whether or not to do business with Defendants, and were known by Defendants to be false and misleading.

261. Defendants' true pricing terms and model include but are not limited to: (a) new and increased fees for monthly PCI protection, (b) new and increased fees for PCI non-compliance, (c) marked-up pass through fees, (d) excessive rates for debit card transactions for customers on tiered pricing plans, (e) increased monthly minimum discount fees, (f) increased discount fees, (g) new annual fees, (h) increased Foundry fees, and (i) improper non-qualified fees.

262. Prior to executing Applications and forming a contract with Defendants, Plaintiffs and the other Overcharge Class members were deceived by Defendants with respect to the pricing terms that would be applicable to their accounts.

263. The nature and amounts of fees charged, as represented by Defendants at the time of merchant enrollment (including in the in the Application) were material to and justifiably relied upon by Plaintiffs and the other Overcharge Class members. Had Defendants accurately

represented their true pricing terms to Plaintiffs and the other Overcharge Class members, and not misrepresented, obscured, and concealed their true pricing terms from them, Plaintiffs and the Overcharge Class members would not have contracted with Defendants to receive payment processing services.

264. Accordingly, Plaintiffs and the other Overcharge Class members were fraudulently induced to enter into contracts with Defendants.

265. Plaintiffs and the Overcharge Class members are entitled to seek damages and/or rescission of their contracts with Defendants, or other equitable relief, including restitution of funds Defendants took from them without permission.

266. Plaintiffs will make any necessary election of remedies at the appropriate juncture.

## COUNT THREE
### Breach of Contract
### (Plaintiffs Mena Stone, Tulsa Art Center, Dr. DeFabio, Al's Pals, Ban-A-Pest, Fleetwood, and Bayley)

267. Plaintiffs repeat paragraphs 1 through 266 above.

268. Defendants may argue they have binding contractual agreements even with those they have defrauded, merchants which only came into contact with Defendants via fraud and misrepresentations. Many such customers never even processed a single transaction with Defendants. Even if this Court determines that a binding contract exists between Plaintiffs and the Class members, on the one hand, and Defendants, on the other hand, however, Defendants have materially violated the specific terms of such contracts. As described above, Defendants' business plan also includes systematic overcharges.

269. For contracts that did not result from fraudulent inducement, Defendants have materially violated the specific terms of the contract.

270. Defendants' merchant agreement sets forth various fees to be charged. Yet, from the earliest stages of the relationship, Defendants assess additional fees not allowed by the contract.

271. Numerous examples of Defendants' overcharges are described above.

272. The improper fees described above are not a complete list of improper fees charged by Defendants, but merely examples.

273. Defendants' assessment and deduction of fees from the accounts of Plaintiffs and the members of the Overcharge Class are improper and not calculated using rates and fees disclosed in any contract.

274. As described in this Count Three and throughout this First Amended Class Action Complaint, Defendants have repeatedly violated the express terms of their contracts with Plaintiffs and the members of the Overcharge Class (to the extent they are deemed to have binding contracts).

275. Defendants violated the contracts by assessing charges not provided for and by unilaterally marking up agreed-upon fees and charges. Furthermore, Defendants have assessed other fees in the guise of pass-through fees from the card networks which are actually retained by Defendants. Thus, Defendants have materially breached the express terms of their own form contracts.

276. Plaintiffs and the Classes have performed all, or substantially all, of the conditions precedent and obligations imposed on them under the contract. There is no legitimate excuse or defense for Defendants' conduct.

277. Defendants' anticipated attempts to defend their overbilling through reliance on self-serving contractual provisions will be without merit. Such provisions are either inapplicable

or unenforceable because they are void, illusory, lack mutuality, are invalid exculpatory clauses, violate public policy, and are procedurally and substantively unconscionable, among other reasons. These provisions do not excuse Defendants' breaches or otherwise preclude Plaintiffs and the Overcharge Class from recovering for such breaches.

278. Plaintiffs and the members of the Overcharge Class sustained damages as a result of Defendants' breaches of contract.

## COUNT FOUR
## Unjust Enrichment
## (All Plaintiffs)

279. Plaintiffs repeat paragraphs 1 through 278 above.

280. Plaintiffs, on behalf of themselves and the other Class members, assert a common law claim for unjust enrichment. This claim is brought only in the alternative and is contingent on Defendants' contracts with Plaintiffs and the Class members being deemed ineffective, inapplicable, void, or unenforceable. In such a scenario, unjust enrichment will dictate that Defendants disgorge all monies and items unjustly received.

281. As alleged herein, Defendants were unjustly enriched at the expense of Plaintiffs and the other Class members, who were improperly charged and overcharged by Defendants.

282. Plaintiffs and other Class members were unjustly deprived of money obtained by Defendants as a direct and proximate result of their fraudulent inducement to enter contracts which they never would have entered but for Defendants' misrepresentations.

283. Plaintiffs and the other Class members were unjustly deprived of money obtained by Defendants as a direct and proximate result of their contract, which may be deemed void or unenforceable in whole or in part by this Court.

284. It would be inequitable and unconscionable for Defendants to retain the profit, benefit, and other compensation obtained from Plaintiffs and the other Class members as a result of the wrongful conduct alleged herein.

285. Plaintiffs and the other Class members are entitled to seek restitution from Defendants as well as an order from this Court requiring disgorgement of all profits, benefits, and other compensation obtained by Defendants by virtue of their wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the proposed Classes demand a jury trial on all claims so triable and judgment as follows:

1. Certifying this case as a class action pursuant to Federal Rule 23;

2. Temporarily and permanently enjoining Defendants from continuing the improper practices alleged herein;

3. Granting rescission of the contracts;

4. Declaring certain contractual provisions to be unenforceable and enjoining their enforcement;

5. Awarding damages in an amount to be determined by a jury;

6. Requiring restitution or disgorgement of all amounts improperly obtained by Defendants;

7. Awarding pre-judgment interest at the maximum rate permitted; and

8. Awarding such other relief as this Court deems just and proper.

DATED this 28th day of March, 2018.

Respectfully submitted,

WEBB, KLASE & LEMOND, LLC

By:    */s/ E. Adam Webb*
E. Adam Webb
Georgia Bar No. 743910
Adam@WebbLLC.com
1900 The Exchange, S.E.
Suite 480
Atlanta, GA 30339
Telephone: (770) 444-0773

*Attorney-in-Charge for Plaintiffs*

MEADE & NEESE LLP
Andrew K. Meade
Texas Bar No. 24032854
ameade@meadeneese.com
D. John Neese, Jr.
Texas Bar No. 24002678
jneese@meadeneese.com
Leann Pinkerton
Texas Bar No. 24038826
lpinkerton@meadeneese.com
2118 Smith Street
Houston, TX 77002
Telephone: (713) 355-1200

*Local Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2018, a copy of the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel who have registered with the Court.

*/s/ E. Adam Webb*
E. Adam Webb