## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| AL'S PALS PET CARE, LLC, DeFABIO SPINE AND SPORTS REHAB, LLC, JULIE RUDIGER, INC., MENA STONE & LANDSCAPING SUPPLIES, LLC, TULSA ART CENTER, LLC, BAN-A-PEST EXTERMINATION CO., INC., FLEETWOOD CHIROPRACTIC & REHABILITATION, PC, and BAYLEY PRODUCTS, INC., individually and on behalf of all others similarly situated, | § § § § § § § § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. |
| v. | § § | 4:17-CV-3852 |
| WOODFOREST NATIONAL BANK, N.A., MERCHANTS' CHOICE PAYMENT SOLUTIONS, and PAYSAFE PAYMENT PROCESSING SOLUTIONS LLC, | § § § § § | |
| Defendants. | § § | |

## UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT

E. Adam Webb, Esq.
Matthew C. Klase, Esq.
WEBB, KLASE & LEMOND, LLC
1900 The Exchange, SE, Suite 480
Atlanta, Georgia  30339
(770) 444-0773

Andrew K. Meade, Esq.
D. John Neese, Jr., Esq.
Leann Pinkerton, Esq.
MEADE & NEESE LLP
2118 Smith Street
Houston, Texas 77002
(713) 355-1200

*Attorneys for Plaintiffs*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................... ii

TABLE OF CITATIONS ........................................................................ iv

SUMMARY OF THE ARGUMENT ........................................................1

STATEMENT OF THE NATURE AND STAGE OF THE
PROCEEDING ...................................................................................1

STATEMENT OF THE ISSUE AND STANDARD OF REVIEW ...................13

ARGUMENT AND CITATION OF AUTHORITY .............................................14

    A. The Settlement Class Is Adequately Defined and Clearly
       Ascertainable ...........................................................................14

    B. The Rule 23(a) Requirements Are Met ...................................14

        1. Numerosity .........................................................................15

        2. Commonality ......................................................................15

        3. Typicality...........................................................................15

        4. Adequacy of Representation .........................................16

    C. The Rule 23(b)(3) Requirements Are Met .............................16

        1. Predominance .................................................................16

        2. Superiority .......................................................................17

    D. The Proposed Settlement Is Fair, Adequate, and Reasonable................17

        1. No Fraud or Collusion.....................................................18

        2. The Complexity, Expense, and Likely Duration of
           Litigation ......................................................................18

3. The Stage of Proceedings and Amount of Discovery ...................19

4. The Probability of Success on the Merits ......................................20

5. The Range of Possible Recovery ..................................................21

6. The Opinions of Class Counsel, Class Representatives,
   and Absent Class Members ..........................................................22

E. The Court Should Approve the Proposed Notice Program....................23

CONCLUSION ......................................................................................................25

# <u>TABLE OF CITATIONS</u>

<u>Cases</u>

*Agan v. Katzman & Korr, P.A.,*
    222 F.R.D. 692 (S.D. Fla. 2004) ..................................................................17

*Amchem Prods. Inc. v. Windsor*,
    521 U.S. 591 (1997) ...................................................................................13

*Ayers v. Thompson*,
    358 F.3d 356, 368 (5th Cir. 2004) ...................................................14, 17, 19

*Brown v. Electrolux Home Prods.*,
    817 F.3d 1225 (11th Cir. 2016) ...................................................................17

*Champs Sports Bar & Grill Co. v. Mercury Payment Systems, LLC*,
    275 F.Supp.3d 1350 (N.D. Ga. 2017) ...............................................6, 23, 25

*Cotton v. Hinton*,
    559 F.2d 1326 (5th Cir. 1977) ...............................................................14, 22

*DeBremaecker v. Short*,
    443 F.2d 733 (5th Cir. 1970) .......................................................................13

*DeHoyos v. Allstate Corp.*,
    240 F.R.D. 269 (W.D. Tex. 2007) ...............................................................24

*Eric P. John Fund, Inc. v. Halliburton, Co.,*
    2018 WL 1942227 (N.D. Tex. Apr. 25, 2018) ............................................21

*Forbush v. J.C. Penney Co*.,
    994 F.2d 1101 (5th Cir. 1993) .....................................................................15

*Gutierrez v. Wells Fargo Bank*, *N.A.*,
    730 F. Supp. 2d 1080 (N.D. Cal. 2010) .........................................................7

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) .....................................................................17

*In re Checking Account Overdraft Litig.*,
    286 F.R.D. 645 (S.D. Fla. 2012) ....................................................................7

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
    851 F. Supp. 2d 1040 (S.D. Tex. 2012) ......................................................20

*In re Nissan Motor Corp., Antitrust Litig.*,
    552 F.2d 1088 (5th Cir. 1977) ......................................................................24

*In re Terazosin Hydrochloride Antitrust Litig.*,
    220 F.R.D. 672 (S.D. Fla. 2004) .................................................................15

*James v. City of Dallas*,
    254 F.3d 551 (5th Cir. 2001) ........................................................................16

*Jenkins v. Raymark Indus., Inc.*,
    782 F.2d 468 (5th Cir. 1986) ........................................................................15

*Kelly v. Phitten USA, Inc.*,
    277 F.R.D. 564 (S.D. Iowa 2011) ..........................................................24, 25

*Klein v. O'Neil, Inc.*,
    705 F. Supp. 2d 632 (N.D. Tex. 2010) ........................................................22

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012) ........................................................................25

*Lipuma v. American Express Co.*,
    406 F. Supp. 2d 1298 (S.D. Fla. 2005) ..................................................18, 19

*Mullane v. Cent. Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950) ......................................................................................23

*Mullen v. Treasure Chest Casino, LLC*,
    186 F.3d 620 (5th Cir. 1999) .................................................................15, 16

*Parker v. Anderson*,
    667 F.2d 1204 (5th Cir. 1982) .........................................................14, 20, 21

*Pederson v. Louisiana State Univ.*,
    213 F.3d 858 (5th Cir. 2000) ........................................................................15

*Reed v. General Motors Corp.*,
    703 F.2d 170 (5th Cir. 1983) ..........................................................18, 20, 23

*Regents of Univ. of Cal. v. Credit Suisse First Boston (USA)*
    482 F.3d 372 (5th Cir. 2007) ...................................................................16

*Salinas v. Roadway Express, Inc.*,
    802 F.2d 787 (5th Cir. 1986) ...................................................................22

*Smith v. Crystian*,
    91 Fed. Appx. 952 (5th Cir. 2004) .....................................................14, 20

*Steinberg v. Nationwide Mut. Ins. Co.*,
    224 F.R.D. 67 (E.D.N.Y. 2004) ................................................................15

*Stirman v. Exxon Corp.*,
    280 F.3d 554 (5th Cir. 2002) ...................................................................16

*Stott v. Capital Fin. Servs., Inc.*,
    277 F.R.D. 316 (N.D. Tex. 2011) .............................................................21

*Turner v. Murphy Oil USA, Inc.*,
    472 F. Supp. 2d 830 (E.D. La. 2007) .......................................................22

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
    669 F.3d 632 (5th Cir. 2012) ...........................................................13, 14, 15

*Wolfe v. Anchor Drilling Fluids USA Inc.*,
    2015 WL 12778393 (S.D. Tex. Dec. 7, 2015) (Hoyt, J.) .............................24

*Young v. Katz*,
    447 F.2d 431 (5th Cir. 1971) ...................................................................18

Federal Rules of Civil Procedure

FED. R. CIV. P. 23(b)(3) .......................................................................9, 13, 14, 16

FED. R. CIV. P. 23(e) ..........................................................................14, 17, 23

FED. R. CIV. P. 26(f) ...................................................................................5

Treatises

Manual for Complex Litigation, Fourth, § 13.14  ....................................................14

Manual for Complex Litigation, Fourth, § 21.632 ...........................................14, 23

## SUMMARY OF ARGUMENT

Plaintiffs are pleased to report that the parties have agreed to a class settlement.  If approved, the settlement will provide several important benefits to customers of Defendants that were allegedly improperly charged for payment processing services.  <u>First</u>, Defendants have agreed to establish a settlement fund of $15 million to make cash payments to the class members, as well as to cover the costs of notice and administration, attorneys' fees and expenses, and service awards to the class representatives.  <u>Second</u>, Defendants have agreed to make important revisions to their contractual terms and sales practices so (a) customers must be provided with advance notice before fees are increased, (b) it is easier for merchants to end their account with Defendants without being subject to a requirement to pay costly early termination penalties (often $495); (c) merchants have more opportunity to dispute charges; and (d) Defendants' sales agents are trained to avoid any implication to prospective customers that they are affiliated with the merchant's current payment processing service.

By any objective measure, the settlement is a fantastic result for the proposed class.   It is all the more impressive because it was achieved early enough in the litigation that it will avoid years of delay and considerable judicial and party resources.

The settlement meets each of the standards for preliminary approval.  The settlement class is ascertainable and satisfies the requirements of Rule 23.  The settlement itself is fair, adequate, and reasonable and the notice program – consisting of email and mail notice and a website maintained by the settlement administrator – comports with Rule 23.

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

For years, Defendant Woodforest National Bank ("Woodforest") provided payment processing services to merchants through Defendant Merchants' Choice Payment Solutions

1

("MCPS").[1]  *See* Amended Complaint ¶ 1 (Dkt. 24).  MCPS enrolled merchants in the card processing services after having merchants sign a Merchant Payment Application ("Application").  *Id.* at ¶ 42.  Each signed Application was subject to MCPS' form terms and conditions.  *Id.* at ¶ 43.  MCPS then proceeded to process card transactions and send invoices that summarized card transactions and the applicable fees.  *Id.* at ¶ 50.

Plaintiffs filed this action asserting two primary theories.  First, Plaintiffs alleged that MCPS agents induced merchants to do business with MCPS by "cold calling" them and falsely insinuating they were with the merchant's then-current processing company, thus leading merchants to unwittingly bind themselves to do business with MCPS.  *Id.* at ¶¶ 9-28.  Second, Plaintiffs alleged that Defendants overcharged customers by imposing several types of fees that were either never mentioned during the contracting process or, in some cases, merchants were explicitly informed in the contracting documents they would not pay.  *Id.* at ¶¶ 29-60.  The lawsuit seeks to recover all amounts that the aggrieved merchants ultimately paid as a result of Defendants' alleged wrongdoing.[2]  Plaintiffs asserted causes of action for fraudulent inducement, breach of contract, and unjust enrichment.  *Id.* at ¶¶ 244-85.

Plaintiffs allege that they personally suffered from a range of improper practices that date all the way back to 2011.  In 2017, they proceeded to research potential legal claims with counsel.  *See* Joint Declaration of E. Adam Webb and Matthew C. Klase ("Joint Decl.") ¶ 6.  Such research revealed factual and legal support for a lawsuit against Woodforest and MCPS.  *Id.* at ¶ 7.

---

[1] Capitalized terms have the meanings afforded them in the Settlement Agreement, filed herewith as Exhibit A.

[2] Defendant Paysafe Payment Processing Solutions, LLC ("Paysafe"), purchased MCPS in August of 2017.

Extensive research was undertaken to better understand Defendants and their practices. *Id.* at ¶ 8. Most importantly, Plaintiffs were interviewed and their documents digested. The extensive contractual documents of Woodforest and MCPS were analyzed. *Id.*

After it was determined that the contracts contained potentially enforceable choice-of-law (Texas) and venue (Montgomery County) provisions, Texas co-counsel was researched and then interviewed and retained. *Id.* at ¶ 9. Texas law and Fifth Circuit law were evaluated. *Id.* at ¶ 10. The consideration of whether to proceed in state or federal court was extensive. After federal court was agreed upon, the local rules of court were considered. *Id.*

Counsel's research and analysis included speaking with a variety of industry experts about the practices and reputation of Woodforest and MCPS. *Id.* at ¶ 11. Former agents of Woodforest and MCPS were also contacted and interviewed. *Id.* Formal and informal complaints against Defendants were analyzed, including governmental investigations. The relationships between Woodforest, MCPS, and other entities – including the new owner of MCPS – were investigated. *Id.*

The theories of the case – which were different from those of prior actions in the payment processing industry – were developed. *Id.* at ¶ 12. Several drafts of the complaint were prepared, circulated among counsel, and revised and proofed. *Id.*

The original complaint was filed on December 22, 2017, by Plaintiffs Al's Pals Pet Care, LLC, DeFabio Spine and Sports Rehab, LLC, Julie Rudiger, Inc., Mena Stone & Landscaping Supplies, LLC, and Tulsa Art Center, LLC, against Woodforest and MCPS. *Id.* at ¶ 13. After assignment to the Honorable Kenneth M. Hoyt, the Judge's rules and prior orders were evaluated. *Id.* at ¶ 14. After service was executed on Defendants, counsel for Defendants suggested that Plaintiff amend to correct the corporate entities at issue. *Id.* at ¶ 15. Plaintiffs' counsel researched the corporate issues in detail and determined it would be appropriate to add Paysafe, the current owner of the MCPS business, as a

defendant.  *Id.*  The parties jointly moved to add Paysafe on February 8, 2018, and the Court granted this motion on February 15, 2018.  *Id.* at ¶ 16.

Defendants also raised the issue of arbitration.  *Id.* at ¶ 17.  Plaintiffs reviewed all relevant contracts to weigh the applicability of arbitration provisions found in certain agreements.  Arbitration was never asserted as a defense by Defendants.  *Id.*

On March 9, 2018, Defendants filed their lengthy motion to dismiss the complaint.  *Id.* at ¶ 18. Therein, Defendants asserted a number of arguments, including that Plaintiffs' (a) fraudulent inducement claims were inadequately pled, (b) contract claims were barred because they failed to comply with the contractual provision requiring timely written notice of any errors and because the contract provided Defendants with discretion to merchant increase fees, and (c) unjust enrichment claim failed because of the existence of an enforceable contract.  *Id.*

Meanwhile, Class Counsel had been contacted by several merchants that had learned of the case and expressed a desire to be added as named plaintiffs.  *Id.* at ¶ 19.  Class Counsel investigated these merchants' claims and vetted them for inclusion in an amended complaint.  *Id.*

After receiving the motion to dismiss, Class Counsel contacted counsel for Defendants and informed them of their plan to file an amended complaint pleading additional facts and adding several new party plaintiffs.  *Id.* at ¶ 20.  Defendants consented to this amendment and, on March 21, 2018, the parties jointly notified the Court that an amended complaint would soon be filed and requested a scheduling order.  The Court entered the parties' requested scheduling order on March 23, 2018.  *Id.*

After extensive work among Class Counsel, on March 28, 2018, the 285-paragraph amended complaint was filed.  *Id.* at ¶ 21.  This added Ban-A-Pest Extermination Co., Inc., Fleetwood Chiropractic & Rehabilitation, PC, and Bayley Products, Inc. as Plaintiffs.  Additional factual

allegations, developed through counsel's ongoing investigation and interviews of former customers, whistleblowers, and payment processing industry experts, were included. *Id.*

On April 12, 2018, the Court entered an order denying Defendants' motion to dismiss the original complaint, holding: "Based on the plaintiffs' First Amended Complaint, the Court concludes that the Amended Complaint contains sufficient factual content, if accepted as true, that satisfies the rules of pleadings and case law." *Id.* at ¶ 22. The parties began a series of communications about the order. *Id.* at ¶ 23. On April 13, 2018, Defendants moved for clarification that the Court's April 12, 2018 order was only intended to find Defendants' motion to dismiss the original complaint moot. The Court granted this motion on April 20, 2018. *Id.*

In the meantime, the parties held the Rule 26(f) conference and first discussed the possibility of holding an early mediation to explore a class settlement. *Id.* at ¶ 24. Class Counsel contacted multiple data experts to discuss the data and information that would be needed to allow Plaintiffs to mediate. *Id.* at ¶ 25. A sampling methodology was developed based largely on a prior successful mediation in a payment processing case. Plaintiffs presented Defendants with an itemized, detailed list of the documents and electronic data that Defendants would need to produce in order for Class Counsel and Plaintiffs to engage in informed settlement discussions. *Id.*

The parties and their experts had several discussions and exchanged lengthy correspondence regarding the nature and scope of the requested data and information. *Id.* at ¶ 26. Defendants informed Class Counsel what items were available and could be produced, Class Counsel discussed these issues with their expert, and made amendments to their requests based on his input. The parties ultimately agreed on the scope of informal discovery that was needed to fairly and thoroughly evaluate the claims and defenses in the case. *Id.* at ¶¶ 26-27.

Following such discussions, the parties agreed to mediate and, on April 18, 2018, asked the Court to stay further proceedings so settlement negotiations could take place. On April 20, 2018, the Court granted this request and stayed the case. *Id.* at ¶ 27.

The parties then proceeded to negotiate a confidentiality order to govern the handling of information produced in furtherance of the mediation. *Id.* at ¶ 28. Drafts were circulated and revised. The order was approved by the Court on April 26, 2018. *Id.*

To assist with the settlement discussions, the parties agreed to retain a well-respected and experienced mediator, Hunter Hughes III, who scheduled a face-to-face mediation in Atlanta, Georgia for July 18, 2018. *Id.* at ¶ 29. Mr. Hughes was chosen because of his sterling reputation as a class action mediator and because he had recently successfully mediated another class settlement in a case involving similar allegations of overbilling by card processing servicers – *Champs Sports Bar & Grill Co., et al. v. Mercury Payment Systems, LLC and Global Payments Direct, Inc.*, 275 F.Supp.3d 1350 (N.D. Ga. 2017). Joint Decl. ¶ 29.

The parties took full advantage of the ensuing months, agreeing to exchange the substantial amount of information needed for the mediation to be productive. *Id.* at ¶ 30. Defendants produced more than 8,000 pages of documents, which included all of the various Application forms and terms and conditions used by MCPS during the Class Period, all notices relating to the Subject Fees, aggregate revenue figures relating to the Subject Fees during the Class Period, breakdowns of Former and Current Customers, all of the named Plaintiff Applications and statements, individual Applications and statements for a statistically significant sample of Settlement Class members. *Id.* at ¶ 31. Plaintiffs' counsel reviewed and coded every document provided by Defendants. *Id.*

Critically, Defendants also produced *hundreds of thousands* of lines of transaction and fee data for the named Plaintiffs and a statistically-significant sample of Class members. *Id.* at ¶ 32. Defendants

6

also provided extensive aggregate information necessary to understand the customer-specific data.  *Id.* at ¶ 32.

Class Counsel prepared extensively for the mediation.  *Id.* at ¶ 33.  To assist in the organization and breakdown of the voluminous data, Class Counsel retained Arthur Olsen of Cassis Technology, LLC, a renowned data consultant whose expert testimony has been accepted by numerous courts.  *Id.*; *also In re Checking Account Overdraft Litig.*, 286 F.R.D. 645, 650 n.4 (S.D. Fla. 2012) (concluding Mr. Olsen has the "ability to calculate damages on an account-by-account basis using the bank's own computerized records, a method upon which Mr. Olsen previously relied, with court approval"); *Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1138-39 (N.D. Cal. 2010) (finding Olsen's methods to be "professional" and "careful").

Working in tandem with Class Counsel, Mr. Olsen organized three sets of platform data, wrote code to extract overcharges relating to the Subject Fees, and created demonstrative exhibits detailing his findings for use at the mediation.  *Id.* at ¶ 34.  Using Defendants' data and his expertise, Mr. Olsen was able to isolate each merchant in the sample data that was allegedly overcharged by MCPS and the amount of each such merchant's overcharges.  *Id.* at ¶ 35.  This analysis was provided to MCPS in advance of the mediation.  *Id.*

Defendants, meanwhile, retained their own data and damages experts to perform an independent analysis, the results of which they provided to Class Counsel.  *Id.* at ¶ 36.  Class Counsel and Mr. Olsen participated in multiple pre-mediation calls with Defendants and their experts to explore the methodologies that had been used in estimating damages.  *Id.*  Differences between the conclusions reached by the experts were studied by all parties and additional work was performed by the experts to bridge the gap for purposes of negotiation.  *Id.* at ¶ 37.  Concessions were made by the parties and the experts' reports were revised accordingly.  *Id.*

Class Counsel also researched and wrote a mediation statement that, exclusive of exhibits, was 43 pages in length. The mediation statement took on several important issues in the litigation, including the alleged unenforceability of key contract terms, as well a detailed summary of how Plaintiffs intended to prove each of the class certification elements. Plaintiffs laid out substantial support for their position on each of these issues. *Id.* at ¶ 38. In order to ensure maximum benefit of the mediation statement, it was provided to Defendants over a week prior to the mediation. It was also provided to Mr. Hughes. *Id.* at ¶ 39. Additional private briefing and materials were provided by both parties to the mediator. *Id.*

Class Counsel also studied Defendants' voluminous mediation statement. *Id.* at ¶ 40. As to several issues, Plaintiffs felt compelled to respond. They prepared a rebuttal mediation statement of 14 pages in length. *Id.*

Class Counsel also consulted with Mr. Hughes in advance of mediation and coordinated with the Plaintiffs, providing them with status updates and discussing the issues to be mediated. *Id.* at ¶ 41.

Despite these extensive efforts, the mediation on July 18, 2018 was unsuccessful. *Id.* at ¶ 42. The parties spent an entire day mediating at Mr. Hughes' offices. However, the parties narrowed the divide that existed at the outset of the mediation considerably and made great headway toward understanding each other's claims and defenses. *Id.*

At Mr. Hughes' urging, the parties continued to negotiate. *Id.* at ¶ 43. These negotiations concerned not only the amount of the common fund that would be established for the Class, but also the nature and scope of contract amendments and practice changes that Defendants would make as part of any settlement. *Id.* Extensive negotiations occurred over a period of four weeks. *Id.* at ¶ 44. The parties exchanged legal analysis of thorny issues. They consulted with their experts to support offers and counteroffers. Proposed terms of settlement, including non-monetary terms, were negotiated. *Id.* On August 13, 2018, the parties reached agreement on a deal in principle and promptly informed the Court.

*Id.* at ¶ 45.  The Settlement resulted from arm's length, difficult negotiations that succeeded in large part due to Mr. Hughes' active involvement.  *Id.*

The parties thereafter worked to finalize the specific terms of the Agreement.  *Id.* at ¶ 46.  Class Counsel prepared an initial draft of the Agreement and circulated to Defendants for their review and comment.  *Id.*  Over the next few weeks, the parties exchanged multiple redlined drafts of the Agreement, which included fine tuning the agreed-upon practice changes and contract amendments and how and when such revisions would be communicated to the Class, as well as how notice and eventually payments could most efficiently be disseminated to the Class.  *Id.*

The parties also exchanged multiple drafts of (1) the Notices to ensure that the Settlement was accurately and appropriately described to the Class, and (2) the Allocation Formula to design a cost-effective manner to fairly divide payments among Class members.  *Id.* at ¶ 47.  In conjunction with these discussions, Class Counsel obtained advice from potential settlement administrators, who also submitted competitive bids to provide notice and administer the Settlement.  *Id.* at ¶ 48.

The parties did not negotiate the amount of Class Counsel's fees and expenses or Service Awards to the Class Representatives until after the key provisions of the Settlement, including the amount of the direct relief to the Class, was agreed upon.  *Id.* at ¶ 49.  Consensus was reached on final drafts of the Agreement, Notices, and Allocation Formula on September 4, 2018.  *Id.* at ¶ 50.

The Settlement's terms are detailed in the Agreement filed herewith.  The following is a summary of the material terms of the Settlement:

<u>Settlement Class:</u>  The Settlement Class – an opt-out class under Rule 23(b)(3) – is defined as:

> All merchants in the United States that contracted to receive payment processing services from or through Defendants and paid one or more of the Subject Fees from December 22, 2013 through the date of preliminary approval.[3]

---

[3] "Subject Fees" refers to the following categories of fees charged by Defendants:  (1) annual fee, (2) batch header fee, (3) PCI program/compliance fee, (4) PCI non-compliance/non-validation fee, (5) gateway access fee, (6)

Settlement ¶ 40.  Several types of entities enumerated in the Settlement are excluded from the Class, most notably those owned by or affiliated with Defendants.  *Id.*

    <u>The Relief:</u>  The relief to Settlement Class members includes:

    ***The Settlement Fund*** – Defendants will pay $15 million into an escrow account that will be used to pay cash benefits to Settlement Class members, the costs of Notice and administration, legal fees and expenses, and Service Awards to the Class Representatives.  Settlement ¶ 32.  All Settlement Class members are eligible to receive a cash payment.  Current Customers who are in the Settlement Class – roughly 59,017 in number – will automatically receive their payments.  *Id.* at ¶ 64; Joint Decl. ¶ 53.  Current Customers who are still with Defendants when it is time to distribute the Settlement will receive their payments by electronic funds transfer (or credit against amounts otherwise owed on their statement), while Current Customers that leave Defendants between Preliminary Approval and distribution will be mailed checks.  Settlement ¶ 66; Joint Decl. ¶ 53.

    Meanwhile, Former Customers in the Class – roughly 112,000 in number – will receive a payment via check if they file a simple Claim Form attesting that they contracted with Defendants during the Class Period and provide their current contact information.  Settlement ¶¶ 66-67; Joint Decl. ¶ 53.

    The amount of the cash payments is calculated the same way for both Current Customers and Former Customers as described in the Allocation Formula, a copy of which is attached as Exhibit 1 to the Settlement Agreement.  Thirty-five percent of the net settlement fund (the amount remaining after payment of all other obligations) will be equally allocated, on a *per capita* basis to all of the members of the Settlement Class.  Forty percent will be allocated, *pro rata*, based on the total number of calendar months during which such Settlement Class member was a customer of Defendants

---

Foundry/emerchant fee, (7) monthly minimum discount fee, (8) non-qualified fee, (9) discount rate, (10) other discount fee, or (11) paper statement fee.  Settlement ¶ 38.

during the Class Period, up to a maximum of 36 months per Settlement Class member. And twenty-five percent will be distributed, *pro rata*, to Settlement Class members based on their share of the total dollar volume of transactions processed through Defendants during the Class Period. This Allocation Formula was chosen to account for the fact that some of the Subject Fees are service fees that are assessed monthly regardless of transaction volume, while others are dependent solely upon transaction volume. Joint Decl. ¶ 54. These percentages comport with the analysis of Plaintiffs' expert as to the relative significance of the categories of challenged fees. *Id.* at ¶ 55. Class Counsel believes that the negotiated Allocation Formula ensures that all Class members will be fairly compensated relative to each other. *Id.*

If the total of the cash distributed to Current Customers, the cash amount claimed by Former Customers, costs of Notice and administration, attorneys' fees and expenses, and Service Awards is less than $11 million, then the difference between the total of all of those amounts and $11 million will be distributed *pro rata* to all Settlement Class members, except for those Former Customers who have not submitted claims. Settlement ¶ 67. If the total of all of those amounts is equal to or more than $11 million, the money remaining in the Settlement Fund after payment of all obligations will be returned to Defendants. *Id.*

***Practice Changes*** – In addition to funding the Settlement, Defendants are bound to amend their Application and terms and conditions to reflect the following modifications:

    a.  Prior to increasing or adding any fees, Defendants will notify all affected customers in writing at least 30 days prior to the effective date of such increase or addition;

    b.  Any applicable early termination fee will be waived in the event of termination of the agreement by a merchant within 90 days of an increase in Non-Pass-Through Fees; and

     c.   Customers will be permitted to dispute errors or charges on their statements within 90 days (rather than the current 30 days) from receipt or availability of their statements.

Such amended contract terms must take effect no more than 60 days after the Effective Date, and Defendants are required to notify all Current Customers of the amendments at least 30 days prior to the amendments taking effect.  Settlement ¶ 41.

Defendants are also bound to undertake a comprehensive review of their telemarketing practices within six months of the Effective Date and, based on the results of this review, to establish a training program for their independent sales offices/agents which includes, but is not limited to, instruction that independent sales offices/agents should not imply or insinuate to prospective merchants that they are affiliated with the merchant's current payment processing service provider.  *Id.* at ¶ 42.

Notice Program:  Defendants possess records containing an email and/or mailing address for all Settlement Class Members.  As a result, the parties propose to individually notify each Class member by email and US mail as set forth below.  Current Customers will be notified by email.  Those Current Customers whose email addresses are unavailable or as to whom an email is returned as undeliverable will be mailed a postcard notice.  Former Customers will receive a postcard notice and Claim Form to improve the likelihood that they read the notice and respond with current contact information.  If the Former Customer's mailing address is unknown or the postcard is returned as undeliverable, the Settlement Administrator will send notice to the Former Customer by email and will use reasonable efforts to locate a current mailing address.  A Long Form Notice and other relevant pleadings and information will be posted on a Settlement Website maintained by the Settlement

Administrator.  Former Customers will be able to file claims on the Settlement Website as well, and will also be able to file claims through the mail.  Settlement ¶¶ 50-57.

Attorneys' Fees and Expenses and Service Awards:  Class Counsel will apply to the Court for an award of attorneys' fees and expenses.  The Class will be notified that Class Counsel may request reimbursement of the expenses they reasonably incurred up to $75,000 and may request attorneys' fees of up to one-third of the Settlement Amount.  Defendants will not oppose these requests.  *Id.* at ¶ 73.  Also, Class Counsel will apply for, and Defendants do not oppose, service awards of up to $10,000 for each Class Representative to compensate them for the efforts and risk they undertook on behalf of the Class.  *Id.* at ¶ 75.  Among those risks was the possibility they might have to pay Defendants' attorneys' fees and expenses even if the merchants won the case, as Defendants' contracts purportedly require that they do.  Joint Decl. ¶ 56.

Release:  The Settlement Class will release Defendants from claims relating to the issues in this case or that could have been raised in this case.  In turn, Defendants will release Settlement Class members from any potential liability for payment of Defendants' attorneys' fees and expenses incurred in defending this case.  The Releases are set forth in more detail in the Settlement Agreement. Settlement ¶¶ 68-71.

## STATEMENT OF THE ISSUE AND STANDARD OF REVIEW

Rule 23's requirements apply even when certification is requested in conjunction with a settlement.  *See Amchem Prods. Inc. v. Windsor*, 521 U.S. 591 (1997).  To determine whether a proposed Rule 23(b)(3) settlement class should be certified and a settlement granted preliminary approval, courts must conduct a four-part inquiry.  First, the court must determine whether the putative class is "adequately defined and clearly ascertainable."  *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012) (quoting *DeBremaecker v. Short*, 443 F.2d 733, 734 (5th Cir. 1970) (per

curiam)). Second, the court must address whether Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation are satisfied. *Union Asset*, 669 F.3d 639. Third, the court must determine whether Rule 23(b)(3)'s requirements of predominance and superiority are satisfied. *Id.* Fourth, if the action fulfills each of these standards, the court has discretion to approve a settlement that it determines is fair, reasonable, and adequate within the meaning of Rule 23(e)(2). *Ayers v. Thompson*, 358 F.3d 356, 368 (5th Cir. 2004).

There is a presumption in favor of settlement because "litigants should be encouraged to determine their respective rights between themselves." *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977). Because of the "strong judicial policy favoring resolving disputes through settlement," court approval of a class action settlement is afforded "great deference." *Smith v. Crystian*, 91 Fed. Appx. 952, 955 (5th Cir. 2004) (quoting *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982)).

Granting Preliminary Approval will allow all members of the Settlement Class to receive notice of the Settlement terms and of the date and time of the Final Approval Hearing at which Class members may be heard, and at which the parties may present further evidence and argument concerning the fairness, adequacy, and reasonableness of the Settlement. *Manual for Complex Litig.*, §§ 13.14, 21.632. Neither notice nor a hearing is required for Preliminary Approval. *Id.* at § 13.14.

## ARGUMENT AND CITATION OF AUTHORITY

### A. The Settlement Class Is Adequately Defined and Clearly Ascertainable.

Here, membership in the Settlement Class is based on precise, objective criteria that are unrelated to the merits. Settlement ¶ 40 (i.e., membership dependent on whether a merchant (1) is in the United States, (2) contracted with Defendants, and (3) paid one or more of the Subject Fees from December 22, 2013 through the date of Preliminary Approval). Defendants maintain records that contain the information points needed to determine whether each of its merchant-customers meet all three criteria. Joint Decl. ¶ 51. Because class membership is governed by a "mechanical

14

and objective standard, [and] in no way [dependent on] an individualized 'causal' determination

on the merits," the Settlement Class is adequately defined and clearly ascertainable.  *Union Asset*,

669 F.3d at 639-40.

**B.**    **The Rule 23(a) Requirements Are Met.**

1.    Numerosity:  Rule 23(a)(1) requires that a proposed settlement class be "so

numerous that joinder of all class members is impracticable."  Here, the Settlement Class consists

of about 171,000 merchants, making joinder of all class members impossible.  Joint Decl. ¶ 53.

*E.g.*, *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000); *Mullen v. Treasure Chest

Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999).  Numerosity is easily met.

2.    Commonality:  The bar for proving commonality is met when there is at least one

issue whose resolution will affect all or a significant number of the putative class members.  *Forbush

v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993); *Jenkins v. Raymark Indus., Inc.*, 782 F.2d

468, 472 (5th Cir. 1986) ("The threshold of 'commonality' is not high").  Where the defendant is

alleged to have "engaged in a standardized course of conduct that affects all class members,"

commonality is clearly satisfied.  *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672,

685-86 (S.D. Fla. 2004); *see also Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 74

(E.D.N.Y. 2004) ("claims arising from interpretations of a form contract appear to present the

classic case for treatment as a class action").  In this case, all members of the Settlement Class

assert the same legal claims, that they were injured in the same ways, and that their injuries resulted

from Defendants' common conduct.  Proving their claims thus will involve numerous common

questions of law and fact that will be resolved in the same way for all members.  The commonality

requirement thus is met.

3.    Typicality:  The test for typicality "focuses on the similarity between the named

plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Mullen*, 186 F.3d at 625.   In contrast to commonality, "the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class." *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001).   Here, the claims of the named Plaintiffs and members of the Settlement Class align, as they all arise out of the same alleged misconduct in that they all paid one or more of the Subject Fees and are based on the same legal theories.   Thus, the typicality requirement is satisfied.

4. <u>Adequacy of Representation</u>:   To satisfy adequacy of representation, plaintiffs must show (1) "the zeal and competence" of class counsel as well as (2) "the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees." *Stirman v. Exxon Corp.*, 280 F.3d 554, 563 (5th Cir. 2002) (internal citation and quotations omitted).   Here, Class Counsel's zeal is manifested by the work they have already done on behalf of the Settlement Class and their experience is supported by the evidence in the record.   Joint Decl. ¶¶ 6-50. Meanwhile, the named Plaintiffs have taken on an active role and do not have any interests antagonistic to other class members.   Joint Decl. ¶¶ 6-8.   This requirement is met.

## C. **The Rule 23(b)(3) Requirements Are Met.**

In addition to satisfying the Rule 23(a) requirements, for settlement purposes, the proposed class must satisfy the additional requirements in Rule 23(b).   *Regents of Univ. of Cal. v. Credit Suisse First Boston (USA)*, 482 F.3d 372, 295 (5th Cir. 2007).   Rule 23(b)(3), which pertains to a class seeking monetary relief (as is the case here), is satisfied if "the questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

1. <u>Predominance</u>:   Common issues of fact and law predominate if they have a direct

impact on every class member's effort to establish liability and entitlement to relief. Predominance does not require that all questions be common, but rather that "a significant aspect of the case . . . can be resolved for all members of the class in a single adjudication." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (internal quotations omitted). The requirement is met here because important issues of law and fact are common to all class members. For instance, the Settlement Class members all contracted with Defendants and were subject to uniform contractual terms that were all governed by Texas law. Joint Decl. ¶ 9. Moreover, the salient evidence necessary to establish the Settlement Class' claims (e.g., corporate billing policies, contractual terms, etc.) is in no way dependent on the size of the Class. The only real individual issue relates to damages, which does not defeat predominance. *Brown v. Electrolux Home Prods.*, 817 F.3d 1225, 1239 (11th Cir. 2016) ("The 'black letter rule' recognized in every circuit is that 'individual damage calculations generally do not defeat a finding that common issues predominate'").

2.    Superiority: "The inquiry into whether the class action is the superior method for a particular case focuses on increased efficiency." *Agan v. Katzman & Korr, P.A.*, 222 F.R.D. 692, 700 (S.D. Fla. 2004) (internal quotations omitted). Litigating the claims of 170,984 merchants, requiring presentation of the same evidence and expert opinions over and over again, would obviously be inefficient. Because class treatment is superior to individual litigation, the superiority element is satisfied.

**D.    The Proposed Settlement Is Fair, Adequate, and Reasonable.**

This Court has discretion to approve a class action settlement under Rule 23(e) if the settlement is "fair, adequate, and reasonable." *Ayers*, 358 F.3d at 368. In assessing whether a proposed settlement satisfies this standard, the Fifth Circuit has identified six key points of analysis, known as the "*Reed* factors.*" *Dell*, 669 F.3d at 639 (citing *Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir. 1983)).

These six factors are:

    (1)    the existence of fraud or collusion behind the settlement;
    (2)    the complexity, expense, and likely duration of the litigation;
    (3)    the stage of the proceedings and the amount of discovery completed;
    (4)    the probability of plaintiffs' success on the merits;
    (5)    the range of possible recovery; and
    (6)    the opinions of the class counsel, class representatives, and absent class members.

*Dell*, 669 F.3d at 639 n.11 (quoting *Reed*, 703 F.2d at 172).

It is essential to confine the certification inquiry to the fairness, reasonableness, and adequacy of the proposed settlement, without attempting to resolve the legal and factual issues that are the basis of the underlying suit. The Fifth Circuit explained the rationale for this limited analysis: "In examining a proposed [settlement] . . . the court does not try the case. The very purpose of compromise is to avoid the delay and expense of such a trial." *Young v. Katz*, 447 F.2d 431, 433 (5th Cir. 1971). Each of the *Reed* factors favors approving this Settlement.

1.    <u>No Fraud or Collusion:</u>  The parties agreed to the Settlement only after good-faith, informed and arms-length negotiations by experienced attorneys under the supervision of a well-respected and highly experienced mediator after the exchange of significant and material informal discovery. Joint Decl. ¶¶ 29-50. Counsel zealously represented their clients throughout the case. *Id.* There is absolutely no indication that the settlement resulted from fraud or collusion.

2.    <u>The Complexity, Expense, and Likely Duration of Litigation:</u>  A settlement merits approval if it "will alleviate the need for judicial exploration of . . . complex subjects, reduce litigation costs, and eliminate the significant risk that individual claimants might recover nothing." *Lipuma v. American Express Co.*, 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005). Such is the case here. Approval will avoid complex, expensive, and lengthy litigation, saving resources of the parties and the Court. This is a difficult case that involves voluminous account data, billions of transactions, and complicated issues of law. Joint Decl. ¶ 57. Without the Settlement, Plaintiffs would face

substantial hurdles litigating their claims through the forthcoming motion to dismiss, as well as class certification, summary judgment, *Daubert* challenges, and trial. *Id.* "[S]ettling now avoids the risks and burdens of potentially protracted litigation." *Ayers*, 358 F.3d at 369.

   3. <u>The Stage of Proceedings and Amount of Discovery</u>:  The purpose of this factor is "to ensure that Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation." *Lipuma*, 406 F. Supp. 2d at 1324.  Here, before they filed the pleadings, Class Counsel extensively investigated the claims of Plaintiffs, with the assistance of former agents of Defendants, experts, and potential class members.  Joint Decl. ¶¶ 6-21.  They reviewed dozens of contracts and billing statements and interviewed several witnesses.  *Id.*  Perhaps most importantly, Class Counsel were able to obtain key informal discovery from Defendants that helped them not only assess the level of the alleged wrongdoing, but the monetary impact it had on the Settlement Class.  Such informal discovery included more than 8,000 pages of documents, including all versions of the contracts and terms and conditions used by Defendants during the Class Period and notices provided by Defendants relating to the Subject Fees, as well as a huge amount of billing data for the named Plaintiffs and a statistically significant sample of Settlement Class members.  *Id.* at ¶¶ 31-32.  Class Counsel, with the assistance of their data expert, Mr. Olsen, were able to review and analyze the significant data produced to understand exactly how Defendants billed their merchants, who had been effected by these billing practices, and what their alleged damages were.  *Id.* at ¶¶ 33-35.  The parties also exchanged voluminous briefs on the salient legal issues, such as the applicability and enforceability of key contractual provisions, such as the 30-day notice requirement and the amendment provision.  *Id.* at ¶¶ 38-40.

   This extensive informal discovery and briefing allowed Class Counsel to better understand

the merits of this Action and damages of the Settlement Class, prepared them for the mediation, and allowed them to engage in vigorous, arms-length negotiations under the direction of Mr. Hughes, who fully explored the issues in the case and helped the parties reach the proposed Settlement. *Id.* at ¶¶ 29-50; *see also In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.,* 851 F. Supp. 2d 1040, 1064 (S.D. Tex. 2012) (approving settlement because "[t]he parties have shown that they possessed sufficient information to gauge the strengths and weaknesses of the claims and defenses" despite the fact that only informal discovery was taken and the case settled at an early stage).

    4.    The Probability of Success on the Merits:    The fourth *Reed* factor is critical. "Absent a showing of fraud or collusion, 'the most important factor is the probability of the plaintiffs' success on the merits.'"    *Smith*, 91 Fed. Appx. at 955 n.3 (quoting *Parker*, 667 F.2d at 1209).    Settlement is an appropriate outcome where the likelihood of success is difficult to assess and the plaintiffs face substantial challenges.    *Parker*, 667 F.2d at 1209-10.

    Here, the Settlement represents a compromise that balances the merits of Plaintiffs' claims with the considerable difficulties of proving their claims.    Plaintiffs and Class Counsel believe that they could succeed on their claims at trial.    Joint Decl. ¶ 58.    However, the risks involved cannot be disregarded.    For instance, Defendants' contracts contain many exculpatory clauses, such as the provision that Defendants would argue waives claims unless billing "errors" are timely disputed and a limitation on recoverable damages.    *Id.*    If the 30-day notice provision was enforced and the Court decided that the notices served by the named Plaintiffs were insufficient for the other class members, the breach claims would have likely been effectively ended.    *Id.*    The same result would have been likely if the Court enforced the amendment provision in Defendants' contracts which they contend allowed them to increase merchant fees without notice.    *Id.*    Defendants could also be expected

vigorously to contest certification of the class, arguing that the "slamming" allegations are fact-specific, and that the question of the Subject Fees will vary from customer to customer based on the notices received and the bases on which the particular fee at issue was assessed. *Id.*

Class certification is always challenging and, assuming a class is certified, Plaintiffs risk losing on summary judgment, at trial, or on appeal. *Id.* at ¶¶ 57, 60. The proposed Settlement avoids these uncertainties and provides the Settlement Class with immediate, meaningful, and certain monetary and equitable relief. Under the circumstances, Plaintiffs and Class Counsel appropriately determined that the Settlement outweighs the risks of continued litigation. *Id.* at ¶ 61.

5. The Range of Possible Recovery: In ascertaining whether a settlement falls within the range of possible approval, courts will compare the settlement amount to the relief the class could expect to recover at trial. *Eric P. John Fund, Inc. v. Halliburton, Co.*, 2018 WL 1942227, *5 (N.D. Tex. Apr. 25, 2018). "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Parker*, 667 F.2d at 1210 n.6. Thus, even a minimal settlement can be approved. *See, e.g.*, *Stott v. Capital Fin. Servs., Inc.*, 277 F.R.D. 316, 345-46 n. 19 (N.D. Tex. 2011 (approving settlement when class members only received 2-3% of potentially recoverable losses).

Class Counsel believes that the Settlement Fund of $15 million represents approximately 28% of the Settlement Class' most probable recoverable trial damages. Joint Decl. ¶ 62. This estimate does not account for the "merchant-friendly" changes to Defendants' form contracts and sales practices provided by the Settlement, which themselves are extremely valuable to the Settlement Class. *Id.* at ¶ 63. For instance, if a Settlement Class member, in the future, receives advance notice of a fee increase (which it was not guaranteed before), and does not wish to continue its account with Defendants, it can now terminate without paying a $495

early termination fee, a huge savings.   Settlement ¶ 41(b).   Moreover, if a busy merchant forgets to review its statement for a few months and then notices and informs Defendants of an improper charge, it will now have preserved its right to dispute that charge, whereas currently Defendants would have argued that fee increases must be challenged within 30 days. *Id.* at ¶ 41(c); Joint Decl. ¶¶ 64-65.   The important value of such relief to the Settlement Class cannot be overlooked.

Based on the foregoing, the recovery contemplated by the Settlement represents a reasonable midpoint in the range of possible recovery.   *Cf. Salinas v. Roadway Express, Inc.*, 802 F.2d 787, 790 (5th Cir. 1986) (explaining settlement as "a compromise that cannot possibly satisfy every class member's particular desires").   By any reasonable measure, this recovery is a significant achievement given the extraordinary obstacles that Plaintiffs and the Settlement Class faced in the litigation.   Joint Decl. ¶ 66.

6.      The Opinions of Class Counsel, Class Representatives, and Absent Class Members: The Parties' counsel are the Court's main source of information about the fairness, adequacy, and reasonableness of a proposed class settlement.   *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 852 (E.D. La. 2007).   As a result, "[t]he Fifth Circuit has repeatedly stated that the opinion of class counsel should be accorded great weight."   *Klein v. O'Neil, Inc.*, 705 F. Supp. 2d 632, 649 (N.D. Tex. 2010); *Cotton,* 559 F.2d at 1330 ("the trial court is entitled to rely upon the judgment of experienced counsel for the parties.").   "Class counsel's opinion should be presumed reasonable because they are in the best position to evaluate fairness due to an intimate familiarity with the lawsuit." *Murphy Oil*, 472 F. Supp. 2d at 852.

Class Counsel whole-heartedly recommend the Settlement as an excellent result for the Settlement Class.   Joint Decl. ¶¶ 5, 67.   Indeed, Class Counsel endorse the Settlement as fair,

reasonable, and adequate based upon (i) their experience with litigating other class actions, including those involving similar allegations and issues concerning other payment processors, such as *Mercury Payment* (ii) their hands-on involvement in this litigation, (iii) their knowledge of the extensive informal discovery that they reviewed and analyzed, (iv) the opinions and guidance they received from their expert, and (v) their participation in arms-length and adversarial negotiations under the supervision of Mr. Hughes. *Id.*; *cf. Reed*, 703 F.2d at 175 (noting that "adequacy of representation and adequacy of settlement are different sides of the same question," such that competent counsel's approval is an indicator of reasonableness).

The eight named Plaintiffs uniformly agree that the settlement is a fair, adequate, and reasonable compromise. Joint Decl. ¶ 68. Because the Settlement Class has not yet received the formal notice about the proposed Settlement, it is premature to assess the reaction of the absent class members. However, to the extent that an absent class member disagrees with any portion of the Settlement, it provides that merchant with protections by enabling it to object to the Settlement or be excluded from it. Settlement ¶¶ 56-57. The Settlement is fair, adequate, and reasonable and merits Preliminary Approval.

**E.    The Court Should Approve the Proposed Notice Program.**

"Rule 23(e)(1)(B) requires the court to direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise regardless of whether the class was certified under Rule 23(b)(1), (b)(2), or (b)(3)." *Manual for Complex Litigation*, § 21.312 (internal quotation marks omitted). The best practicable notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

23

The Notice Program provides notice to Current and Former Customers by either email or U.S mail. One of the Defendants' primary ways of communicating with their Current Customers is by email. Joint Decl. ¶ 69. For those Current Customers, the Settlement Administrator will provide email notice to them. In the event that the Defendants do not have an email address for a Current Customer, or if an email sent to a Current Customer bounces back as undeliverable, the Settlement Administrator will send postcard notice to the Current Customer by U.S. mail. For Former Customers, the Settlement Administrator will send them notice by postcard through the U.S. mail. In the event that the postcard is returned as undeliverable, the Settlement Administrator will provide notice to the Former Customer by email and will make a reasonable effort to locate a current mailing address for that customer in order to send them postcard notice. Settlement ¶¶ 51-55.

The proposed Notice Program satisfies the requirements of due process and Rule 23 and should be approved. Direct notice in class actions has traditionally been accomplished by U.S. mail, and courts have long recognized that method as effective in notifying class members of their rights. *See In re Nissan Motor Corp., Antitrust Litig.*, 552 F.2d 1088, 1097-98 (5th Cir. 1977) (holding that mailed notice should be used where the "last known address of those class members can be identified with reasonable effort"); *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 296 (W.D. Tex. 2007) (recognizing that U.S. mail is an appropriate method for sending notice where class members can be identified). As technology has made communication by email widely available, courts have approved notice plans where email was used in lieu of, or in addition to, notice by U.S. mail. *Wolfe v. Anchor Drilling Fluids USA Inc.*, 2015 WL 12778393, *2 (S.D. Tex. Dec. 7, 2015) (Hoyt, J.) (finding email notice satisfies due process and Rule 23); *Kelly v. Phitten USA, Inc.*, 277 F.R.D. 564, 569-70 (S.D. Iowa 2011) (approving class notice where notice was primarily provided by email).

Email notification is particularly appropriate where a majority of the defendant's contact and

24

communications with class members occur electronically, as is the case here.  *E.g.*, *Lane v. Facebook, Inc.*, 696 F.3d 811, 818 (9th Cir. 2012) (the primary delivery of notice was through email because contact with the class members was primarily through electronic means); *Kelly*, 277 F.R.D. at 569 (approving email notice "sent based upon [defendant]'s customer email data").  Accordingly, notice by email and U.S. mail satisfies due process requirements.

The Court should also approve Epiq to serve as the Settlement Administrator.  Epiq is a well-known firm with a history of successfully administering many class action settlements, including the settlement in the similar *Mercury Payment* matter.  Joint Decl. ¶ 70.

<u>**CONCLUSION**</u>

For the reasons set forth above and in the accompanying materials, Plaintiffs request that the Court grant their motion and enter an order to:  (1) preliminarily approve the proposed Settlement; (2) certify the proposed Settlement Class; (3) appoint Plaintiffs as Class Representatives and their counsel as Class Counsel; (4) approve the Notice program; and (5) schedule the Final Approval Hearing.  A proposed order granting Preliminary Approval is filed herewith.

DATED this 7th day of September, 2018.

Respectfully submitted,

WEBB, KLASE & LEMOND, LLC

By:    */s/ E. Adam Webb*
E. Adam Webb
Georgia Bar No. 743910
Adam@WebbLLC.com
Matthew C. Klase
Georgia Bar No. 141903
Matt@WebbLLC.com
1900 The Exchange, S.E.
Suite 480
Atlanta, GA 30339
Telephone: (770) 444-0773

*Attorneys-in-Charge for Plaintiffs*

MEADE & NEESE LLP
Andrew K. Meade
Texas Bar No. 24032854
ameade@meadeneese.com
D. John Neese, Jr.
Texas Bar No. 24002678
jneese@meadeneese.com
Leann Pinkerton
Texas Bar No. 24038826
lpinkerton@meadeneese.com
2118 Smith Street
Houston, TX 77002
Telephone: (713) 355-1200

*Local Counsel for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 7, 2018, a copy of the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel who have registered with the Court.

*/s/ E. Adam Webb*
E. Adam Webb