# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| AL'S PALS PET CARE, LLC, DeFABIO SPINE AND SPORTS REHAB, LLC, JULIE RUDIGER, INC., MENA STONE & LANDSCAPING SUPPLIES, LLC, TULSA ART CENTER, LLC, BAN-A-PEST EXTERMINATION CO., INC., FLEETWOOD CHIROPRACTIC & REHABILITATION, PC, and BAYLEY PRODUCTS, INC., individually and on behalf of all others similarly situated, | § § § § § § § § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. |
| v. | § § | 4:17-CV-3852 |
| WOODFOREST NATIONAL BANK, N.A., MERCHANTS' CHOICE PAYMENT SOLUTIONS, and PAYSAFE PAYMENT PROCESSING SOLUTIONS LLC, | § § § § § | |
| Defendants. | § § | |

## MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT

E. Adam Webb, Esq.
Matthew C. Klase, Esq.
WEBB, KLASE & LEMOND, LLC
1900 The Exchange, SE, Suite 480
Atlanta, Georgia 30339
(770) 444-0773

Andrew K. Meade, Esq.
D. John Neese, Jr., Esq.
Leann Pinkerton, Esq.
MEADE & NEESE LLP
2118 Smith Street
Houston, Texas 77002
(713) 355-1200

*Attorneys for Plaintiffs and the Settlement Class*

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF CITATIONS ............................................................................................ iii

SUMMARY OF ARGUMENT ..................................................................................... 1

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ............................. 1

    A. Background ...................................................................................................... 1

    B. Terms of Settlement ......................................................................................... 8

        1. Settlement Class ......................................................................................... 8

        2. Relief ......................................................................................................... 8

    C. Notice Program ............................................................................................. 11

STATEMENT OF THE ISSUE AND STANDARD OF REVIEW ......................................... 12

ARGUMENT AND CITATION OF AUTHORITY .......................................................... 13

    A.  The Court Has Personal Jurisdiction Over the Settlement Class
        Because They Received Proper Notice and Due Process ......................................... 13

    B.  The Settlement Is Fair, Adequate, and Reasonable .................................................. 14

        1. The Settlement Class Has Received Excellent Representation ...................... 15

        2. The Settlement Was Negotiated at Arm's Length ........................................ 17

        3. The Substantial Relief Provided Is Admirable Given the Risks .................... 18

        4. The Settlement Treats Class Members Equitably ........................................ 22

        5.  The Opinions of Class Counsel, Class Representatives, and
            Absent Class Members Support the Settlement ............................................ 23

    C.  The Court Should Certify the Settlement Class ...................................................... 25

CONCLUSION .......................................................................................................... 25

<u>**TABLE OF CITATIONS**</u>

<u>**Cases**</u>

*Ayers v. Thompson*,
   358 F.3d 356 (5th Cir. 2004) ................................................................ 12, 14, 18

*Billitteri v. Securities Am., Inc.*,
   2011 WL 3586217 (N.D. Tex. Aug. 4, 2011) ................................................ 18

*Champs Sports Bar & Grill Co. v. Mercury Payment Sys., LLC*,
   275 F. Supp. 3d 1350 (N.D. Ga. 2017) ................................................... *passim*

*Cotton v. Hinton*,
   559 F.2d 1326 (5th Cir. 1977) ............................................................... 13, 23

*Erica P. John Fund, Inc. v. Halliburton, Co.*,
   2018 WL 1942227 (N.D. Tex. Apr. 25, 2018) ............................................. 20

*Frew v. Hawkins*,
   2007 WL 2667985 (E.D. Tex. Sept. 5, 2007) ............................................. 20

*Gutierrez v. Wells Fargo Bank, N.A.*,
   730 F. Supp. 2d 1080 (N.D. Cal. 2010) ........................................................ 5

*In re Bluetooth Headset Prods. Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011) ...................................................................... 17

*In re Checking Account Overdraft Litig.*,
   286 F.R.D. 645 (S.D. Fla. 2012) .................................................................. 5

*In re Chicken Antitrust Litig. Am. Poultry*,
   669 F.2d 228 (5th Cir. 1982) ...................................................................... 12

*In re Educ. Testing Serv. Praxis Principles of Learning and Teaching, Grades 7–12 Litig.*,
   447 F. Supp. 2d 612 (E.D. La. 2006) ........................................................... 15

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
   851 F. Supp. 2d 1040 (S.D. Tex. 2012) ....................................................... 17

*In re Katrina Canal Breaches Litig.*,
   628 F.3d 185 (5th Cir. 2010) ...................................................................... 13

*In re Nissan Motor Corp. Antitrust Litig.*,
   552 F.2d 1088 (5th Cir. 1977) ............................................................... 12, 13

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*,
  910 F. Supp. 2d 891 (E.D. La. 2012)................................................................ 17, 24

*In re Pool Prods. Distribution Market Antitrust Litig.*,
  2016 WL 235781 (E.D. La. Jan. 20, 2016)...................................................... 24

*Kemp v. Tower Loan of Miss., LLC*,
  2017 WL 6522323 (S.D. Miss. Dec. 20, 2017) ............................................. 17

*Klein v. O'Neil, Inc.*,
  705 F. Supp. 2d 632 (N.D. Tex. 2010) ........................................................... 23

*Lee v. Ocwen Loan Servicing, LLC*,
  2015 WL 5449813 (S.D. Fla. Sept. 14, 2015) ............................................... 24

*Lipuma v. American Express Co.*,
  406 F. Supp. 2d 1298 (S.D. Fla. 2005) .......................................................... 18

*McNary v. American Sav. and Loan Ass'n*,
  76 F.R.D. 644 (D.C. Tex. 1977) ..................................................................... 12

*Mullane v. Cent. Hanover Bank & Trust Co*.,
  339 U.S. 306 (1950)........................................................................................ 13

*Parker v. Anderson*,
  667 F.2d 1204 (5th Cir. 1982)................................................................... 19, 20

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985)........................................................................................ 13

*Quintanilla v. A & R Demolition Inc.*,
  2008 WL 9410399 (S.D. Tex. May 7, 2007).................................................. 24

*Reed v. General Motors Corp.*,
  703 F.2d 170 (5th Cir. 1983)........................................................ 14, 15, 18, 24

*Salinas v. Roadway Express, Inc.*,
  802 F.2d 787 (5th Cir.1986).................................................................... 18, 22

*Silber v. Mabon*,
  18 F.3d 1449 (9th Cir. 1994) ......................................................................... 14

*Smith v. Crystian*,
  91 Fed. Appx. 952 (5th Cir. 2004) ................................................................ 18

*Stott v. Capital Fin. Servs., Inc.*,
    277 F.R.D. 316 (N.D. Tex. 2011) ................................................................. 20

*Turner v. Murphy Oil USA, Inc.*,
    472 F. Supp. 2d 830 (E.D. La. 2007) ............................................................ 23

*Union Asset Management Holding A.G. v. Dell, Inc.*,
    669 F.3d 632 (5th Cir. 2012) ......................................................................... 14

*Zerkle v. Cleveland-Cliffs Iron Co.*,
    52 F.R.D. 151 (S.D.N.Y. 1971) ..................................................................... 12

## **Federal Rules of Civil Procedure**

FED. R. CIV. P. 23(a) ................................................................................................. 25

FED. R. CIV. P. 23(b)(3) ...................................................................................... 8, 25

FED. R. CIV. P. 23(e)(2) ................................................................................. *passim*

FED. R. CIV. P. 26(f) ................................................................................................. 4

## **Other Authorities**

Advisory Committee Note to FED. R. CIV. P. 23(e) ................................................... 23

## SUMMARY OF ARGUMENT

On September 18, 2018, the Court issued preliminary approval to the Settlement and Notice Program and provisionally certified the Settlement Class.[1]  Dkt. 40.  Notice having since been given, Plaintiffs now move for final approval of the Settlement and certification of the Settlement Class.  The Settlement – which consists of (1) a common fund of $15,000,000, to be distributed to Current and Former Customers of Defendants that were allegedly overcharged for processing payment card transactions, and (2) critical contractual and practice changes that will help protect merchants from unknowingly doing business with Defendants and future unwanted price increases – was negotiated by experienced lawyers following substantial discovery and expert analysis.  The Settlement is an outstanding achievement that will provide immediate benefits to the Settlement Class without further risks or delay.  To date, not a single member of the Settlement Class has objected to or opted out of the Settlement.  Moreover, the Notice Program, as implemented, satisfies due process and Rule 23 and the Settlement Class satisfies the requirements for certification.  This motion should thus be granted.

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

A.    **Background.**   For years, Defendant Woodforest National Bank ("Woodforest") provided payment processing services to merchants through Defendant Merchants' Choice Payment Solutions ("MCPS").   *See* Amended Complaint ¶ 1 (Dkt. 24).   MCPS enrolled merchants in its card processing services after having them sign a Merchant Payment Application ("Application").   *Id.* at ¶ 42.  Each signed Application was subject to MCPS' form terms and conditions.   *Id.* at ¶ 43.  MCPS then proceeded to process card transactions and send invoices that summarized card transactions and the applicable fees.   *Id.* at ¶ 50.

---

[1] Capitalized terms have the meanings afforded them in the Settlement Agreement (Dkt 38-1).

Plaintiffs filed this action asserting two primary theories.  First, Plaintiffs alleged that MCPS agents induced merchants to do business with MCPS by "cold calling" them and falsely insinuating the callers were with the merchant's then-current processing company, thus leading merchants to unwittingly bind themselves to do business with MCPS.  *Id.* at ¶¶ 9-28.  Second, Plaintiffs alleged that Defendants overcharged their customers by imposing several types of fees that were either never mentioned during the contracting process or, in some cases, merchants were explicitly informed in the contracting documents they would not pay.  *Id.* at ¶¶ 29-60.  The lawsuit sought to recover all amounts that the aggrieved merchants ultimately paid as a result of Defendants' alleged wrongdoing.[2]  Plaintiffs asserted causes of action for fraudulent inducement, breach of contract, and unjust enrichment.  *Id.* at ¶¶ 244-85.

Plaintiffs allege that they personally suffered from a range of improper practices that date all the way back to 2011.  In 2017, they proceeded to research potential legal claims with counsel.  *See* Joint Declaration of E. Adam Webb and Matthew C. Klase ("Joint Decl.") ¶ 6 (Dkt. 39).  This research was substantial and revealed factual and legal support for a lawsuit against Woodforest and MCPS.  *Id.* at ¶¶ 7-12.

The original complaint was filed on December 22, 2017, by Plaintiffs Al's Pals Pet Care, LLC, DeFabio Spine and Sports Rehab, LLC, Julie Rudiger, Inc., Mena Stone & Landscaping Supplies, LLC, and Tulsa Art Center, LLC, against Woodforest and MCPS.  *Id.* at ¶ 13. Defendant Paysafe, the current owner of the MCPS business, was subsequently added as a defendant. *Id.* at ¶¶ 14-16.

On March 9, 2018, Defendants filed their lengthy motion to dismiss the complaint.  *Id.* at ¶ 18. Therein, Defendants asserted a number of arguments, including that Plaintiffs' (a) fraudulent inducement claims were inadequately pled, (b) contract claims were barred because they failed to

---

[2] Defendant Paysafe Payment Processing Solutions, LLC ("Paysafe") purchased MCPS in August of 2017.

comply with the contractual provision requiring timely written notice of any errors and because the contract provided Defendants with discretion to increase merchant fees, and (c) unjust enrichment claim failed because of the existence of an enforceable contract. *Id.* Meanwhile, Class Counsel had been contacted by several merchants that had learned of the case and expressed a desire to be added as named plaintiffs. *Id.* at ¶ 19.

After receiving the motion to dismiss, Class Counsel contacted counsel for Defendants and informed them of their plan to file an amended complaint pleading additional facts and adding several new party plaintiffs. *Id.* at ¶ 20. Defendants consented to this amendment and, on March 21, 2018, the Parties jointly notified the Court that an amended complaint would soon be filed and requested a scheduling order. The Court entered the Parties' requested scheduling order on March 23, 2018. *Id.*

On March 28, 2018, the amended complaint was filed. *Id.* at ¶ 21. This added Ban-A-Pest Extermination Co., Inc., Fleetwood Chiropractic & Rehabilitation, PC, and Bayley Products, Inc. as Plaintiffs. Additional factual allegations, developed through counsel's ongoing investigation and interviews of former customers, whistleblowers, and payment processing industry experts, were included. *Id.*

On April 12, 2018, the Court entered an order denying Defendants' motion to dismiss the original complaint, holding: "Based on the plaintiffs' First Amended Complaint, the Court concludes that the Amended Complaint contains sufficient factual content, if accepted as true, that satisfies the rules of pleadings and case law." *Id.* at ¶ 22. The Parties began a series of communications about the order. *Id.* at ¶ 23. On April 13, 2018, Defendants moved for clarification that the Court's April 12, 2018 order was only intended to find Defendants' motion to dismiss the original complaint moot. The Court granted this motion on April 20, 2018. *Id.*

In the meantime, the Parties held the Rule 26(f) conference and first discussed the possibility of holding an early mediation to explore a class settlement. *Id.* at ¶ 24. Class Counsel contacted multiple data experts to discuss the data and information that would be needed to allow Plaintiffs to mediate. *Id.* at ¶ 25. A sampling methodology was developed based largely on a prior successful mediation in a payment processing case. Plaintiffs presented Defendants with an itemized, detailed list of the documents and electronic data that Defendants would need to produce in order for Class Counsel and Plaintiffs to engage in informed settlement discussions. *Id.*

The Parties and their experts had several discussions and exchanged lengthy correspondence regarding the nature and scope of the requested data and information. *Id.* at ¶ 26. Defendants informed Class Counsel what items were available and could be produced and the Parties discussed these issues in great detail, ultimately agreeing on the scope of informal discovery that was needed to fairly and thoroughly evaluate the claims and defenses in the case. *Id.* at ¶¶ 26-27.

On April 20, 2018, at the Parties' request, the Court stayed further proceedings so settlement discussions could take place. *Id.* at ¶ 27. The Parties agreed to a confidentiality order to govern the handling of pre-mediation discovery and such order was approved by the Court on April 26, 2018. *Id.* at ¶ 28.

To assist with the settlement discussions, the Parties agreed to retain a well-respected and experienced mediator, Hunter Hughes III, who scheduled a face-to-face mediation in Atlanta, Georgia for July 18, 2018. *Id.* at ¶ 29; *also* Declaration of Hunter Hughes ("Hughes Decl.") ¶¶ 1-7 (filed contemporaneously herewith). Mr. Hughes was chosen because of his sterling reputation as a class action mediator and because he had recently successfully mediated an approved class settlement in a case involving similar allegations of overbilling by card processing servicers – *Champs Sports Bar &*

*Grill Co., et al. v. Mercury Payment Systems, LLC and Global Payments Direct, Inc.*, 275 F. Supp. 3d 1350 (N.D. Ga. 2017).  Joint Decl. ¶ 29.

The Parties took full advantage of the ensuing months, agreeing to exchange the substantial amount of information needed for the mediation to be productive.  *Id.* at ¶ 30.  Defendants produced more than 8,000 pages of documents, which included all of the various Application forms and terms and conditions used by MCPS during the Class Period, all notices relating to the Subject Fees, aggregate revenue figures relating to the Subject Fees during the Class Period, breakdowns of Former and Current Customers, all of the named Plaintiff Applications and statements, and individual Applications and statements for a statistically significant sample of Settlement Class members.  *Id.* at ¶ 31.  Class Counsel reviewed and coded every document provided by Defendants.  *Id.*

Critically, Defendants also produced *hundreds of thousands* of lines of transaction and fee data for the named Plaintiffs and a statistically-significant sample of Class members.  *Id.* at ¶ 32.  Defendants also provided extensive aggregate information necessary to understand the customer-specific data.  *Id.* at ¶ 32.

To assist in the organization and breakdown of the voluminous data, Class Counsel retained Arthur Olsen of Cassis Technology, LLC, a renowned data consultant whose expert testimony has been accepted by numerous courts.  *Id.*; *also In re Checking Account Overdraft Litig.*, 286 F.R.D. 645, 650 n.4 (S.D. Fla. 2012) (concluding Mr. Olsen has the "ability to calculate damages on an account-by-account basis using the bank's own computerized records, a method upon which Mr. Olsen previously relied, with court approval"); *Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1138-39 (N.D. Cal. 2010) (finding Olsen's methods to be "professional" and "careful").

Working in tandem with Class Counsel, Mr. Olsen organized three sets of platform data, wrote code to extract overcharges relating to the Subject Fees, and created demonstrative exhibits detailing his findings for use at the mediation. *Id.* at ¶ 34. Using Defendants' data and his expertise, Mr. Olsen was able to isolate each merchant in the sample data that was allegedly overcharged by MCPS and the amount of each such merchant's overcharges. *Id.* at ¶ 35. This analysis was provided to MCPS in advance of the mediation. *Id.*

Defendants, meanwhile, retained their own data and damages experts to perform an independent analysis, the results of which they provided to Class Counsel. *Id.* at ¶ 36. Class Counsel and Mr. Olsen participated in multiple pre-mediation calls with Defendants and their experts to explore the methodologies that had been used in estimating damages. *Id.* Differences between the conclusions reached by the experts were studied by all Parties and additional work was performed by the experts to bridge the gap for purposes of negotiation. *Id.* at ¶ 37. Concessions were made by the Parties and the experts' reports were revised accordingly. *Id.*

The Parties also exchanged voluminous mediation statements that took on several important issues in the litigation, including the alleged unenforceability of key contract terms, as well a detailed summary of how Plaintiffs intended to prove each of the class certification elements. *Id.* at ¶¶ 38-39. Additional private briefing and materials were provided by both Parties to the mediator and Plaintiffs prepared a rebuttal mediation statement. *Id.* at ¶ 40. Class Counsel also consulted with Mr. Hughes in advance of mediation and coordinated with the Plaintiffs. *Id.* at ¶ 41.

Despite these extensive efforts, the mediation on July 18, 2018 was unsuccessful. *Id.* at ¶ 42. The Parties spent an entire day mediating at Mr. Hughes' offices. However, the Parties narrowed the divide that existed at the outset of the mediation considerably and made great headway toward understanding each other's claims and defenses. *Id.*

At Mr. Hughes' urging, the Parties continued to negotiate. *Id.* at ¶ 43. These negotiations concerned not only the amount of the common fund that would be established for the Class, but also the nature and scope of contract amendments and practice changes that Defendants would make as part of any settlement. *Id.* Extensive negotiations occurred over a period of four weeks. *Id.* at ¶ 44. The Parties exchanged legal analysis of thorny issues. They consulted with their experts to support offers and counteroffers. Proposed terms of settlement, including non-monetary terms, were negotiated. *Id.* On August 13, 2018, the Parties reached agreement on a deal in principle and promptly informed the Court. *Id.* at ¶ 45. The Settlement resulted from arm's length, difficult negotiations that succeeded in large part due to Mr. Hughes' active involvement. *Id.*; *also* Hughes Decl. ¶ 8 ("The negotiations were not the product of collusion but rather were hotly contested and hard fought") (filed contemporaneously herewith).

The Parties thereafter worked to finalize the specific terms of the Agreement. Joint Decl. ¶ 46. Class Counsel prepared an initial draft of the Agreement and circulated to Defendants for their review and comment. *Id.* Over the next few weeks, the Parties exchanged multiple redlined drafts of the Agreement, which included fine tuning the agreed-upon practice changes and contract amendments and how and when such revisions would be communicated to the Class, as well as how Notice and eventually payments could most efficiently be disseminated to the Class. *Id.*

The Parties also exchanged multiple drafts of (1) the Notices to ensure that the Settlement was accurately and appropriately described to the Class, and (2) the Allocation Formula to design a cost-effective manner to fairly divide payments among Class members. *Id.* at ¶ 47. In conjunction with these discussions, Class Counsel obtained advice from potential settlement administrators, who also submitted competitive bids to provide Notice and administer the Settlement. *Id.* at ¶ 48. Consensus

was reached on final drafts of the Agreement, Notices, and Allocation Formula on September 4, 2018. Joint Decl. ¶ 50.

On September 7, 2018, Plaintiffs and Class Counsel filed an unopposed motion for preliminary approval of the Settlement and supporting evidence. Dkts. 38-39. The motion was granted by the Court on September 18, 2018. *See* Preliminary Approval Order (Dkt. 40).

**B.**    **Terms of Settlement.**    The Settlement's terms are detailed in the Agreement filed herewith as Exhibit A. The following is a summary of the material terms of the Settlement:

1.    Settlement Class:    The Settlement Class – an opt-out class under Rule 23(b)(3) – is defined as:

> All merchants in the United States that contracted to receive payment processing services from or through Defendants and paid one or more of the Subject Fees from December 22, 2013 through the date of preliminary approval.[3]

Settlement ¶ 40. Several types of entities enumerated in the Settlement are excluded from the Class, most notably those owned by or affiliated with Defendants. *Id.*

2.    Relief:    The relief to Settlement Class members includes:

***The Settlement Fund*** – Defendants have paid $15 million into an escrow account that is to be used to pay cash benefits to Settlement Class members, the costs of Notice and administration, legal fees and expenses, and Service Awards to the Class Representatives. Settlement ¶ 32. All 121,645 Settlement Class members are eligible to receive a cash payment. *See* Declaration of Cameron Azari ("Azari Decl.") ¶ 21 (filed contemporaneously herewith). Current Customers – 44,026 in number – will automatically receive their payments. *Id.*; Settlement ¶ 64. Meanwhile, Former Customers – 77,619 in number – will receive a payment via check if they file a

---

[3] "Subject Fees" refers to the following categories of fees charged by Defendants: (1) annual fee, (2) batch header fee, (3) PCI program/compliance fee, (4) PCI non-compliance/non-validation fee, (5) gateway access fee, (6) Foundry/emerchant fee, (7) monthly minimum discount fee, (8) non-qualified fee, (9) discount rate, (10) other discount fee, or (11) paper statement fee. Settlement ¶ 38.

simple Claim Form attesting that they contracted with Defendants during the Class Period and provide their current contact information. Settlement ¶¶ 64-67; Azari Decl. ¶ 21.

The amount of the cash payments is calculated the same way for both Current Customers and Former Customers as described in the Allocation Formula, a copy of which is attached as Exhibit 1 to the Settlement Agreement. Thirty-five percent of the net settlement fund (the amount remaining after payment of all other obligations) will be equally allocated, on a *per capita* basis to all of the members of the Settlement Class. Forty percent will be allocated, *pro rata*, based on the total number of calendar months during which such Settlement Class member was a customer of Defendants during the Class Period, up to a maximum of 36 months per Settlement Class member. And twenty-five percent will be distributed, *pro rata*, to Settlement Class members based on their share of the total dollar volume of transactions processed through Defendants during the Class Period. This Allocation Formula was chosen to account for the fact that some of the Subject Fees are service fees that are assessed monthly regardless of transaction volume, while others are dependent solely upon transaction volume. Joint Decl. ¶ 54. These percentages comport with the analysis of Plaintiffs' expert as to the relative significance of the categories of challenged fees. *Id.* at ¶ 55.

If the total of the cash distributed to Current Customers, the cash amount claimed by Former Customers, costs of Notice and administration, attorneys' fees and expenses, and Service Awards is less than $11 million, then the difference between the total of all of those amounts and $11 million will be distributed *pro rata* to all Settlement Class members, except for those Former Customers who have not submitted claims. Settlement ¶ 67. If the total of all of those amounts is equal to or more than $11 million, any money remaining in the Settlement Fund after payment of all obligations will be returned to Defendants. *Id.*

***Contract and Practice Changes*** – In addition to funding the Settlement, Defendants are bound to amend their Application and terms and conditions to reflect the following modifications:

    a. Prior to increasing or adding any fees, Defendants will notify all affected customers in writing at least 30 days prior to the effective date of such increase or addition;

    b. Any applicable early termination fee will be waived in the event of termination of the agreement by a merchant within 90 days of an increase in Non-Pass-Through Fees; and

    c. Customers will be permitted to dispute errors or charges on their statements within 90 days (rather than the current 30 days) from receipt or availability of their statements.

Such amended contract terms must take effect no more than 60 days after the Effective Date, and Defendants are required to notify all Current Customers of the amendments at least 30 days prior to the amendments taking effect.  Settlement ¶ 41.

Defendants are also bound to undertake a comprehensive review of their telemarketing practices within six months of the Effective Date and, based on the results of this review, to review and revise their training program for their independent sales offices/agents, as may be necessary to include instruction that independent sales offices/agents should not imply or insinuate to prospective merchants that they are affiliated with the merchant's current payment processing service provider.  *Id.* at ¶ 42.

In conjunction with the Settlement, the Class will release Defendants from the claims that were or could have been raised in this case.  *Id.* at ¶ 68.  Settlement Class members specifically retain all rights to challenge invoices sent by Defendants after Preliminary Approval.  *Id.*  In turn, Defendants will release Settlement Class members from any potential liability for payment of Defendants' attorneys' fees and expenses incurred in defending this case.  *Id.* at ¶ 69.  The releases are more fully described in Section XII of the Settlement Agreement.

C.      **The Notice Program.**  The Notice Program was designed to provide the best notice practicable, and was tailored to take advantage of the contact information Defendants had available about the Settlement Class members.  Agreement ¶¶ 50-57.  Each facet of the Notice Program was timely and properly accomplished.  Azari Decl. ¶¶ 10-26.

Defendants forwarded the Settlement Administrator the names and contact information for all members of the Settlement Class.  *Id.* at ¶ 13; Declaration of Giovanni Diano ("Diano Decl.") ¶ 4 (filed contemporaneously herewith).  Notice of the Settlement was sent to Current Customers by email and postcard notice was sent to those Current Customers whose email addresses were unavailable or unusable.  Former Customers were sent a postcard notice and Claim Form.  Email notice was also sent to Former Customers whose mailing addresses were unknown or whose postcard notices were returned as undeliverable.[4]  Reasonable efforts were made to update all addresses.  Azari Decl. ¶¶ 15-26.

Since November 1, 2018, a long form notice, relevant pleadings, and other information about the Settlement has been available on the Settlement Website and Class members have been able to call a toll-free number to ask questions.  The Settlement Website also enables Settlement Class members to submit claims online.  *Id.* at ¶¶ 30-31.  As of December 18, 2018, the Settlement Website had 13,337 visits and the telephone number had handled 691 calls.  *Id.*

The success rate for the individual Notice Program has been high.   To date, individual Notice has reached 93.4 percent of Settlement Class members, *id.* at ¶¶ 25, 36, and efforts to resend Notices to those whose previous Notice was returned as undeliverable are ongoing.  *Id.*  This reach

---

[4] As noted in the Declaration of Giovanni Diano, the initial list provided to the Settlement Administrator was overinclusive, which caused Notice to be sent not only to all Settlement Class members but also to some merchants that do not qualify for inclusion in the Settlement Class.  *Id.* at ¶¶ 5-6.  Defendants subsequently realized this mistake, identified the non-Settlement Class members, and provided a subsequent notice to certain of them at Defendants' expense that advised them they were not Class members and could disregard the Notice.  *Id.* at ¶ 7.  Such non-Settlement Class members will not receive a distribution from the Settlement, if it is approved.  *Id.* at ¶ 8; Azari Decl. ¶ 20.

exceeds the threshold recommended by the Federal Judicial Center and approved by many courts in connection with other class action settlements. *Id.* at ¶¶ 26, 36.

As of December 18, 2018, the Settlement Administrator had received zero requests for exclusion (opt-outs). *Id.* at ¶ 29. Moreover, to date zero objections to the Settlement have been received. *Id.*; *also* Supplemental Joint Declaration of E. Adam Webb and Matthew C. Klase ("Supp. Joint Decl.") ¶ 27 (filed contemporaneously herewith).

To date, the claims process has also been successful. As of December 18, 2018, 7,994 Former Customers had submitted claims, a "to-date" claim percentage of 10.3%. Azari Decl. ¶ 28. The claims rate is expected to rise even higher as Class Counsel continue to send emails to Former Customers, reminding them to file claims. Supp. Joint Decl. ¶ 28.

## STATEMENT OF THE ISSUE AND STANDARD OF REVIEW

Court approval is required for settlement of a class action. Fed. R. Civ. P. 23(e). The federal courts have long recognized a strong policy and presumption in favor of class settlements. The Rule 23(e) analysis should be "informed by the strong judicial policy favoring settlements as well as the realization that compromise is the essence of settlement." *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. 1982). In evaluating a proposed class settlement, the Court "will not substitute its business judgment for that of the Parties; 'the only question . . . is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval.'" *McNary v. Am. Sav. and Loan Ass'n*, 76 F.R.D. 644, 649 (D.C. Tex. 1977) (quoting *Zerkle v. Cleveland-Cliffs Iron Co.*, 52 F.R.D. 151, 159 (S.D.N.Y. 1971)); *Ayers v. Thompson*, 358 F.3d 356, 368 (5th Cir. 2004) (class settlements that are fair, reasonable, and adequate should be approved). Indeed, "[s]ettlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and uncertainties and preventing lawsuits." *In re Nissan Motor*

*Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977). Class settlements minimize the litigation expenses of the Parties and reduce the strain that litigation imposes upon already scarce judicial resources. Therefore, "in class action suits, there is an overriding public interest in favor of settlement." *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977). The Settlement here is more than sufficient under Rule 23(e) and Final Approval is clearly warranted.

## ARGUMENT AND CITATION OF AUTHORITY

A.    **The Court Has Personal Jurisdiction Over the Settlement Class Because They Received Proper Notice and Due Process.** In addition to having personal jurisdiction over Plaintiffs, the Court also has personal jurisdiction over all members of the Settlement Class because they received the requisite notice and due process. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985) (citing *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306, 314-15 (1950)). The Court-approved Notice satisfies due process requirements because it described "the substantive claims . . . [and] contained information reasonably necessary to make a decision to remain a class member and be bound by the final judgment." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d at 1104-05; *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 197 (5th Cir. 2010) ("a settlement notice need only satisfy the broad reasonableness standards imposed by due process"); Preliminary Approval Order ¶¶ 10-11. Indeed, not only did the Notice inform the Settlement Class members about the scope of the Settlement, their rights under the Settlement, and where they could find more information, but it also informed them of Class Counsel's intention to seek attorneys' fees of up to one-third of the Settlement Fund as well as $10,000 Service Awards for each of the Plaintiffs. Hence, the Notice was "reasonably calculated, under [the] circumstances, to apprise interested Parties of the pendency of the action and afford them an opportunity to present their objections." *Shutts*, 472 U.S. at 812.

Moreover, in terms of timing, the Settlement Class members had 61 days between the initial mailing of the Notice on November 2, 2018, and the deadline to request exclusion from the Class, which is January 2, 2019. *Silber v. Mabon*, 18 F.3d 1449, 1452, 1454 (9th Cir. 1994) (due process requirement and Rule 23 satisfied when settlement notices were sent out 40 days before the opt-out deadline). The Notice Program, as implemented, clearly met constitutional and Rule 23(e) due process requirements. Azari Decl. ¶¶ 35-36. As a result, the Court should affirm in its Final Approval order that the Settlement Class was provided the best notice practicable under the circumstances.

**B.**    **The Settlement Is Fair, Adequate, and Reasonable.** This Court has discretion to approve a class action settlement under Rule 23(e) if the settlement is "fair, adequate, and reasonable." *Ayers*, 358 F.3d at 368. Over the years, the various circuits developed their own criteria for assessing whether a class settlement was "fair, adequate, and reasonable." The Fifth Circuit, for instance, identified six key points of analysis, known as the "*Reed* factors." *Union Asset Management Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012) (citing *Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir. 1983)). These six factors are:

(1)    the existence of fraud or collusion behind the settlement;

(2)    the complexity, expense, and likely duration of the litigation;

(3)    the stage of the proceedings and the amount of discovery completed;

(4)    the probability of plaintiffs' success on the merits;

(5)    the range of possible recovery; and

(6)    the opinions of the class counsel, class representatives, and absent class members.

*Dell*, 669 F.3d at 639 n.11 (quoting *Reed*, 703 F.2d at 172).

14

In an effort to unify the criteria considered by the various circuits, Congress recently amended Rule 23(e) to specifically articulate the criteria. The amended Rule 23(e)(2) took effect on December 1, 2018, and states that courts may approve a proposed settlement as "fair, reasonable, and adequate" only after a hearing and after considering whether:

(A)     the class representatives and class counsel have adequately represented the class;

(B)     the proposal was negotiated at arm's length;

(C)     the relief provided for the class is adequate, taking into account:

   (i)     the costs, risks, and delay of trial and appeal;

   (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

   (iii)   the terms of any proposed award of attorney's fees, including timing of payment; and

   (iv)    any agreement required to be identified under Rule 23(e)(3); and

(D)     the proposal treats class members equitably relative to each other.

An analysis of these criteria, which are substantively similar to the Fifth Circuit's *Reed* factors, show this Settlement to be eminently fair, reasonable, and adequate.

1.     <u>The Settlement Class Has Received Excellent Representation:</u>  The record shows that Class Counsel and the Class Representatives have provided exceptional representation to the Settlement Class. Most importantly, Counsel worked diligently to obtain sufficient information to evaluate the merits of the case and prepare for informed settlement discussions. *In re Educ. Testing Serv. Praxis Principles of Learning and Teaching, Grades 7–12 Litigation*, 447 F. Supp. 2d 612, 620 (E.D. La. 2006). "The question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed . . ." *Id.* at

620-21.

Here, before they filed the pleadings, Class Counsel extensively investigated the claims of Plaintiffs, with the assistance of the Class Representatives, former agents of Defendants, experts, and potential class members.  Joint Decl. ¶¶ 6-21.  Counsel reviewed dozens of contracts and billing statements and interviewed several witnesses.  *Id.*  Perhaps most importantly, Class Counsel were able to obtain key informal discovery from Defendants that helped them not only assess the level of the alleged wrongdoing, but the monetary impact it had on the Settlement Class.  Such informal discovery included more than 8,000 pages of documents, including all versions of the contracts and terms and conditions used by Defendants during the Class Period and notices provided by Defendants relating to the Subject Fees, as well as a huge amount of billing data for the named Plaintiffs and a statistically significant sample of Settlement Class members.  *Id.* at ¶¶ 31-32.  Class Counsel, with the assistance of their data expert, Mr. Olsen, were able to review and analyze the significant data produced to understand exactly how Defendants billed their merchants, who had been effected by these billing practices, and what their alleged damages were.  *Id.* at ¶¶ 33-35.  The Parties also exchanged voluminous briefs on the salient legal issues, such as the applicability and enforceability of key contractual provisions, the 30-day notice requirement and the amendment provision.  *Id.* at ¶¶ 38-40.  Class Counsel also relied on their experience litigating similar legal issues in prior and current cases and the knowledge of the legal precedent governing such issues.  Supp. Joint Decl. ¶ 13.

This extensive knowledge, investigation, informal discovery, and briefing allowed Class Counsel to better understand the merits of this Action and damages of the Settlement Class, prepared them for the mediation, and successfully positioned them to engage in vigorous, arms-length negotiations under the direction of Mr. Hughes, who fully explored the issues in the case

and helped the Parties reach the proposed Settlement.  *Id.* at ¶¶ 29-50; Hughes Decl. ¶¶ 8-9; Supp. Joint Decl. ¶ 14.   In light of the foregoing, the Settlement represents an informed, educated, and fair resolution of this dispute.  Extensive information allowed Class Counsel and the Class Representatives to assess their position in great detail and make a reasonable decision on settlement, which is all that is required.  *E.g.*, *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1064 (S.D. Tex. 2012) (approving settlement because "[t]he parties have shown that they possessed sufficient information to gauge the strengths and weaknesses of the claims and defenses" despite the fact that only informal discovery was taken and the case settled at an early stage); *Mercury Payment*, 275 F. Supp. 3d at 1354 (approving class settlement that was settled under similar procedural circumstances); *Kemp v. Tower Loan of Miss., LLC*, 2017 WL 6522323, *6 (S.D. Miss. Dec. 20, 2017) (approving settlement that was negotiated after "Class Counsel conducted discovery and analyzed data that [Defendant] produced on a random sampling of [customers] that was retrieved in accordance with the instructions and specifications of Class Counsel").

       2.    <u>The Settlement Was Negotiated at Arm's Length</u>:  The Settlement resulted from hard-fought, informed protracted negotiations by experienced attorneys with the active assistance of a well-respected and highly experienced mediator.  Joint Decl. ¶¶ 29-50; Hughes Decl. ¶¶ 1-8.  Counsel zealously represented their clients throughout the case.  *Id.*  There is absolutely no indication that the settlement resulted from fraud or collusion.  *E.g.*, *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (noting that the "presence of a neutral mediator" is a factor "weighing in favor of a finding of non-collusiveness"); *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*, 910 F. Supp. 2d 891, 931 (E.D. La. 2012) (stating that "any suggestion of fraud or collusion" respecting a class action settlement was

"baseless" since "the Settlement was reached only after many months of hard-fought negotiations"); *Billitteri v. Securities Am., Inc.*, 2011 WL 3586217, *10 (N.D. Tex. Aug. 4, 2011) ("there is no evidence that the settlement was obtained by fraud or collusion.  On the contrary, this settlement was diligently negotiated after a long and hard-fought process that culminated in ultimately successful mediation"); *also* Hughes Decl. ¶ 8.

        3.    <u>The Substantial Relief Provided Is Admirable Given the Risks:</u>  "The very purpose of [a class action] compromise is to avoid the delay and expense of . . . trial."  *Reed*, 703 F.2d at 172.  A settlement thus merits approval if it "will alleviate the need for judicial exploration of . . . complex subjects, reduce litigation costs, and eliminate the significant risk that individual claimants might recover nothing."  *Lipuma v. American Express Co.*, 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005).  Such is the case here.  Indeed, if not settled, this case inevitably will result in substantial additional expenditure of time and money by the Parties and the Court, as would be true of any case involving complex facts and a national Class of 121,645 members.  The Court would be required to rule on the forthcoming motion to dismiss and the Parties would move forward with intense fact and expert discovery and briefing on class certification, summary judgment, *Daubert* challenges, followed by a lengthy trial and (potentially) appeals.  Joint Decl. ¶ 57.  Because many of "the most controversial and hard-fought of all the issues in this case" remain to be litigated, *Salinas v. Roadway Express, Inc.*, 802 F.2d 787, 790 (5th Cir.1986), the Settlement "eliminates the transaction costs that further proceedings would impose," "provides relief for the class sooner than continued litigation would," and "avoids the risks and burdens of potentially protracted litigation."  *Ayers*, 358 F.3d at 369.

        "Absent a showing of fraud or collusion, 'the most important factor is the probability of the plaintiffs' success on the merits.'"  *Smith v. Crystian*, 91 Fed. Appx. 952, 955 n.3 (5th Cir. 2004)

(quoting *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982)). Settlement is an appropriate outcome where the likelihood of success is difficult to assess and the plaintiffs face substantial challenges. *Parker*, 667 F.2d at 1209-10.

Here, the Settlement represents a compromise that balances the merits of Plaintiffs' claims with the considerable difficulties of proving their claims. The Class Representatives and Class Counsel believe that they could succeed on their claims at trial. Joint Decl. ¶ 58. However, the risks involved cannot be disregarded. For instance, Defendants' contracts contain many exculpatory clauses, such as the provision that Defendants would argue waives claims unless billing "errors" are timely disputed and a limitation on recoverable damages. *Id.* If the 30-day notice provision was enforced and the Court decided that the notices served by the named Plaintiffs were insufficient for the other class members, the breach claims would have likely been effectively ended. *Id.* The same result would have been likely if the Court enforced the amendment provision in Defendants' contracts which they contend allowed them to increase merchant fees without notice. *Id.* Defendants could also be expected vigorously to contest certification of the class, arguing that the "slamming" allegations are fact-specific, and that the question of the Subject Fees will vary from customer to customer based on the notices received and the bases on which the particular fee at issue was assessed. *Id.*

Moreover, obtaining certification of a nationwide class potentially involving the laws of all 50 states (as Plaintiffs' fraudulent inducement and unjust enrichment claims arguably would) is always challenging and, assuming a class is certified, Plaintiffs risk losing on summary judgment, at trial, or on appeal. *Id.*

The proposed Settlement avoids all of these risks and uncertainties and provides the Settlement Class with immediate, meaningful, and certain monetary and equitable relief. Under the

circumstances, Plaintiffs and Class Counsel appropriately determined that the Settlement outweighs

the risks of continued litigation.  Joint Decl. ¶ 61; *also Mercury Payment*, 275 F. Supp. 3d at 1354

(approving settlement after considering "the odds of the Plaintiffs succeeding at trial balanced by

the risks of continued litigation" against the defendant payment processors).

In ascertaining whether a settlement falls within the range of possible approval, courts will

compare the settlement amount to the relief the class could reasonably expect to recover at trial.

*Erica P. John Fund, Inc. v. Halliburton, Co.*, 2018 WL 1942227, *5 (N.D. Tex. Apr. 25, 2018); *Stott*

*v. Capital Fin. Servs., Inc.*, 277 F.R.D. 316, 345-46 n. 19 (N.D. Tex. 2011) (holding that in assessing

the potential range of recovery, courts should consider the risks involved in the litigation and the

potential costs involved).

"The fact that a proposed settlement may only amount to a fraction of the potential recovery

does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be

disapproved." *Parker*, 667 F.2d at 1210 n.6.  Thus, even a minimal settlement can be approved.  *See,*

*e.g.*, *Stott*, 277 F.R.D. at 345-46 n.19 (N.D. Tex. 2011) (approving settlement when class members

only received 2-3% of potentially recoverable losses).   This is because "[b]y definition, settlements

are the product of give and take.  In the process, parties make concessions and in doing so, give up

relief that they may have sought in exchange for other relief that is agreeable to both sides." *Frew v.*

*Hawkins*, 2007 WL 2667985, *29 (E.D. Tex. Sept. 5, 2007).  Consequently, "courts do not look for

perfection when deciding whether to approve settlements in class actions."  *Id.*

Class Counsel believes that the Settlement Fund of $15 million represents approximately

28% of the Settlement Class' most probable recoverable trial damages.  Joint Decl. ¶ 62.  This

estimate does not account for the "merchant-friendly" changes to Defendants' form

contracts and sales practices provided by the Settlement, which themselves are extremely

valuable to the Settlement Class. *Id.* at ¶ 63. For instance, when a Settlement Class member, in the future, receives advance notice of a fee increase (which it was not guaranteed before), and does not wish to continue its account with Defendants, it can now terminate without paying a $495 early termination fee, a huge savings. Settlement ¶ 41(b). Moreover, if a busy merchant forgets to review its statement for up to 90 days and then notices and informs Defendants of an improper charge, it will now have preserved its right to dispute that charge, whereas currently Defendants would have argued that fee increases must be challenged within 30 days. *Id.* at ¶ 41(c); Joint Decl. ¶¶ 64-65. The important value of such relief to the Settlement Class cannot be overlooked.

Distribution of the Settlement Fund to the Settlement Class members will be made directly in cash. Indeed, Current Customers who are still with Defendants when it is time to distribute the Settlement will receive their payments by electronic funds transfer (or credit against amounts otherwise owed on their statement), while Current Customers that leave Defendants between Preliminary Approval and distribution and all Former Customers that submit Claim Forms will be mailed checks. Settlement ¶ 66. Given that very recent address information is available to the latter group of Settlement Class members, it is likely that the overwhelming percentage of mailed checks will actually be received and cashed by such merchants. Under the circumstances, this is the best method of distribution possible. Supp. Joint Decl. ¶ 25.

Additionally, to make it as easy as possible on Former Customers to receive their payments, the Parties (1) designed a very simple Claim Form that is extremely easy to complete and (2) provided multiple options for submission – U.S. Mail and electronic submission through the Settlement Website. Settlement ¶ 54; Supp. Joint Decl. ¶ 26. The experienced Settlement Administrator will have no trouble processing these simple claim forms. Azari Decl. ¶ 28. Claims

21

will only be rejected if they are submitted by non-Settlement Class members or are untimely. *Id.*

Subject to approval by the Court, the Settlement calls for Class Counsel to receive one third of the Settlement Fund and a fee and expense reimbursement of up to $75,000, and each Class Representative to receive a Service Award of $10,000. Settlement ¶¶ 72-76. Such amounts are to be paid on the Effective Date. *Id.* at ¶ 74. The Parties did not negotiate these amounts until after the key provisions of the Settlement, including the direct relief to the Class, was agreed upon. Joint Decl. ¶ 49; Hughes Decl. ¶ 9. These amounts are reasonable. *See* Motion for Attorneys' Fees, Expenses, and Service Awards (filed concurrently herewith).

The Parties have no agreements amongst themselves in connection with the Settlement other than those specifically articulated in the Agreement. Supp. Joint Decl. ¶ 16.

The Settlement provides "admirable" relief to the Settlement Class in light of the myriad of risks that existed. Declaration of John Zavitsanos ("Zavitsanos Decl.") ¶¶ 25, 30 (filed concurrently herewith). Based on the foregoing, the recovery contemplated by the Settlement represents a reasonable midpoint in the range of possible recovery. *Cf. Salinas v. Roadway Express, Inc.*, 802 F.2d 787, 790 (5th Cir. 1986) (explaining settlement as "a compromise that cannot possibly satisfy every class member's particular desires"); *Mercury Payment*, 275 F. Supp. 3d at 1354 (approving settlement estimated to be between 25 and 50 percent of trial damages). By any reasonable measure, this recovery is a significant achievement given the extraordinary obstacles that Plaintiffs and the Settlement Class faced in the litigation. Joint Decl. ¶ 66.

    4.   <u>The Settlement Treats Class Members Equitably</u>: All Class members have the opportunity to receive a payment from the Settlement Fund pursuant to an Allocation Formula that was designed to ensure that they will be fairly compensated relative to each other. *Id.* at ¶¶ 54-55. The merchant-friendly changes to Defendants' standard form contracts will provide immediate

benefits to Current Customers but such benefits are also available to Former Customers if they decide to re-enroll in Defendants' services. The required changes to Defendants' sales practices will also benefit all Former Customers that decide to use Defendants' services in the future or Current Customers that leave Defendants but later return. *Id.* In summary, all Class members have the equivalent opportunity to benefit from the relief provided by the Settlement.

   5. <u>The Opinions of Class Counsel, Class Representatives, and Absent Class Members Support the Settlement:</u> The Advisory Committee Note to the amended Rule 23(e) provides that courts may continue to consider factors previously used to assess the fairness of a settlement in addition to those specifically enumerated. Because the Parties' counsel are the Court's main source of information about the fairness, adequacy, and reasonableness of a proposed class settlement (*Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 852 (E.D. La. 2007)), "[t]he Fifth Circuit has repeatedly stated that the opinion of class counsel should be accorded great weight." *Klein v. O'Neil, Inc.*, 705 F. Supp. 2d 632, 649 (N.D. Tex. 2010); *Cotton,* 559 F.2d at 1330 ("the trial court is entitled to rely upon the judgment of experienced counsel for the parties."). "Class counsel's opinion should be presumed reasonable because they are in the best position to evaluate fairness due to an intimate familiarity with the lawsuit." *Murphy Oil*, 472 F. Supp. 2d at 852.

   Class Counsel whole-heartedly recommend the Settlement as an excellent result for the Settlement Class. Joint Decl. ¶¶ 5, 67. Indeed, Class Counsel endorse the Settlement as fair, reasonable, and adequate based upon (i) their experience with litigating other class actions, including those involving similar allegations and issues concerning other payment processors, such as *Mercury Payment* (ii) their hands-on involvement in this litigation, (iii) their knowledge of the extensive informal discovery that they reviewed and analyzed, (iv) the opinions and guidance they

received from their expert, and (v) their participation in arms-length and adversarial negotiations under the supervision of Mr. Hughes. *Id.*; *cf. Reed*, 703 F.2d at 175 (noting that "adequacy of representation and adequacy of settlement are different sides of the same question," such that competent counsel's approval is an indicator of reasonableness).

The eight named Plaintiffs also uniformly agree that the settlement is a fair, adequate, and reasonable compromise. Joint Decl. ¶ 68.

Moreover, every indication is that collectively the absent Settlement Class members also support the Settlement. While the objection and opt out deadline is still two weeks away, to date no Class member has objected or opted out. Azari Decl. ¶ 29; Supp. Joint Decl. ¶ 27. Considering that the Settlement Class comprises 121,645 members, this response is overwhelmingly favorable, strengthening the argument that the Settlement should be approved. Indeed, it is settled "that one indication of the fairness of a settlement is the lack of or small number of objections." *In re Oil Spill by Oil Rig Deepwater Horizon*, 2013 WL 144042 at *39; *also, e.g.*, *Quintanilla v. A & R Demolition Inc.*, 2008 WL 9410399, *5   (S.D. Tex. May 7, 2007) ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement").

Similarly, as of December 18, 2018, approximately 10.3 percent of Former Customers had already filed claims. This response rate provides even more evidence the Class approves the Settlement. Indeed, this claims rate already exceeds that for the entire claims period in most other settlements. *E.g.*, *In re Pool Products Distribution Market Antitrust Litig.*, 2016 WL 235781, *6 (E.D. La. Jan. 20, 2016) (approving settlement with 5% claims rate); *Lee v. Ocwen Loan Servicing, LLC*, 2015 WL 5449813, *22 (S.D. Fla. Sept. 14, 2015), *appeal dismissed*, 2016 WL 3896231, *1 (11th Cir. May 23, 2016) (noting that typical approved claims-made settlements have claims rates that "rarely" exceed 7 percent, "even with the most extensive notice campaigns") (citation omitted).

24

Undoubtedly many more Former Customers will file claims before the March 4, 2019 deadline, especially given the email reminders Class Counsel is providing. Supp. Joint Decl. ¶ 28.

 All of the new Rule 23(e)(2) factors, as well as the Fifth Circuit's *Reed* factors, support a finding that the Settlement is fair, reasonable, and adequate.

C.      **The Court Should Certify the Settlement Class.**  This Court has previously found that the Settlement Class is adequately defined and clearly ascertainable and that all requirements of Rule 23(a) and 23(b)(3) are satisfied in this Action in a settlement posture.  *See* Preliminary Approval Order ¶¶ 3-5; *also* Motion for Preliminary Approval, pp. 14-17 (Dkt. 38).  The amendment to Rule 23 did not change these criteria, nor has anything changed regarding the application of the factors to this case since the Preliminary Approval Order was entered.  For the reasons already considered by the Court, Plaintiffs request that the Court confirm its preliminary decision and finally certify the Settlement Class.  *E.g.*, *Mercury Payment*, 275 F. Supp. 3d at 1355.

## CONCLUSION

Based on the foregoing, Plaintiffs and Class Counsel respectfully request that the Court find that the Notice Program, as implemented, meets the requirements of due process and Rule 23, finally approve the Settlement, and certify the Settlement Class.  The Parties will submit a proposed order for the Court's review.

DATED this 19th day of December, 2018.

Respectfully submitted,

WEBB, KLASE & LEMOND, LLC

By:    */s/ E. Adam Webb*
E. Adam Webb
Georgia Bar No. 743910
Adam@WebbLLC.com
Matthew C. Klase
Georgia Bar No. 141903
Matt@WebbLLC.com
1900 The Exchange, S.E.
Suite 480
Atlanta, GA 30339
Telephone: (770) 444-0773

*Attorneys-in-Charge for Plaintiffs*
*and the Settlement Class*

MEADE & NEESE LLP
Andrew K. Meade
Texas Bar No. 24032854
ameade@meadeneese.com
D. John Neese, Jr.
Texas Bar No. 24002678
jneese@meadeneese.com
Leann Pinkerton
Texas Bar No. 24038826
lpinkerton@meadeneese.com
2118 Smith Street
Houston, TX 77002
Telephone: (713) 355-1200

*Local Counsel for Plaintiffs*
*and the Settlement Class*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 19, 2018, a copy of the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel who have registered with the Court.

*/s/ E. Adam Webb*
E. Adam Webb