# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| AL'S PALS PET CARE, LLC, DeFABIO SPINE AND SPORTS REHAB, LLC, JULIE RUDIGER, INC., MENA STONE & LANDSCAPING SUPPLIES, LLC, TULSA ART CENTER, LLC, BAN-A-PEST EXTERMINATION CO., INC., FLEETWOOD CHIROPRACTIC & REHABILITATION, PC, and BAYLEY PRODUCTS, INC., individually and on behalf of all others similarly situated, | § § § § § § § § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. |
| v. | § § | 4:17-CV-3852 |
| WOODFOREST NATIONAL BANK, N.A., MERCHANTS' CHOICE PAYMENT SOLUTIONS, and PAYSAFE PAYMENT PROCESSING SOLUTIONS LLC, | § § § § § | |
| Defendants. | § § | |

## MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS

E. Adam Webb, Esq.
Matthew C. Klase, Esq.
WEBB, KLASE & LEMOND, LLC
1900 The Exchange, SE, Suite 480
Atlanta, Georgia  30339
(770) 444-0773

Andrew K. Meade, Esq.
D. John Neese, Jr., Esq.
Leann Pinkerton, Esq.
MEADE & NEESE LLP
2118 Smith Street
Houston, Texas 77002
(713) 355-1200

*Attorneys for Plaintiffs and the Settlement Class*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.................................................................................ii

TABLE OF CITATIONS ..............................................................................iv

SUMMARY OF ARGUMENT .......................................................................1

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING...........................2

    A. Initial Investigation ...........................................................................2

    B. Early Litigation ................................................................................4

    C. Preparation for Settlement Negotiations, Mediation, and Agreement ..................6

    D. Post-Settlement Activities..................................................................10

ARGUMENT AND CITATION OF AUTHORITY ...............................................11

    A.  The Requested Fee of One Third of the Common Fund Is Reasonable .................11

        1. Substantial Time and Labor Was Required ......................................14

        2. The Issues Invovled Were Novel and Difficult ................................15

        3.  Class Counsel Possessed the Necessary Skill to Effectively Litigate the Case ......................................................................15

        4.  Class Counsel Were Precluded From Taking on Other Employment.........................................................................16

        5. The Requested Fee Is Customary ................................................17

        6. This Case Was Prosecuted Entirely on a Contingent Fee Basis ...............17

        7. Class Counsel Worked Under Time Pressures ..................................19

        8. Class Counsel Achieved an Excellent Settlement ..............................20

        9. Class Counsel Are Highly Experienced and Are Well Respected.................21

        10. The Case Qualifies as "Undesirable" ...........................................21

        11. Class Counsel Had No Prior Relationships with the Plaintiffs...................22

12. The Requested Fee Comports with Awards in Similar Cases ...................... 22

13. The Court Should Honor the Parties' Agreement .......................................... 22

B.   The Expense Request Is Appropriate ........................................................ 23

C.   Service Awards Are Warranted for the Class Representatives ................................. 24

CONCLUSION .................................................................................................................. 25

# TABLE OF CITATIONS

Cases

*Altier v. Worley Catastrophe Response, LLC*,
  2012 WL 161824 (E.D. La. Jan. 18, 2012)....................................................................... 24

*Barton v. Drummond Co.*,
  636 F.2d 978 (5th Cir. 1981) ......................................................................................... 11

*Beech Cinema, Inc. v. Twentieth-Century Fox Film Corp.*,
  480 F. Supp. 1195 (S.D.N.Y. 1979)............................................................................... 22

*Behrens v. Wometco Enters., Inc.*,
  118 F.R.D. 534 (S.D. Fla. 1988)..................................................................................... 18

*Bethea v. Sprint Communications Co.*,
  2013 WL 228094 (S.D. Miss. Jan. 18, 2013) ................................................................ 12

*Billitteri v. Securities Am., Inc.*,
  2011 WL 3585983 (N.D. Tex. Aug. 4, 2011)........................................................... 16, 18

*Blanchard v. Bergeron*,
  489 U.S. 87 (1989)..................................................................................................... 1, 17

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980)................................................................................................. 11, 20

*Braud v. Transport Serv. Co.*,
  2010 WL 3283398 (E.D. La. Aug. 17, 2010) ................................................................ 21

*Burford v. Cargill, Inc.*,
  2012 WL 5471985 (W.D. La. Nov. 8, 2012) ................................................................. 13

*Campton v. Ignite Restaurant Group, Inc.*,
  2015 WL 12766537 (S.D. Tex. June 5, 2015) ............................................................... 13

*Cobra Tactical, Inc. v. Payment Alliance Int'l Inc.*,
  315 F. Supp. 3d 1342 (N.D. Ga. 2018) ......................................................................... 19

*Collins v. Sanderson Farms, Inc.*,
  568 F. Supp. 2d 714 (E.D. La. 2008)............................................................................. 12

*Cook v. Howard*,
  2013 WL 943664 (S.D. Miss. Mar. 11, 2013) ............................................................... 24

iv

*DeHoyos v. Allstate Corp.*,
   240 F.R.D. 269 (W.D. Tex. 2007) ................................................................. 17

*Deposit Guar. Nat'l Bank v. Rope*,
   445 U.S. 326 (1980) ....................................................................................... 11

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   2018 WL 1942227 (N.D. Tex. Apr. 25, 2018) ............................................... 13

*Fairway Medical Center, LLC v. McGowan Enterprs, Inc.*,
   2018 WL 1479222 (E.D. La. Mar. 27, 2018) ................................................. 13

*Frost v. Oil States Energy Servs.*,
   2015 WL 12780763 (S.D. Tex. Nov. 19, 2015) ............................................. 12

*Gaskill v. Gordon*,
   942 F. Supp. 382 (N.D. Ill. 1996) .................................................................. 22

*Ingram v. Coca-Cola Co.*,
   200 F.R.D. 685 (N.D. Ga. 2001) .................................................................... 23

*In re Ampicillin Antitrust Litig.*,
   526 F. Supp. 494 (D.D.C. 1981) .................................................................... 22

*In re Catfish Antitrust Litig.*,
   939 F. Supp. 493 (N.D. Miss. 1996) .............................................................. 24

*In re Combustion, Inc.*,
   968 F. Supp. 1116 (W.D. La. 1997) ......................................................... 13, 18

*In re Crazy Eddie Sec. Litig.*,
   824 F. Supp. 320 (E.D.N.Y. 1993) ................................................................ 22

*In re Gould Sec. Litig.*,
   727 F. Supp. 1201 (N.D. Ill. 1989) ................................................................ 11

*In re Lease Oil Antitrust Litig.*,
   186 F.R.D. 403 (S.D. Tex. 1999) ................................................................... 22

*In re Pool Prods. Distribution Mkt. Antitrust Litig.*,
   2015 WL 4528880 (E.D. La. July 27, 2015) ................................................. 13

*Jenkins v. Trustmark Nat'l Bank*,
   300 F.R.D. 291 (S.D. Miss. 2014) ............................................................ 13, 21

*Johnson v. Georgia Highway Express, Inc.*,
    488 F.2d 714 (5th Cir. 1974) ................................................................. *passim*

*King v. United SA Fed. Credit Union*,
    744 F. Supp. 2d 607 (W.D. Tex. 2010)........................................................ 18

*Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*,
    540 F.2d 102 (3d Cir. 1976)........................................................................ 19

*Manners v. American Gen. Life Ins. Co.*,
    1999 WL 33581944 (M.D. Tenn. Aug. 11, 1999) ...................................... 23

*Masters v. Wilhelmina Model Agency, Inc.*,
    473 F.3d 423 (2d Cir. 2007)........................................................................ 20

*Mills v. Electric Auto-Lite Co.*,
    396 U.S. 375 (1970)..................................................................................... 23

*Muehler v. Land O'Lakes, Inc.*,
    617 F. Supp. 1370 (D. Minn. 1985) ............................................................ 12

*Pinto v. Princess Cruise Lines*,
    513 F. Supp. 2d 1334 (S.D. Fla. 2007) ....................................................... 20

*Poertner v. Gillette Co.*,
    618 Fed. Appx. 624 (11th Cir. 2015)........................................................... 20

*Schwartz v. TXU Corp.*,
    2005 WL 3148350 (N.D. Tex. Nov. 8, 2005)............................................. 16

*Shaw v. Toshiba Am. Info. Sys., Inc.*,
    91 F. Supp. 2d 942 (E.D. Tex. 2000) ............................................... 16, 22, 24

*Skelton v. General Motor Corp.*,
    860 F.2d 250 (7th Cir. 1988) ...................................................................... 19

*Smith v. Tower Loan of Miss., Inc.*,
    216 F.R.D. 338 (S.D. Miss. 2003) .............................................................. 12

*Spicer v. Chicago Bd. Options Exchange, Inc.*,
    844 F. Supp. 1226 (N.D. Ill. 1993) ............................................................ 24

*Sullivan v. DB Inv., Inc.*,
    667 F.3d 273 (3rd Cir. 2011) ...................................................................... 24

*Turner v. Murphy Oil USA, Inc.*,
    472 F. Supp. 2d 830 (E.D. La. 2007)........................................................... 18

*Union Asset Management Holding A.G. v. Dell, Inc.*,
  669 F.3d 632 (5th Cir. 2012) ............................................................................ 1, 12, 13

*Williams v. MGM-Pathe Communications Co.*,
  129 F.3d 1026 (9th Cir. 1997) ........................................................................ 20

*Wolfe v. Anchor Drilling Fluids USA Inc.*,
  2015 WL 12778393 (S.D. Tex. Dec. 7, 2015) ............................................. 12

*Zam & Zam Super Market, LLC v. Ignite Payments, LLC*,
  736 Fed. Appx. 274 (2d. Cir. 2018) ............................................................... 19

## SUMMARY OF ARGUMENT

Class Counsel overcame an assortment of significant risks and negotiated a Settlement with Defendants that provides $15 million in cash benefits to the Settlement Class and sweeping contract and practice changes that will benefit both the Settlement Class members and the general public for years to come.[1]  As compensation for their successful efforts, Class Counsel request the Court approve a one third fee and expense reimbursement, as set forth in the Settlement Agreement.

The reasonableness of the requested fee – representing one third of the $15 million common fund established by the Settlement – is supported by declarations from Hunter Hughes, the mediator who helped the Parties reach the Settlement, and respected Houston attorney John Zavitsanos.  Mr. Zavitsanos, who reviewed the record, has opined that, "Class counsel undertook an incredibly risky case and, through their diligence, creativity, and skill, obtained an outstanding result.  They are to be commended for such an extraordinary result and compensated in the reasonable manner requested."   Declaration of John Zavitsanos ("Zavitsanos Decl.") ¶ 30 (filed contemporaneously herewith).

The fee's reasonableness is confirmed by an analysis of the twelve "*Johnson* factors," which the Fifth Circuit has insisted be examined when counsel seeks a percentage of the settlement fund created through their efforts.  *Union Asset Management Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 643 (5th Cir. 2012) (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989)).  Additionally, the requested expenses are reasonable and were all necessarily incurred

---

[1] Capitalized terms have the meanings afforded them in the Settlement Agreement (Dkt. 38-1).

on behalf of the Settlement Class.  As a result, the motion for fees and expenses should be approved.

The Court should also approve Service Awards of $10,000 for each of the eight Class Representatives, in accordance with the Settlement.  The Settlement could not have occurred but for these brave merchants' temerity in standing up to Defendants and their willingness to accept the risk they could be contractually liable for Defendants' attorneys' fees, even if they won the litigation.  The awards thus are reasonable and justified.

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

The background of this litigation is described in the motion for final approval of Class Settlement, filed concurrently herewith.  Herein, attention will be focused specifically on Class Counsel's efforts to investigate and prosecute claims on behalf of Plaintiffs and the Settlement Class.

**A.** **Initial Investigation.**  Class Counsel's first involvement in this case began well over a year ago when they began investigating potential legal claims against MCPS with several of the named Plaintiffs.  *See* Joint Declaration of E. Adam Webb and Matthew C. Klase ("Joint Decl.") ¶ 6 (Dkt. 39).  Plaintiffs Julie Rudiger, Mena Stone, and Tulsa Art Center were adamant during interviews that they had been tricked into doing business with MCPS by deceptive representations made by MCPS agents during cold calls.  *See* Supplemental Joint Declaration of E. Adam Webb and Matthew C. Klase ("Supp. Joint Decl.") ¶ 2 (filed concurrently herewith).  Class Counsel undertook a detailed investigation to confirm these allegations, which included interviewing industry practitioners who had accused MCPS of similar misconduct, scouring internet message boards and other sources for similar complaints, searching for transcripts of the allegedly deceptive cold calls, and reviewing related government investigations of MCPS.  *Id.* at ¶ 3.  Such research

revealed factual and legal support for fraud and unjust enrichment claims against Woodforest and MCPS.  Joint Decl. ¶ 7.

Class Counsel also reviewed Plaintiffs' documents, most notably their Merchant Applications ("Applications"), which set forth agreed upon pricing information, the voluminous boilerplate terms and conditions governing such Applications, as well as dozens and dozens of monthly billing statements.  *Id.* at ¶ 8.  This was done to assess whether Plaintiffs were charged fees that were not contemplated in their Applications and whether Defendants' fee modifications were allowed by the multitude of self-serving exculpatory provisions in the Parties' contracts and if so, the enforceability of such provisions.  Supp. Joint Decl. ¶ 4.  This was not an easy task given the number of parties that have a hand in setting and imposing charges for accepting card transactions, as well as the limited amount of information provided to Plaintiffs on their monthly statements.  *Id.* at ¶ 5.  Class Counsel obtained as many Applications and statements as they could in an attempt to establish patterns of fee exploitations across Defendants' customer base. *Id.* at ¶ 6.  Such research revealed factual and legal support for breach of contract claims against Woodforest and MCPS.  Joint Decl. ¶ 7.

After it was determined that the contracts contained potentially enforceable choice-of-law (Texas) and venue (Montgomery County) provisions, Texas co-counsel was needed.  *Id.* at ¶ 9. Various possibilities were researched and then interviews were conducted and Meade & Neese was retained.  *Id.*

The firms then evaluated the Texas law issues in play.  *Id.* at ¶ 10.  Also, Fifth Circuit law was evaluated.  *Id.*  The consideration of whether to proceed in state or federal court was extensive.  After federal court was agreed upon, the local rules of court were considered.  *Id.*

Counsel's research and analysis included speaking with a variety of payment processing industry experts about the practices and reputation of Woodforest and MCPS. *Id.* at ¶ 11. Former agents of Woodforest and MCPS were also contacted and interviewed. *Id.* The relationships between Woodforest, MCPS, and other entities – including the new owner of MCPS – were investigated. *Id.*

The theories of the case – which were different from those of prior actions in the payment processing industry – were developed. *Id.* at ¶ 12. Several drafts of the complaint were prepared, circulated among counsel, and revised and proofed. *Id.*

**B.** **Early Litigation.** The original complaint was filed on December 22, 2017, by Plaintiffs Al's Pals, DeFabio, Julie Rudiger, Mena Stone, and Tulsa Art Center, LLC, against Woodforest and MCPS. *Id.* at ¶ 13. After assignment to the Honorable Kenneth M. Hoyt, the Judge's rules and prior orders were evaluated. *Id.* at ¶ 14. After service was executed on Defendants, counsel for Defendants suggested that Plaintiff amend to correct the corporate entities at issue. *Id.* at ¶ 15. Class Counsel researched the corporate issues in detail and determined it would be appropriate to add Paysafe, the current owner of the MCPS business, as a defendant. *Id.* The Parties jointly moved to add Paysafe on February 8, 2018, and the Court granted this motion on February 15, 2018. *Id.* at ¶ 16.

Defendants also raised the issue of arbitration. *Id.* at ¶ 17. Class Counsel reviewed all relevant contracts to weigh the applicability of arbitration provisions found in certain agreements and advocated to Defendants that the arbitration clause found in the terms did not govern the claims being asserted by Plaintiffs. Arbitration was ultimately never asserted as a defense by Defendants. *Id.*

On March 9, 2018, Defendants filed their lengthy motion to dismiss the complaint. *Id.* at ¶ 18. Therein, Defendants asserted a number of arguments, including that Plaintiffs' (a) fraudulent

inducement claims were inadequately pled, (b) contract claims were barred because they failed to comply with the contractual provision requiring timely written notice of any errors and because the contract provided Defendants with discretion to merchant increase fees, and (c) unjust enrichment claim failed because of the existence of an enforceable contract. *Id.*

Meanwhile, Class Counsel had been contacted by several merchants that had learned of the case, alleged similar misconduct, and expressed a desire to be added as named plaintiffs. *Id.* at ¶ 19. Class Counsel investigated these merchants' claims and vetted them for inclusion in an amended complaint. *Id.*

After receiving the motion to dismiss, Class Counsel contacted counsel for Defendants and informed them of their plan to file an amended complaint pleading additional facts and adding several new party plaintiffs. *Id.* at ¶ 20. Defendants consented to this amendment and, on March 21, 2018, the Parties jointly notified the Court that an amended complaint would soon be filed and requested a scheduling order. The Court entered the Parties' requested scheduling order on March 23, 2018. *Id.*

After extensive work among Class Counsel, on March 28, 2018, the 285-paragraph amended complaint was filed. *Id.* at ¶ 21. This added Ban-A-Pest, Fleetwood Chiropractic, and Bayley Products as Plaintiffs. Additional factual allegations, developed through counsel's ongoing investigation and interviews of former customers, whistleblowers, and payment processing industry experts, were included. *Id.*

On April 12, 2018, the Court entered an order denying Defendants' motion to dismiss the original complaint, holding: "Based on the plaintiffs' First Amended Complaint, the Court concludes that the Amended Complaint contains sufficient factual content, if accepted as true, that satisfies the rules of pleadings and case law." *Id.* at ¶ 22. The Parties began a series of communications about the order. *Id.* at ¶ 23. On April 13, 2018, Defendants moved for clarification that the Court's April 12,

2018 order was only intended to find Defendants' motion to dismiss the original complaint moot. Plaintiffs opposed the motion but the Court granted it on April 20, 2018.  *Id.*

      C.    **Preparation for Settlement Negotiations, Mediation, and Agreement.**  In the meantime, the Parties held the Rule 26(f) conference and first discussed the possibility of holding an early mediation to explore a class settlement.  *Id.* at ¶ 24.  Class Counsel contacted multiple data experts to discuss the data and information that would be needed to allow Plaintiffs to mediate.  *Id.* at ¶ 25.  A sampling methodology was developed based largely on a prior successful mediation in a payment processing case.  Plaintiffs presented Defendants with an itemized, detailed list of the documents and electronic data that Defendants would need to produce in order for Class Counsel and Plaintiffs to engage in informed settlement discussions.  *Id.*

      The Parties and their experts had several discussions and exchanged lengthy correspondence regarding the nature and scope of the requested data and information.  *Id.* at ¶ 26.  Defendants informed Class Counsel what items were available and could be produced, Class Counsel discussed these issues with their expert, and made amendments to their requests based on his input.  The Parties ultimately agreed on the scope of informal discovery that was needed to fairly and thoroughly evaluate the claims and defenses in the case.  *Id.* at ¶¶ 26-27.

      Following such discussions, the Parties agreed to mediate and, on April 18, 2018, asked the Court to stay further proceedings so settlement negotiations could take place.  On April 20, 2018, the Court granted this request and stayed the case.  *Id.* at ¶ 27.

      The Parties then proceeded to negotiate a confidentiality order to govern the handling of information produced in furtherance of the mediation.  *Id.* at ¶ 28.  Drafts were circulated and revised. The order was approved by the Court on April 26, 2018.  *Id.*

To assist with the settlement discussions, the Parties agreed to retain a well-respected and experienced mediator, Hunter Hughes III, who scheduled a face-to-face mediation in Atlanta, Georgia for July 18, 2018. *Id.* at ¶ 29.

The Parties took full advantage of the ensuing months, agreeing to exchange the substantial amount of information needed for the mediation to be productive. *Id.* at ¶ 30. Defendants produced more than 8,000 pages of documents, which included all of the various Application forms and terms and conditions used by MCPS during the Class Period, all notices relating to the Subject Fees, aggregate revenue figures relating to the Subject Fees during the Class Period, breakdowns of Former and Current Customers, all of the named Plaintiff Applications and statements, and individual Applications and statements for a statistically significant sample of Settlement Class members. *Id.* at ¶ 31. Class Counsel reviewed and coded every document provided by Defendants. *Id.*

Critically, Defendants also produced *hundreds of thousands* of lines of transaction and fee data for the named Plaintiffs and a statistically-significant sample of Class members. *Id.* at ¶ 32. Defendants also provided extensive aggregate information necessary to understand the customer-specific data. *Id.* at ¶ 32.

Class Counsel prepared extensively for the mediation. *Id.* at ¶ 33. To assist in the analysis of the voluminous data, Class Counsel retained Arthur Olsen of Cassis Technology, LLC, a renowned data consultant whose expert testimony has been accepted by numerous courts. *Id.*

Working in tandem with Class Counsel, Mr. Olsen organized three sets of platform data, wrote code to extract overcharges relating to the Subject Fees, and created demonstrative exhibits detailing his findings for use at the mediation. *Id.* at ¶ 34. Using Defendants' data and his expertise, Mr. Olsen was able to isolate each merchant in the sample data that was allegedly overcharged by

MCPS and the amount of each such merchant's overcharges. *Id.* at ¶ 35. This analysis was provided to MCPS in advance of the mediation. *Id.*

Defendants, meanwhile, retained their own data and damages experts to perform an independent analysis, the results of which they provided to Class Counsel. *Id.* at ¶ 36. Class Counsel and Mr. Olsen participated in multiple pre-mediation calls with Defendants and their experts to explore the methodologies that had been used in estimating damages. *Id.* Differences between the conclusions reached by the experts were studied by all Parties and additional work was performed by the experts to bridge the gap for purposes of negotiation. *Id.* at ¶ 37. Concessions were made by the Parties and the experts' reports were revised accordingly. *Id.*

Class Counsel also researched and wrote a mediation statement that, exclusive of exhibits, was 43 pages in length. The mediation statement took on several important issues in the litigation, including the alleged unenforceability of key contract terms, as well a detailed summary of how Plaintiffs intended to prove each of the class certification elements. Plaintiffs laid out substantial support for their position on each of these issues. *Id.* at ¶ 38. In order to ensure maximum benefit of the mediation statement, it was provided to Defendants over a week prior to the mediation. It was also provided to Mr. Hughes. *Id.* at ¶ 39. Additional private briefing and materials were provided by both Parties to the mediator. *Id.*

Class Counsel also studied Defendants' voluminous mediation statement. *Id.* at ¶ 40. As to several issues, Class Counsel felt compelled to respond. They prepared a rebuttal mediation statement of 14 pages in length. *Id.*

Class Counsel also consulted with Mr. Hughes in advance of mediation and coordinated with the Plaintiffs, providing them with status updates and discussing the issues to be mediated. *Id.* at ¶ 41.

Despite these extensive efforts, the mediation on July 18, 2018 was unsuccessful.  *Id.* at ¶ 42. The Parties spent an entire day mediating at Mr. Hughes' offices.  The Parties did succeed, however, in narrowing the divide that existed at the outset of the mediation considerably and made great headway toward understanding each other's claims and defenses.  *Id.*

At Mr. Hughes' urging, the Parties continued to negotiate.  *Id.* at ¶ 43.  These negotiations concerned not only the amount of the common fund that would be established for the Class, but also the nature and scope of contract amendments and practice changes that Defendants would make as part of any settlement.  *Id.*  Extensive negotiations occurred over a period of four weeks.  *Id.* at ¶ 44. The Parties exchanged legal analysis of thorny issues.  They consulted with their experts to support offers and counteroffers.   Proposed terms of settlement, including non-monetary terms, were negotiated.  *Id.*  On August 13, 2018, the Parties reached agreement on a deal in principle and promptly informed the Court.  *Id.* at ¶ 45.  The Settlement resulted from arm's length, difficult negotiations that succeeded in large part due to Mr. Hughes' active involvement.  *Id.*

The Parties thereafter worked to finalize the specific terms of the Agreement.  *Id.* at ¶ 46. Class Counsel prepared an initial draft of the Agreement and circulated to Defendants for their review and comment.  *Id.*  Over the next few weeks, the Parties exchanged multiple redlined drafts of the Agreement, which included fine tuning the agreed-upon practice changes and contract amendments and how and when such revisions would be communicated to the Class, as well as how Notice and eventually payments could most efficiently be disseminated to the Class.  *Id.*

The Parties also exchanged multiple drafts of (1) the Notices to ensure that the Settlement was accurately and appropriately described to the Class, and (2) the Allocation Formula to design a cost-effective manner to fairly divide payments among Class members.  *Id.* at ¶ 47.  In conjunction with

these discussions, Class Counsel obtained advice from potential settlement administrators, who also submitted competitive bids to provide Notice and administer the Settlement.  *Id.* at ¶ 48.

The Parties did not negotiate the amount of Class Counsel's fees and expenses or Service Awards to the Class Representatives until after the key provisions of the Settlement, including the amount of the direct relief to the Class, was agreed upon.  *Id.* at ¶ 49.  Consensus was reached on final drafts of the Agreement, Notices, and Allocation Formula on September 4, 2018.  *Id.* at ¶ 50.

> **D.**   **Post-Settlement Activities.**  Class Counsel prepared and – on September 7, 2018 – filed a detailed, unopposed motion for preliminary approval of the Settlement.  Dkts. 38-39.  The motion was granted by the Court on September 18, 2018.  *See* Preliminary Approval Order (Dkt. 40).

Since Preliminary Approval was issued, Class Counsel has worked on a near daily basis with counsel for Defendants and employees of Epiq – the appointed Settlement Administrator – to ensure that all Settlement Class members were provided Notice in accordance with the Notice Program and the Court's Preliminary Approval Order.  Supp. Joint Decl. ¶ 18.  In doing so, Class Counsel (1) worked with Epiq and Defendants to ensure the class list included all necessary data points and information to provide Notice and calculate awards pursuant to the Allocation Formula and was timely provided by Defendants; (2) assisted in negotiating and finalizing an escrow agreement for the establishment of the Settlement Fund; (3) edited the email, postcard, and long form Notices, the Claim Form, and the content of the Settlement Website and telephone line scripts; (4) ensured the Settlement Fund was timely funded; (5) ensured Notice was timely sent; (6) assisted Epiq and Defendants in resolving the mistake in the class list that caused Notice to be sent not only to all Settlement Class members but also some non-Settlement Class members [*see* Declaration of Giovanni Diano ¶¶ 3-8 (filed concurrently herewith)]; (7) answered questions from many Settlement Class members via telephone and email; (8) monitored the undeliverables and claims response; and (9) sent out tens-of-

thousands of emails to Former Customer Settlement Class Members reminding them to file claims. Supp. Joint Decl. ¶ 19.

Class Counsel has also prepared and filed a motion for Final Approval of Class Settlement and will appear at the Final Approval Hearing. *Id.* at ¶ 20. Even if the Settlement is approved, Class Counsel's work will continue past the Final Approval Hearing and not conclude until all claims are paid and the Settlement fully consummated. *Id.* at ¶ 22. This process will take several months if not a full year of additional work. *Id.*

## ARGUMENT AND CITATION OF AUTHORITY

**A.** **The Requested Fee of One Third of the Common Fund Is Reasonable.** For decades, it has been established that when a representative party confers a substantial benefit upon a class, its counsel is entitled to attorneys' fees based upon the benefit obtained. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Barton v. Drummond Co.*, 636 F.2d 978, 982 (5th Cir. 1981). This common benefit doctrine is an exception to the general rule that each party must bear its own litigation costs. The doctrine serves the "twin goals of removing a potential financial obstacle to a plaintiff's pursuit of a claim on behalf of a class and of equitably distributing the fees and costs of successful litigation among all who gained from the named plaintiff's efforts." *In re Gould Sec. Litig.*, 727 F. Supp. 1201, 1202 (N.D. Ill. 1989) (citation omitted). The common benefit doctrine stems from the premise that those who receive the benefit of a lawsuit without contributing to its costs are "unjustly enriched" at the expense of the successful litigant. *Van Gemert*, 444 U.S. at 478. Courts have also recognized that appropriate fee awards in cases such as this encourage redress for wrongs caused to entire classes of persons and deter future misconduct of a similar nature. *See, e.g., Deposit Guar. Nat'l Bank v. Rope*, 445 U.S. 326, 338-39 (1980). Adequate compensation promotes the availability of counsel for aggrieved persons:

> If the plaintiffs' bar is not adequately compensated for its risk, responsibility, and effort when it is successful, then effective representation for plaintiffs in these cases will disappear . . . .  We as members of the judiciary must be ever watchful to avoid being isolated from the experience of those who are actively engaged in the practice of law.  It is difficult to evaluate the effort it takes to successfully and ethically prosecute a large plaintiffs' class action suit.  It is an experience in which few of us have participated.  The dimensions of the undertaking are awesome.

*Muehler v. Land O'Lakes, Inc.*, 617 F. Supp. 1370, 1375-76 (D. Minn. 1985).

In *Dell*, the controlling authority regarding attorneys' fees in common fund class action cases, the Fifth Circuit indicated it was amenable to the use of the percentage method when calculating attorneys' fees in common fund class action cases.  669 F.3d at 644.  When using the "percentage method . . .[,] the court awards fees as a reasonable percentage of the common fund." *Id.* at 642.  "[D]istrict courts in [the Fifth] Circuit regularly use the percentage method," which "allows for easy computation" and "aligns the interests of class counsel with those of the class members." *Id.* at 643; *see also Bethea v. Sprint Communications Co.*, 2013 WL 228094, *3 (S.D. Miss. Jan. 18, 2013) ("adopt[ing] the percentage-of-the-fund approach" to calculate attorneys' fees in a common fund class action case).

The Court has substantial discretion in determining the appropriate fee percentage.  "No general rule can be articulated on what is a reasonable percentage of a common fund." *Bethea*, 2013 WL 228094 at *3 (quoting *Smith v. Tower Loan of Miss., Inc.*, 216 F.R.D. 338, 369 (S.D. Miss. 2003)).  Nonetheless, awards commonly fall between a lower end of 20% and an upper end of 50%. *Smith,* 216 F.R.D. at 368.  Further, as aforementioned, "it is not unusual for district courts in the Fifth Circuit to award percentages of approximately one third." *Collins v. Sanderson Farms, Inc.*, 568 F. Supp. 2d 714, 729 (E.D. La. 2008) (citation omitted); *also, e.g.*, *Wolfe v. Anchor Drilling Fluids USA Inc.*, 2015 WL 12778393, *3 (S.D. Tex. Dec. 7, 2015) (Hoyt, J.) (awarding 40%); *Frost v. Oil States Energy Services*, 2015 WL 12780763, *2 (S.D.

Tex. Nov. 19, 2015) (one third); *Campton v. Ignite Restaurant Group, Inc.*, 2015 WL 12766537, *3 (S.D. Tex. June 5, 2015) (one third); *Jenkins v. Trustmark Nat'l Bank*, 300 F.R.D. 291, 307 (S.D. Miss. 2014) (one third); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1139-40 (W.D. La. 1997) (36%); *Erica P. John Fund, Inc. v. Halliburton Co.*, 2018 WL 1942227, *12-13 (N.D. Tex. Apr. 25, 2018) (awarding one third and collecting cases awarding one third or more); *Fairway Medical Center, LLC v. McGowan Enterprises, Inc.*, 2018 WL 1479222, *2-3 (E.D. La. Mar. 27, 2018) (one third); *In re Pool Prods. Distribution Mkt. Antitrust Litig.*, 2015 WL 4528880, *23 (E.D. La. July 27, 2015) (one third); *Burford v. Cargill, Inc.*, 2012 WL 5471985, *5 (W.D. La. Nov. 8, 2012) (awarding one third and noting "a review of analogous precedent indicates that an award of one-third of the common fund is reasonable and typical").

That fee awards are typically one third of the class benefit is supported by Mr. Hughes, who has mediated fee agreements in hundreds of common fund cases, and is well-versed in the law.   Declaration of Hunter Hughes ("Hughes Decl.") ¶¶ 10-11 (filed contemporaneously herewith).  According to Mr. Hughes:

> In my experience, more than 90% of the class action common fund settlements I have been affiliated with provided for fees of one third of the class fund.  The remaining common fund cases have on occasion had fee awards as high as 40% of the fund down to approximately 25%.

> The amount of fees that class counsel seek in this matter [] is consistent with results of other class and collective action settlements I have mediated throughout the country, including in the Fifth Circuit.

*Id.*  Here, Class Counsel's fee request of one third of the common fund that was created through their efforts falls within the accepted range.  Zavitsanos Decl. ¶¶ 8, 28.

*Dell* requires district courts to cross check the appropriateness of the percentage through analysis of the twelve *Johnson* factors:  (i) time and labor required; (ii) novelty and difficulty of the relevant questions; (iii) skill required to properly carry out the legal services; (iv) preclusion

of other employment; (v) customary fee; (vi) whether the fee is fixed or contingent; (vii) time limitations imposed by the clients or the circumstances; (viii) results obtained, including the amount recovered for the clients; (ix) experience, reputation, and ability of the attorneys; (x) "undesirability" of the case; (xi) nature and the length of the professional relationship with the clients; and (xii) fee awards in similar cases. *Johnson*, 488 F.2d at 717-19.  As applied here, the *Johnson* factors confirm the reasonableness of the requested fee.  Zavitsanos Decl. ¶¶ 12-13.

    1. <u>Substantial Time and Labor Was Required.</u> Class Counsel spent an enormous amount of time on this case.   Joint Decl. ¶¶ 6-50; Supp. Joint Decl. ¶¶ 17-20; Zavitsanos Decl. ¶ 14.  Their work included extensive pre-suit investigation; communications with clients and other MCPS merchants; finding and interviewing knowledgeable industry personnel and experts and former MCPS insiders; preparing complaints, motions, and responses to opposing motions; researching the potential arbitration issue raised by Defendants; negotiating case management orders and similar documents; researching and drafting voluminous mediation briefs (on issues as varied as the viability of fraud and contract claims in light of the facts as well as explaining exactly how the Rule 23 certification elements could be satisfied); exchanging extensive informal liability and damages discovery and working with experts to analyze hundreds of thousands of lines of data; mediating, negotiating, and drafting the Settlement; preparing the approval papers; working with the Settlement Administrator on the Notice and claims programs; and communicating with the Settlement Class members.  Supp. Joint Decl. ¶¶ 17-19.  Moreover, to see the Settlement through to final conclusion will necessitate many hours of additional work answering questions from Settlement Class members, overseeing cash distributions, ensuring Defendants follow through on making agreed-upon contract and practice changes, etc. *Id.* at ¶ 22.

All told, Class Counsel's coordinated work paid great dividends for the Settlement Class. Each of the above-described efforts was essential to achieving the Settlement before the Court. Supp. Joint Decl. ¶ 21.  The substantial time and labor Class Counsel devoted to prosecuting and settling this Action readily justify the fee that is being requested.  Zavitsanos Decl. ¶ 14 ("Had counsel not devoted such time and effort and demonstrated their ability to 'go the distance,' this case may not have settled at all, let alone on the favorable terms reflected in the settlement").

        2.    <u>The Issues Involved Were Novel and Difficult.</u>  The case involved difficult factual issues.  For example, it is very difficult to identify – let alone establish liability based upon – the overcharge practices that lie at the heart of the Action.  Class Counsel had to decipher a complex industry that defies transparency; comprehend perplexing billing practices; and analyze voluminous documents and data that covered a five year period.  Supp. Joint Decl. ¶ 7.  Moreover, the case presented novel legal issues, such as the enforceability and applicability of the contractual provisions that Defendants included in their form contracts in an attempt to exculpate themselves from overbilling, whether the fraudulent inducement claims presented individual reliance issues that could defeat certification, whether Defendants had sufficient records and information to allow the class members to be ascertained and individual damages calculated, and whether a nationwide contract class comprised of more than 100,000 merchants could be managed and certified.  *Id.* at ¶¶ 8-9.  The uncovering of Defendants' purported overbilling and positioning of this case for class certification and a victory on the merits presented challenges most law firms are simply not able to meet.  Supp. Joint Decl. ¶ 10; Zavitsanos Decl. ¶¶ 15-18.

        3.    <u>Class Counsel Possessed the Necessary Skill to Effectively Litigate the Case.</u>  Litigation of this Action required counsel highly trained in class action law and procedure

as well as counsel familiar with the specialized issues at bar.  Zavitsanos Decl. ¶ 19 (noting that counsel's experience "was likely essential in reaching the result they have achieved here").   As evidenced by their resumes (Dkts. 39-2, 39-3) and their work in litigating the case, Class Counsel possess these attributes.

In evaluating the quality of representation by Class Counsel, the Court should also consider the quality of opposing counsel.  *See Billitteri v. Securities Am.*, Inc., 2011 WL 3585983, *7 (N.D. Tex. Aug. 4, 2011) ("because of the extremely effective work of opposing counsel . . . The skill required here . . . certainly justifies the contemplated award"); *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 970 (E.D. Tex. 2000) (finding the presence of "very skilled [opposing] counsel from two of the largest, if not the two largest, Texas-based law firms" as relevant to a *Johnson* analysis).   Throughout the litigation, Defendants were represented by Behn Dayanim and K. Whitner, two attorneys from Paul Hastings LLP who have considerable experience defending class actions.  They were highly skilled adversaries and their diligent, inventive representation of Defendants makes the Settlement all the more impressive. Supp. Joint Decl. ¶ 23; *see also Schwartz v. TXU Corp.*, 2005 WL 3148350, *30 (N.D. Tex. Nov. 8, 2005) ("The standing of opposing counsel should be weighed in determining the fee, because such standing reflects the challenge faced by plaintiffs' attorneys").   The second and third *Johnson*  factors both support the requested fee.

4.     Class Counsel Were Precluded From Taking on Other Employment.   If Class Counsel had not taken on this case, they would have been able to spend significant time on other matters.  Supp. Joint Decl. ¶ 24.  Although this is true whenever lawyers handle multistate class actions requiring large amounts of time, lead Class Counsel (Webb, Klase & Lemond, LLC) here is a small firm with only four attorneys.  *Id.*  Over the last year, they have turned

16

down multiple cases because of the time and attention that this case required.  *Id.* The fourth *Johnson* factor supports the requested fee.  *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 328 (W.D. Tex. 2007) (finding small size of class counsel's firm and amount of time that was necessary to successfully litigate the case left "no doubt [other] cases were not accepted because of this ongoing litigation, especially cases requiring immediate attention"); *also* Zavitsanos Decl. ¶ 20.

       5.    <u>The Requested Fee Is Customary.</u>  Individual contingency cases in Houston typically call for a fee of 40 to 50 percent of the recovery, with 40 percent being the most common.  Zavitsanos Decl. ¶ 21.  In the class action context, however, the fee is typically only one third.  *Id.*  As a result, the fee requested here is reasonable, customary, and standard in this District.  *Id.*

      Moreover, consistent with this usual practice, Class Counsel and the Class Representatives entered into contingent fee agreements providing for payment of one third to forty percent of any recovery.   Supp. Joint Decl. ¶ 11.   The willingness of the Class Representatives to enter into such agreements provides further evidence the requested award is reasonable.  *Blanchard v. Bergeron*, 489 U.S. 87 (1989) ("The presence of a pre-existing fee agreement may aid in determining reasonableness").  The fifth *Johnson* factor supports the fee.

       6.    <u>This Action Was Prosecuted Entirely on a Contingent Fee Basis.</u>  Because Class Counsel took this case on a contingency fee basis, had they not achieved a recovery, they would have received nothing and, in fact, would have suffered a substantial out-of-pocket loss because they were advancing all the litigation expenses, which easily could have amounted to hundreds of thousands of dollars.   Supp. Joint Decl. ¶ 12; Zavitsanos Decl. ¶ 22. Uncompensated expenditures of such magnitude can severely damage or destroy firms of the

relatively small size of the firms of Class Counsel.  Supp. Joint Decl. ¶ 12.

In "[r]ecognizing the contingent risk of nonpayment in [class action] cases, courts have found that class counsel ought to be compensated . . . for risk of loss or nonpayment assumed by carrying through with the case." *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 859-60 (E.D. La. 2007) (citing *In re Combustion,* 968 F. Supp. at 1132); *see also Billitteri*, 2011 WL 3585983, at *7 (finding the contingency fee arrangement of a class action "particularly relevant" to the *Johnson* analysis "considering the difficulty presented by the facts and legal questions in [such] case[s] and the very real risk of obtaining no recovery at all"); *King v. United SA Fed. Credit Union*, 744 F. Supp. 2d 607, 618 (W.D. Tex. 2010) (finding the fact that "Class counsel undertook [the] case on a contingency fee basis" relevant to the *Johnson* analysis).

Public policy concerns – in particular, ensuring the continued availability of experienced and capable counsel to represent classes of injured plaintiffs holding small individual claims – support the requested fee.  Joint Decl. ¶ 79; Zavitsanos Decl. ¶¶ 23, 29.

> Generally, the contingency retainment must be promoted to assure representation when a person could not otherwise afford the services of a lawyer. . . . A contingency fee arrangement often justifies an increase in the award of attorney's fees.  This rule helps assure that the contingency fee arrangement endures.  If this "bonus" methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing.

*Behrens v. Wometco Enters., Inc*., 118 F.R.D. 534, 546 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990).  A higher fee is necessary to account for this risk.  Zavitsanos Decl. ¶ 23 ("Without the potential of a premium to justify the risk, it would have made no practical sense for class counsel to take on the case").

It was extremely risky for Class Counsel to bring this case.  Supp. Joint Decl. ¶ 10.  Not only is certifying fraudulent inducement claims challenging, but recent decisions have dismissed contract claims brought by merchants that involved one-sided contract language requiring

merchants to dispute fees in a timely manner that is very similar to that contained in Defendants' boilerplate contracts. *E.g.*, *Zam & Zam Super Market, LLC v. Ignite Payments, LLC*, 736 Fed. Appx. 274, 276 (2d. Cir. 2018) (affirming dismissal of breach claim on grounds merchant did not provide timely notice of challenged fees in accordance with contract); *Cobra Tactical, Inc. v. Payment Alliance Int'l Inc.*, 315 F. Supp. 3d 1342, 1350-41 (N.D. Ga. 2018) (same). Even if Plaintiffs could overcome the contract language by alleging they provided timely notice, the question then became whether the Plaintiffs' notices were sufficient for all class members or just themselves. Supp. Joint Decl. ¶ 8. This is an unsettled issue under Texas law. *Id.*

Such dispositive risks cannot be ignored even though the case settled at a relatively early stage. Indeed, risk should be evaluated as of the time Class Counsel filed suit, not in hindsight. *See, e.g.*, *Skelton v. General Motor Corp.*, 860 F.2d 250, 258 (7th Cir. 1988), *cert. denied*, 493 U.S. 810 (1989) ("The point at which plaintiffs settle with defendants . . . is simply not relevant" to evaluating class counsel's risk); *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 112 (3d Cir. 1976). The sixth *Johnson* factor supports the requested fee.

7.   <u>Class Counsel Worked Under Time Pressures.</u>   Defendants produced the 8,000 pages of documents and hundreds of thousands of lines of data that Class Counsel requested to prepare for mediation on June 13, 2018, which left Class Counsel just over a month to digest that information and effectively prepare for the mediation on July 18, 2018. Supp. Joint Decl. ¶ 15. Mr. Webb and Mr. Klase worked tirelessly with co-counsel and Plaintiffs expert Art Olsen during this time period to review, process, organize, and interpret this information so they could be fully prepared for the mediation, even finishing their review early so Defendants could have time to review and process the results in advance. *Id.*; Joint Decl. ¶¶ 38-39. However,

Class Counsel do not contend that this factor justifies either a higher or lower fee as time pressure in cases of this sort is commonplace.

        8.    <u>Class Counsel Achieved an Excellent Settlement.</u>  The amount at issue and the result obtained justify the requested fee.  Class Counsel estimates the $15 million cash Settlement Fund represents approximately 28% of the Settlement Class' most probable recoverable trial damages (Joint Decl. ¶ 62) – a "quite unusual" recovery given the myriad of litigation risks and obstacles.[2]  Zavitsanos Decl. ¶ 25.  That this recovery was achieved less than a year after the case was originally filed is all the more impressive.  If approved, Settlement Class members will receive their payments early next year, as opposed to years down the line (if at all).

      The importance of the equitable relief can also not be overlooked and is extremely valuable to the Settlement Class.  Joint Decl. ¶ 63.  MCPS sales agents can no longer insinuate to prospective merchant customers that they are affiliated with their current payment processor.  Moreover, Settlement Class members are afforded multiple protections if MCPS increases their fees in the future, such as the right to receive advance notice of all increases and the right to terminate penalty-free if the merchant would rather do business elsewhere than bear the increase.  Moreover, if a busy merchant forgets to review its statement for a few months and then notices and informs Defendants of an improper charge, it will now have preserved its right to dispute that charge, whereas currently Defendants would have argued that fee increases must be challenged within 30 days.

---

[2] That the entire fund may not be claimed does not impact the fee analysis.  Fees are based on the total amount available to the class rather than the amounts claimed.  *See, e.g.*, *Van Gemert*, 444 U.S. at 480 (class members' "right to share the harvest of the lawsuit, whether or not they exercise it, is a benefit of the fund created by the efforts of . . . class counsel"); *Poertner v. Gillette Co.*, 618 Fed. Appx. 624, 628-29 and n.2 (11th Cir. 2015); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437-38 (2d Cir. 2007); *Williams v. MGM-Pathe Communications Co.*, 129 F.3d 1026 (9th Cir. 1997) (holding a court abused its discretion by calculating fees based upon actual claims); *Pinto v. Princess Cruise Lines*, 513 F. Supp. 2d 1334, 1339 (S.D. Fla. 2007) ("the percentage applies to the total fund created, even where the actual payment following the claims process is lower").

Settlement ¶ 41; Joint Decl. ¶¶ 64-65.  When the impact of this relief is combined with the

$15 million Settlement Fund, it is clear the Settlement is truly an "admirable" result for the

Settlement Class.  Zavitsanos Decl. ¶ 25; Joint Decl. ¶¶ 66-67.

   9. <u>Class Counsel Are Highly Experienced and Are Well Respected.</u>  Webb,

Klase & Lemond have been litigating class action cases for well over a decade and have been

appointed lead counsel, settlement class counsel, and to leadership positions in many prior class

cases.  Joint Decl. ¶¶ 2-3; Firm Résumé (Exh. A to Joint Decl.).  Their efforts have been lauded

by prior courts.  *E.g.*, *Jenkins*, 300 F.R.D. at 308 (finding counsel's training and participation

"added immense value to the representation of this large Settlement Class").  Meade & Neese,

meanwhile, also have excellent reputations in the Houston market for being diligent advocates

for their clients and a deep understanding of Texas law.  Zavitsanos Decl. ¶ 19; Firm Résumé

(Exh. B to Joint Decl.).  Class Counsel's knowledge and experience "was likely essential in

reaching the result they have achieved here."  Zavitsanos Decl. ¶ 19.  This factor thus supports

the requested fee.

   10. <u>The Case Qualifies as "Undesirable."</u>  The "risk of non-recovery" and

"undertaking expensive litigation against . . . well-financed corporate defendants on a contingent

fee" has been held to make a case undesirable, warranting a higher fee.  *Braud v. Transport Serv.

Co.*, 2010 WL 3283398, *13 (E.D. La. Aug. 17, 2010).  Here, all such criteria are present.

Moreover, it is believed that this is the first case brought against Defendants for the practices at

issue here, despite the fact that merchant websites have for years included numerous complaints

about such practices.  Supp. Joint Decl. ¶ 10.  That no prior counsel endeavored to take on the

case and challenge Defendants suggests the case was an undesirable one.  Zavitsanos Decl. ¶ 26

("This case was undesirable not because it was controversial but because of the number of

significant legal risks it contained").

11.    <u>Class Counsel Had No Prior Relationships with the Plaintiffs.</u>    Class Counsel did not have a prior relationship with the Plaintiffs.  "This lack of an existing relationship with any of the clients heightened the risks since class counsel did not know their clients prior to this case.  The lack of an existing relationship also made it unlikely that any other benefit would result from the representation."  Zavitsanos Decl. ¶ 27.  This factor thus also supports the requested fee.

12.    <u>The Requested Fee Comports with Awards in Similar Cases.</u>    The fee sought here matches the fee typically awarded in similar cases.  *E.g.*, pp. 12-13, *supra* (collecting cases); Zavitsanos Decl. ¶ 28 (collecting cases); Hughes Decl. ¶ 11.  Legions of decisions have found that a one third recovery in common fund class action cases is appropriate.  *Shaw*, 91 F. Supp. 2d at 972 ("Empirical studies show that . . . fee awards in class actions average around one-third of the recovery"); *also, e.g.*, *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403 (S.D. Tex. 1999) (35.1 percent)); *Gaskill v. Gordon*, 942 F. Supp. 382, 387-88 (N.D. Ill. 1996) (finding that 33 percent is the norm, and awarding 38 percent of settlement fund), *aff'd*, 160 F.3d 361 (7th Cir. 1998); *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320, 326 (E.D.N.Y. 1993) (33.8 percent); *In re Ampicillin Antitrust Litig.*, 526 F. Supp. 494, 498 (D.D.C. 1981) (45 percent); *Beech Cinema, Inc. v. Twentieth-Century Fox Film Corp.*, 480 F. Supp. 1195, 1199 (S.D.N.Y. 1979) (approximately 53 percent), *aff'd*, 622 F.2d 1106 (2d Cir. 1980).

13.    <u>The Court Should Honor the Parties' Agreement.</u>    The fee requested by Class Counsel is clearly supported by the *Johnson* factors.  Moreover, the Parties' agreement should be given deference because it resulted from adversarial negotiations *after* the terms of the Settlement were decided.  Hughes Decl. ¶ 9; Joint Decl. ¶ 49; *also Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001).  As one court explained:

> The Court finds that the fee and expense negotiations were conducted at arm's length, only after the parties had reached agreement on all terms of the Settlement. There is no evidence in this case that the Settlement, or the fee and expense agreement, was in any way collusive. Under these circumstances, the Court gives great weight to the negotiated fee in considering the fee and expense request.
>
> Such agreements between plaintiffs and defendants in class actions are encouraged, particularly where the attorneys' fees are negotiated separately and only after all terms of the settlement have been agreed to between the parties. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (noting that negotiated, agreed upon attorneys' fees are the "ideal" toward which the parties should strive and stating that "[i]deally, of course, litigants will settle the amount of a fee").

*Manners v. Am. Gen. Life Ins. Co.*, 1999 WL 33581944, *28 (M.D. Tenn. Aug. 11, 1999) (some internal citations omitted); *see also, e.g., Johnson*, 448 F.2d at 720 ("In cases of this kind, we encourage counsel on both sides to utilize their best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorney's fees.")

Many reasons support deferring to the Parties' agreement. There is no one "reasonable fee" mandated by applicable law, but as long as the requested fee is one that the Court agrees is within the range of what is reasonable, it should be approved. The agreement reflects the realities of the marketplace as the competing pressures and motives that drove the parties' positions ensured the fee was reasonable. And, if courts routinely reduce fees agreed upon by the parties, the inevitable result will be to make fee negotiations more difficult and discourage qualified attorneys from taking risky and expensive class actions such as this case.

**B.     The Expense Request Is Appropriate.** Class Counsel also request reimbursement for a total of **$27,340.50** in litigation expenses – much less than the $75,000 amount authorized by the Settlement Agreement. Settlement ¶ 73; Supp. Joint Decl. ¶ 30; *Mills v. Electric Auto-Lite Co*., 396 U.S. 375, 391-92 (1970). The requested sum corresponds to specific out-of-pocket expenses incurred while prosecuting and settling the Action and includes expert witness fees, mediator fees, travel costs, and necessary administrative expenses (i.e., filing

and service fees, PACER charges, copies, postage, delivery fees, etc.).  Supp. Joint Decl. ¶ 30.
All such expenses were reasonably and necessarily incurred in furtherance of this Action.  *Id.*
The expense request is reasonable and should be approved.

      **C.**    <u>**Service Awards Are Warranted for the Class Representatives.**</u>  Pursuant to
the Settlement, Class Counsel request, and Defendants do not oppose, Service Awards of
$10,000 for each of the eight Class Representatives.  Settlement ¶ 75; Supp. Joint Decl. ¶ 31.

      Service awards "compensate named plaintiffs for the services they provided and the risks
they incurred during the course of the class action litigation."  *Altier v. Worley Catastrophe
Response, LLC*, 2012 WL 161824, *15 (E.D. La. Jan. 18, 2012) (quoting *Sullivan v. DB Inv.,
Inc.*, 667 F.3d 273, 333 n.65 (3rd Cir. 2011)).  "It is not unusual for a court to make an 'incentive
award' to named plaintiffs because of their sacrifices in pursuit of litigation on behalf of the
class."  *Cook v. Howard*, 2013 WL 943664, *3 n.4 (S.D. Miss. Mar. 11, 2013) (quoting *In re
Catfish Antitrust Litig.*, 939 F. Supp. 493, 503-04 (N.D. Miss. 1996)).  Courts have consistently
found service awards to be an efficient and productive way to encourage members of a class to
become class representatives.  *See, e.g., In re Catfish Antitrust Litig.*, 939 F. Supp. at 504
("approving incentive awards of $10,000 to each of the four named plaintiffs"); *Shaw,* 91 F.
Supp. 2d at 973 ("approving incentive awards of $25,000 to each of two named plaintiffs");
*Spicer v. Chicago Bd. Options Exchange, Inc*., 844 F. Supp. 1226, 1267-68 (N.D. Ill. 1993)
(collecting cases approving service awards ranging from $5,000 to $100,000, and awarding
$10,000 to each named plaintiff).

      The actions of the Class Representatives demonstrate the reasonableness of the requested
Service Awards.  Supp. Joint Decl. ¶ 31.  Indeed, not only did the Representatives devote
substantial time to this litigation (such as by contacting Class Counsel, submitting to interviews,

24

forwarding relevant documents, participating in conferences and keeping themselves abreast of the proceedings), they exposed themselves to substantial risk that they could have been held liable for the defense legal fees and expenses, regardless of the outcome, if provisions in their merchant agreements were enforced.  But for the Class Representatives' service and willingness to bear this risk, other Settlement Class members would have received nothing.  *Id.*

## <u>CONCLUSION</u>

The requests for a one third fee from the $15 million common fund, $27,340.50 in litigation expenses, and Service Awards of $10,000 to each Class Representative are reasonable under the circumstances and should be approved.

DATED this 19th day of December, 2018.

Respectfully submitted,

WEBB, KLASE & LEMOND, LLC

By:     */s/ E. Adam Webb*
E. Adam Webb
Georgia Bar No. 743910
Adam@WebbLLC.com
Matthew C. Klase
Georgia Bar No. 141903
Matt@WebbLLC.com
1900 The Exchange, S.E.
Suite 480
Atlanta, GA 30339
Telephone: (770) 444-0773

*Attorneys-in-Charge for Plaintiffs*
*and the Settlement Class*

MEADE & NEESE LLP
Andrew K. Meade
Texas Bar No. 24032854
ameade@meadeneese.com
D. John Neese, Jr.
Texas Bar No. 24002678
jneese@meadeneese.com
Leann Pinkerton
Texas Bar No. 24038826
lpinkerton@meadeneese.com
2118 Smith Street
Houston, TX 77002
Telephone: (713) 355-1200

*Local Counsel for Plaintiffs*
*and the Settlement Class*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 19, 2018, a copy of the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel who have registered with the Court.

*/s/ E. Adam Webb*
E. Adam Webb